UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
CHRISTOPHER PAGAN,

                Petitioner,

    -against-

WILLIAM BROWN, Superintendent,

                Respondent.

---------------------------------------------------------------X

**DECLARATION**

CV-07-453(JS)

ALAN M. NELSON declares under penalty of perjury, pursuant to 28 U.S.C. 1746, as follows:

The following facts derive from the state-court records, the district court records, and from speaking to petitioner Christopher Pagan:

## PROCEDURAL BACKGROUND

CHRISTOPHER PAGAN filed this pro se habeas corpus petition pursuant to 28 U.S.C. 2254 following final denial of the appeal of his conviction after jury trial of Criminal Possession of a Weapon in the Second Degree a violation of New York P.L. 265.03, and sentenced to an indeterminate term of 22 years to life incarceration. He is presently incarcerated at the Eastern Correctional Facility. Following appeal the conviction was affirmed. See People v. Pagan, 23 A.D. 3d 412(2nd Dept., 2005), leave denied, 6 NY 3d 779, 811 N.Y.S. 2nd 346 (2006).

In his petition Pagan alleges seven constitutional errors that occurred during the course of his trial and the prior denial of his Pre-Trial motion to suppress physical evidence and his statement. First, Petitioner contends that the Court erred in denying his motion to suppress the fruits of the search of vehicle resulting in the recovery of a firearm, mask, wig and wool hat

contending that such search was conducted in violation of his Fourth Amendment rights.

Second, Petitioner alleges that his Fifth Amendment right to remain silent was violated by the introduction of evidence before the jury of his assertion of his right to remain silent at the time of his initial arrest and interrogation.

Third, Petitioner contends that the introduction into evidence of a statement made subsequent to his initial refusal to answer questions violated his Fifth Amendment right to remain silent.

Fourth, Petitioner asserts that the evidence presented was insufficient as a matter of law to sustain the verdict beyond a reasonable doubt. More particularly Petitioner asserts that there was insufficient or legally incompetent evidence introduced at trial to prove beyond a reasonable doubt two elements of the offense of Criminal Use of Firearm, Penal Law section 265.03; to wit: (1) the weapon was loaded; and (2) Petitioner intended to use the firearm against another.

Finally, Petitioner contends that he was denied his Sixth Amendment right to retain counsel of his choice as a consequence of the Court's denial of his application for a one day adjournment for the purpose of having retained counsel appear and represent him at trial.

Respondent filed a Memorandum of Law in Opposition to the Petition dated March 19, 2007. Thereafter Petitioner requested that the court appoint counsel pursuant to the Criminal Justice Act to assist him in replying to Respondent's memorandum. Counsel was appointed by Order of the Honorable Joanna Seybert to assist Petitioner in replying in April 2007.

By the annexed memorandum counsel refines some of Petitioner's claims and presents additional basis for relief.

More specifically on behalf of the Petitioner the following claims, each of which have been both preserved and exhausted are advanced:

*I. Petitioner was denied his Sixth Amendment Right to Retained Counsel of Choice.*

Petitioner submits, as more fully discussed in his Memorandum of Law, that his Sixth Amendment right to retain counsel of his choice was violated when the trial court refused to adjourn the trial one day for retained counsel to appear was significantly impacted by the intervening Supreme Court decision in <u>United States v. Gonzalez-Lopez</u>, 548 U.S. 140 (2006).

*II. Petitioner alleges that his Fifth Amendment right to remain silent was violated by the introduction of evidence before the jury of his assertion of his right to remain silent at the time of his initial arrest and interrogation.*

*III. Petitioner contends that the introduction into evidence of a statement made subsequent to his initial refusal to answer questions violated his Fifth Amendment right to remain silent.*

*IV. Petitioner asserts that the evidence presented was insufficient as a matter of law to sustain the verdict beyond a reasonable doubt.*

More particularly Petitioner asserts that there was insufficient or legally incompetent evidence introduced at trial to prove beyond a reasonable doubt that the firearm was a "loaded", an element of the offense for which he was charged, Criminal Use of a Firearm in the Second Degree, Penal Law section 265.03. Petitioner submits that his claim that there was legally insufficient evidence to prove that the firearm was loaded was significantly affected by the intervening Supreme Court decision of <u>Crawford v. Washington</u>, 541 U.S. 36 (2004). It is submitted that the evidence concerning the contention that the firearm was loaded was introduced in violation of Petitioner's Sixth Amendment right to confrontation as defined y <u>Crawford v. Washington</u>, 541 U.S. supra.

*V. Petitioner contends that the court erred in denying his motion to suppress the fruits of the search of vehicle resulting in the recovery of a firearm, mask, wig and wool hat contending that such search was conducted in violation of his Fourth amendment rights.*

# FACTUAL BACKGROUND

On the morning of September 17, 1998 at approximately 2:10A.M. Christopher Pagan was observed by New York State Troopers Michael Mawn and Jared Schwarz committing various traffic violations while operating a motor vehicle on the Southern State Parkway.

Petitioner's vehicle was stopped and he was asked to move to the rear of the car. A warrantless search of the vehicle was commenced based upon the officer's observation of a stocking in the front passenger seat allegedly in plain view by th aid of a flash light. The continued search of items piled under the stocking led to the discovery of a .32 caliber pistol. Petitioner was then handcuffed and placed in the back seat of the police vehicle. He was not told the reason for his arrest. Following the administration of Miranda warnings Petitioner either remained silent or replied "No" when asked if he wished to make a statement. (cf. Trooper Mawn testimony H. 98 and T. 146-147). Trooper Mawn then recovered the items from the vehicle, and transported Petitioner to the Trooper's Barracks.

Although Petitioner had already invoked his right to remain silent upon arrival at the Trooper Barracks Pagan was transferred to the custody of New York State Police Investigator Daniel Regini who re-*Mirandized* Petitioner. Investigator Regini acquired an initial statement and then re-interviewed Petitioner over the course of the next 8 hours during which it is alleged Pagan made inculpatory oral admissions which he refused to reduce to writing .

Following arrival at the Barracks Trooper Mawn surrendered custody of the firearm, a .32 Cal. automatic pistol, to Sergeant Hubbard. Hubbard secured and unloaded the weapon, presumably removing the magazine and then the one bullet which was allegedly recovered from the clip. There was no testimony presented concerning chain of custody, vouchering of the firearm. magazine or clip. Significantly, the initials upon each item are "JDG", which match

neither Hubbard nor any of the testifying witnesses although it appears that the initials are those of the later assigned investigator Daniel J. Regini. (Exhibit "A" Ballistics Notes). Significantly Regini provided no trial testimony concerning the issue of whether the firearm was loaded and these was no testimony to indicate he was present when Sergeant Hubbard secured the weapon.

On March 9, 1999 a combined hearing concerning both the suppression of physical evidence and statements was conducted before the Honorable Louis J. Ohlig. In a decision dated April 8, 1999 the Court denied Petitioner's motions to suppress in all regards. (See Exhibit"B" Decision Motion to Suppress). On that date the Court scheduled trial to commence on April 14, 1999.

Immediately following denial of the motions and consultation with his counsel John Bray, who was appointed to represent him pursuant to County Law Article 18b, Petitioner met with and discussed with his family the retention of private counsel to represent him for trial. This decision was conveyed to Mr. Bray on April 13, 1999. (See Affirmation George M Hamel, Esq., in Support of Petitioner's Motion pursuant to CPL 440.10 dated September 25, 2004, at page 10.).

The next day, April 14, 1999, less than one week after the Court's denial of his motions to suppress Petitioner made an application to the trial court to adjourn the case for one day so that he and his wife could get the finances their families and friends had finally agreed to assist them with in order to represent him at trial the following day. (See Exhibit "C" Hamel Affid. p.11). The trial court denied that application. (T.4-16).

Petitioner was convicted following trial of Criminal Possession of a Weapon in violation of New York Penal Law Section 265.03(2). He remains incarcerated following his sentence as a persistent felony offended to serve a term of 22 ½ years to life imprisonment.

# THE HEARING

At the suppression hearing conducted on March 9, 1999 before the Honorable Louis J. Ohig testimony was heard from Trooper Michael Mawn and State Investigator Daniel J. Regini. Trooper Mawn testified that during the early morning hours of September 17, 1998, he was working the 11:00 A.M. to 7:00 A.M. shift with his partner Trooper Jared Schwarz. (H13).

At approximately 2:10 A.M. the Petitioner was observed by Trooper Mawn in the process of an unauthorized U-turn crossing the center median divider of the Southern State Parkway. The front headlights of his vehicle were allegedly not on. (H13).

Trooper Mawn further alleged that a shiny buckle was clearly visible from the seat belt and the Petitioner's vehicle was swerving. (H17). Based on the foregoing, the Troopers engaged the emergency lighting and initiated a traffic stop for the purpose of citing Petitioner for traffic infractions. (H18-19). At this time it is alleged that Petitioner's vehicle began to swerve across the broken line separating the right and center lanes and that he was making furtive movements in the vehicle towards the front passenger seat.(H20). Trooper Mawn testified that Pagan extricating himself from the well of the driver's bucket seat, climbed over the console and exited the vehicle from the passenger side. (H24).

In response to inquiry Petitioner stated he had no driver's license and he was then asked to step to the rear of the vehicle (H26-27). Trooper Mawn stated that at this point he believed he was dealing with a stolen vehicle and proceeded to check the windshield stickers and the ignition switch of Pagan's Volkswagen Jetta through use of his flashlight from outside of the driver side window. (H30). Observing the ignition switch intact the trooper ascertained that vehicle was not stolen. During this inspection of the ignition switch through use of the flashlight Mawn stated he observed a neatly folded black stocking with eye-holes cut into it on top of a pile of other folded

clothing on the right side of the passenger seat. (H34-35). The trooper testified that he was not able to discern the other items on the seat even with the light of his flashlight. (H41). Because he believed that Pagan might have "stashed something" in the vehicle the trooper then entered the car and conducted a warrantless search of the pile of clothing and eventually discovered a knit wool cap containing a .32 caliber pistol. (H34).

Without informing Pagan of this discovery the trooper handcuffed Petitioner and seated him in the rear of the police vehicle. (H52-55). Mawn testified that despite his recovery of the firearm it was his belief that he was placing Pagan under arrest for having no license and for an uninspected vehicle. (H54). He did not inform Pagan a weapon was recovered and did not advise him he was under arrest for the possession of a firearm (H88). Although the weapon remained encased in the wool cap in which it was originally found Mawn testified that Petitioner uttered "Oh fuck" when the trooper entered the police vehicle and placed the wool cap between his legs. (H141).

Trooper Mawn then administered *Miranda* warnings and waivers from a card. When asked the last question, "Having these rights in mind do you wish to talk to us now?", petitioner remained silent. (H98).

Petitioner was transferred to the Trooper Barracks and met with Investigator Daniel Regini. Regini was not informed that Mawn had already administered Pagan his *Miranda* warnings. Nor was he informed that in response to the inquiry that he had invoked his Fifth Amendment right by his silence. Regini testified that he administered Miranda warning to petitioner later that evening and that approximately three hours later Pagan made certain incriminatory statements regarding the gun. Amongst those statements was an alleged assertion that Pagan was returning the gun to Queens to its owner so he could obtain a better gun to do

jobs with. Pagan refused to reduce his statement to writing. (H.190-215).

## HEARING DECISION

The hearing court denied suppression. In so doing the Court first rejected the People's argument that Trooper Mawn's search of the vehicle was lawful because it was based on reasonable suspicion to believe that Pagan was armed or the Trooper's fear for his safety.

Rather the Court *sua sponte* determined that Trooper Mawn's observations of a black knit mask with eye holes cut out on the front seat of the vehicle combined with Pagan's furtive actions of lunging to the right prior to being stopped and exiting from the right passenger door taken together provided probable cause to believe the car contained evidence of a crime. (See Exhibit "B" Decision April 8, 1999).

In denying petitioner's motion to suppress the statements the trial court held that his initial utterance of the words "Oh fuck" were spontaneous and not the subject of custodial interrogation. Accordingly the administration of *Miranda* warnings were not required. With respect to the oral statements Petitioner made later that evening following the administration of *Miranda* warnings by Investigator Regini the trial court found that the uncontroverted evidence established that prior to any questioning that Pagan was fully ad adequately apprized of each of his constitutional rights and that he had knowingly, voluntarily and intelligently waived those rights. (See Exhibit "B" Decision April 8, 1999, p.2).

As discussed more fully herein in so holding the trial Court's decision was both "contrary to" and involved an "unreasonable application of" clearly established Federal Law in two material respects.

Most significantly, the trial court in denying the suppression of his statement to Investigator Regini completely ignored the uncontroverted evidence that petitioner had invoked

his Fifth Amendment right to remain silent prior to questioning by Regini. Trooper Mawn had testified he advised Pagan of his rights at the time of his arrest. He further testified that when asked the last question, "Having these rights in mind do you wish to talk to us now?", petitioner remained silent.(H98). Moreover at trial and prior to the presentation of any testimony concerning Pagan's later statement to Regini Mawn testified that in response to the last Miranda inquiry petitioner, rather than remaining silent had specifically stated "No" (T146-147).

It is black letter and clearly established Federal Law that upon a suspect invoking his right to remain silent the police must cease all questioning. Once a suspect invokes his Miranda rights police may not reinstate interrogation unless counsel is present. Minnick v. Mississippi, 498 U.S. 146, 153 (1990). Any questioning following a suspects having responded "no" to police inquiry of whether he wishes to answer questions violates *Miranda*. United States v. Rambo, 365 F.3d 905, 910-11 (10th Cir. 2004).

In ignoring this uncontroverted testimony and denying the suppression of petitioner's subsequent statements to Investigator Regini the hearing court's decision was both "contrary to" and involved an "unreasonable application of" clearly established Federal Law.

In addition, the court's finding that the police had probable cause under the circumstances to believe that the car contained evidence of a crime was likewise an "unreasonable application of" clearly established Federal Law.

### THE TRIAL

At trial Trooper Mawn testified substantially the same concerning the initial observation, stop, and search of petitioner's vehicle. He testified that on September 17, 1999 at approximately 2:15 A.M. he and his partner Trooper Schwarz were driving a marked Chevy Suburban type vehicle traveling eastbound on the Southern State Parkway when they observed a

Volkswagen Jetta making an illegal U-turn traveling westbound crossing the grass median in an effort to go eastbound. (T121-124). They activated their police lights and proceeded to stop the vehicle with the intention of giving traffic tickets for an illegal U-turn, no lights, and possibly no seatbelt. (T125,126).

The Trooper approached the driver's side and his partner the passenger's side. (T129). The operator had jumped over the console and exited the vehicle from the passenger side near where Trooper Schwarz was standing. (T129). Following inquiry Pagan indicated he was having car trouble and had no paperwork or identification. Mawn then used artificial light by shining his flashlight into the vehicle on the driver's side. (T133). His intent in doing so was to check the ignition and registration certification on the windshield to determine if the vehicle was stolen. (T133). While utilizing the light of his flashlight and determining that the ignition was not popped Mawn observed a black knit cap with eye holes on the passenger seat on top of some other items one of which appeared to be a wig or fake facial hair. The officer claimed he was 3 feet away and that his flashlight was so bright it lit up the whole front seat area. (T134).

Upon seeing these items Mawn entered the car through the passenger side and picked up the stocking because it looked like it could be used for robberies. (T136). The Trooper then felt through the items on the passenger seat and felt what he believed was a weapon. (T136). He then recovered a pistol that was in a black knit cap under the stocking mask. (T137). At the time of this seizure Trooper Schwarz and petitioner were talking at the rear of the vehicle and did not see Mawn's seizure of the items from the front seat. Mawn went to Pagan advising him that he was gong to place him in handcuffs. He did not tell him about the gun's recovery. (T.138). It appeared that Schwarz was very surprised about the cuffing of Pagan at which time Mawn mouthed the word "gun" to him (T139-140). He then entered the patrol car keeping the gun in

his lap as Schwarz placed petitioner in the rear.

As petitioner was being placed in the rear of the vehicle Mawn testified Pagan said "Oh fuck".(T141). Once petitioner was placed in the vehicle Mawn administered *Miranda* warnings to Pagan.

In describing how he administered those warnings to petitioner the following occurred

| | |
|---|---|
| THE COURT: | "Can you be more specific, what the terminology means? |
| MR. RAFFERTY: | " Judge, perhaps we can approach? Can we approach? |

"The following proceedings were held at sidebar, on the record, out of the hearing of the jury"

| | |
|---|---|
| MR RAFFERTY: | " The reason why I wanted to move on is if this trooper clarifies that the defendant invokes his rights to silence , I would rather not-I can't listen to that kind of testimony. That is why at this point it would be better if I just moved, and because he invokes his rights to silence, at this point the defendant doesn't say anything in response, the jury can draw a negative inference and I'm not entitled to say anything about the defendant invocation of his rights to silence" |
| THE COURT: | "You said you mirandized him, counsel wants to know what the word means? |
| MR. BRAY: | "The jury doesn't know what the word means." |
| MR. RAFFERTY: | "Judge, my concern is the trooper, without responding said I read him his Miranda rights and he stayed silent at this point." |
| MR. BRAY: | "That's all right." |
| MR. RAFFERTY: | " We cannot elicit the fact that he remained silent on A direct case, that's-." |
| MR. BRAY: | " We already elicited the fact that he read a Miranda. he doesn't have to say what he did, he can just say |

|               | he read his Miranda warnings which means A, B., C. But mirandized-." |
|---------------|---|
| MR. RAFFERTY: | "For safety I would like the opportunity at least to explain to the witness." |
| THE COURT:    | "Just hold on. You have him under arrest, you have him in the car, you Mirandized him, you gotta tell the jury what he said to him. If he makes any spontaneous statement after that -." |
| MR. RAFFERTY: | "What I'm saying is this judge: To be safe, it would be better if we excuse the jury, all I'm asking you to do is to explain Miranda because he can just blurt out and he invokes his right to silence at this point and we have a mistrial." |
| MR BRAY:      | *"If he invoked his right to silence at that point then that's something different than what he testified to at the hearing, and nothing he said after that can be used as evidence against him."* |

(Emphasis supplied)

| MR. RAFFERTY: | "What I'm saying is if he says - even if he says he didn't say anything responsive, what he said at the hearing was he didn't say anything in response." |
|---|---|
| THE COURT: | You gotta - if you mirandize, and so forth, if he asks him any question. If he allows questions to be asked if he makes anything spontaneous, that's something else. You gotta tell tem what he means by mirandized." |

"(The following proceedings were then had in open court with the jury present.)"

| THE COURT:   | "All right, Trooper Mawn, you testified you used the words, terminology, you took him into custody you arrested him and put him in handcuffs; you used another word mirandized him. Will you tell the jury what you did when you mirandized him. What was that?" |
|--------------|---|
| THE WITNESS: | "I read him his rights." |

| THE COURT: | "You want to pick that up?" |

Question: (unclear by whom)
"What rights did you read."

| THE WITNESS: | "I read him his rights, the basic rights, "You have the right to remain silent...," Read them off the card we carry in our wallet, which is standard police procedure every time you make an arrest." |
| MR. BRAY: | "Objection to standard police procedure, It's irrelevant." |
| THE COURT: | "tell me what you did concerning this arrest, with this defendant." |
| THE WITNESS: | "I read him his rights. I told him he has right to remain silent. I told him that anything he said could be used against him in a Court of Law. I told him if he had to got to trial over this matter, if he couldn't afford an attorney that an attorney would be provided for him by the court. And I asked him him if he understood these rights, he indicated he did *and I asked him if there was anything he wanted to say to us at this time and he said "no."* |

(Emphasis supplied).

(T. 143-147).

Defense counsel immediately objected at requested a mistrial (T.147). At sidebar counsel in citing grounds for a mistrial stated:

| MR. BRAY: | "Judge on the grounds that during the hearing this Trooper testified that he gave him his Miranda warnings and elicited certain responses from the defendant. Now he's saying when he first gave him his Miranda warnings he invoked his right to silence, he chose not to say anything... |
| | he actually said he didn't want to say anything after he received his Miranda warnings, and now we have the whole hearing and the court's decision based on the fact that this Trooper asked him |

|              |                                                                                                                                                                                                                                                                                                                                    |
| ------------ | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|              | questions after Miranda, he got responses; not that he said "I don't want anything, because that's the end of it . That should stop right there."                                                                                                                                                                                |
| THE COURT:   | "I don't know if he made any spontaneous-"                                                                                                                                                                                                                                                                                       |
| MR. BRAY:    | "Well spontaneous has to be after Miranda. There is no spontaneous."                                                                                                                                                                                                                                                             |
| THE COURT:   | "Yes there is. He can make spontaneous outcries or make a response or make a statement without being questioned. He does so at his own peril. So, we are up to the part where I don't know what's coming next. There hasn't been any further questions by the police officer. I'm gonna deny your application at this juncture for a mistrial." |

(T147-148).

Trooper Mawn continued his testimony stating that upon arrival at the Barracks he gave the gun to his supervisor Sergeant Hubbard who proceeded to safeguard and unload the firearm. (T150). It is unclear whether the unloading of the weapon was actually observed by Trooper Mawn. Indeed, upon inquiry by the Court Trooper Mawn testified:

> " I learned later at the station when it's unloaded by my Sergeant that one bullet was in the clip."

(T.173).

At a later time Investigator Regini, who was not present when the firearm was given to the Sergeant, secured the firearm, magazine and one bullet as evidence. (T151). Over defense objection and subject to connection upon the proffered subsequent testimony of Investigator Regini the gun was introduced into evidence as Exhibit 7. (T. 162). Significantly, although a ballistics expert Charles Hopkins from the Suffolk County Crime Laboratory later testified to the operability of the firearm and a single bullet provided to him, neither the bullet nor the magazine were ever introduced as evidence. (T153, 225-226).

Thereafter at sidebar the issue of whether sufficient evidence concerning whether the weapon was loaded was discussed.

> MR. BRAY: "He said someone else told him."
>
> MR RAFFERTY: "He testified he and the sergeant, he then unloaded the gun, it was at that point he learned the gun was loaded."
>
> THE COURT: "Your objection is on the record."
>
> (T233).

Trooper Schwarz was next called as a witness and his testimony essentially mirrored that of his partner Mawn.

Investigator Regini testified that upon his arrival at the Barracks he was given the evidence by Trooper Mawn. (T271). He testified that he administered *Miranda* warnings to the petitioner and following Pagan acknowledging his rights he commenced his interrogation. (T276-277). Regini testified that during this questioning petitioner provided an inculpatory statement that he had been hanging around at a local gas station with some friends, they were apparently planning to rip off some drug dealers and that he talked his friends out of doing so, taking the gun from them with the intent of returning it to the supposed owner. Petitioner further stated that the gun was supposed to go to the owner in Queens, New York for the specific purpose of getting a better gun to do jobs with. (T278-279).

On cross-examination Regini acknowledged that he was informed by Trooper Mawn that Pagan had previously been advised of his Miranda warnings by him. He further stated that Mawn told him that it was okay for Regini to speak with petitioner. (T282).

Significantly when specifically asked Regini testified that Mawn at no time informed him that following the initial administration of *Miranda* warnings by Mawn that Petitioner had

maintained his silence. (T.282, 287). Rather, Regini testified that after asking Mawn if he was okay to be spoken to, Mawn replied in the affirmative. (T282). Regini testified that he questioned petitioner concerning the firearm twice over the course of an eight hour period of time (T286).

The People and defense rested following the conclusion of Regini's testimony. Following the denial of petitioner's motion to dismiss for lack of a prima facie case a request was made for the Court to submit the leaser included offense of possession of an unloaded firearm, Criminal Possession of a Weapon in the Fourth Degree. That request was denied by the Court (T296).

Following deliberation petitioner was found guilty. He was thereafter sentenced as a mandatory persistent felony offender and sentenced to 22 ½ years-life incarceration.

On September 2, 2004 Petitioner filed a motion pursuant to CPL 440.10(f) and (h) requesting that the Court issue an Order vacating his judgment and conviction. Amongst other reasons[1] Petitioner principally argued that in denying him a one day continuance of the trial on April 14, 1999 to have retained counsel appear to represent Pagan at trial the following day he was denied his Sixth Amendment right to counsel of his choice. (Exhibit "C" p.11).

In a decision dated December 7, 2007 the trial Court denied Petitioner's motion. In so doing the Court focused entirely upon Petitioner's claim of ineffectiveness of trial counsel and completely ignored Pagan's claim that he was denied his Sixth amendment right to retained counsel of choice as a consequence of the Court's denying him a one day continuance to have such counsel appear. The court's only comment on this claim being "the court has considered

---

[1] In addition Petitioner alleged that trial counsel was ineffective, failed to provide meaningful representation and as a consequence he was prejudice and denied a fail trial with the context of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

the balance of defendant's arguments raised in his motion and has determined them to be without merit".

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Lake Success, New York
June 10, 2008

_____
ALAN M. NELSON

Alan M. Nelson, Esq. (AMN 3891)
3000 Marcus Avenue, Suite 1E5
Lake Success, New York 11042
(516)328-6200

Attorney for Petitioner CHRISTOPHER PAGAN
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**CHRISTOPHER PAGAN,**

          **Petitioner,**

   -against-

**WILLIAM BROWN, Superintendent,**

          **Respondent.**

-------------------------------------------------------------X

**CERTIFICATE OF SERVICE**

CV-07-453(JS)

STATE OF NEW YORK )
                         )
COUNTY OF NASSAU )

     I, ALAN M. NELSON, an attorney duly admitted to practice before the courts of the State of New York, hereby certify that on the 11th of June, 2008 I caused the foregoing Declaration and Memorandum of Law in the above referenced matter to be served upon by causing a true copy thereof to be served by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed to the following person at the address set forth after the name and electronically filed with he Clerk of Court of the Eastern District of New York:

CLERK, UNITED STATES DISTRICT COURT (ECF)
100 Federal Plaza
Central Islip, New York 11722-4438

Honorable Joanna Seybert
United States District Judge
100 Federal Plaza
Central Islip, New York 11722-4438

THOMAS J. SPOTA
District Attorney of Suffolk county
200 Center Drive
Riverhead, N.Y. 11901

Attention: Michael J. Miller
Assistant District Attorney

_____
Alan Nelson, Esq. (AN 3891)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CHRISTOPHER PAGAN,

                 Petitioner,

                                                                         CV-07-453(JS)

   -against-

WILLIAM BROWN, Superintendent,

                 Respondent.

-------------------------------------------------------------X

# DECLARATION

## ALAN M. NELSON, ESQ.

**Attorney for Defendant**

Office and Post Office Address, Telephone

3000 Marcus Avenue
Lake Success, New York 11042
(516) 328-6200