UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
CHRISTOPHER PAGAN,

                Petitioner,

                                        CV-07-453(JS)

    -against-

WILLIAM BROWN, Superintendent,

                Respondent.

------------------------------------------------------------------X

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
## PETITION BROUGHT UNDER 28 U.S.C 2254

Alan M. Nelson
Attorney for petitioner Christopher Pagan
3000 Marcus Ave - Suite 1E5
Lake Success, N.Y. 11042
(516) 328-6200

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

CHRISTOPHER PAGAN,

               Petitioner,

                                       CV-07-453(JS)

  -against-

WILLIAM BROWN, Superintendent,

               Respondent.

-----------------------------------------------------------------X

## PETITIONER'S MEMORANDUM OF LAW

### PRELIMINARY STATEMENT

This Memorandum of Law is submitted in support of Petitioner's application for a writ

of habeas corpus and in reply to Respondent's Memorandum of Law in opposition.

### PRESERVATION AND EXHAUSTION

Respondent concedes that petitioner has exhausted all of his state court remedies because

he has directly appealed from or collaterally attacked his conviction in the highest state courts.

Also, petitioner's writ is timely because it is within one year of when his time for filing a writ of

certiorari expired Williams v. Artuz, 237 F.3d 147, 151 (2nd Cir. ). (Respondent's Memo p. 7).

### POINT I

### PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO RETAINED COUNSEL OF CHOICE.

#### A. Procedural History

As discussed above, on April 8, 1999 the Honorable Louis J. Ohlig issued his decision

and Order denying petitioner's motions to suppress physical evidence and statements following

an evidentiary hearing which was conducted on March 9, 1999. On that date the Court scheduled trial to commence on April 14, 1999, one week later.

Immediately following denial of the motions Petitioner consulted with his counsel John Bray, who was appointed to represent him pursuant to County Law Article 18b. During those discussions Petitioner was informed by his court appointed counsel Mr. Bray amongst other things that he was "being forced to go to trial"; "he doesn't want to go to trial" (T6); "he is not being paid, you know, seeing any money"; Petitioner "should have took the plea"; and "he told [petitioner's] wife I'm going to do more time". (T9).

As a consequence of these discussions with counsel Petitioner understandably lost confidence in Mr. Bray's commitment to his representation and consequently discussed with his family the retention of private counsel to represent him for trial. This decision was conveyed to Mr. Bray on April 13, 1999. (See Affirmation George M Hamel, Esq., in Support of Petitioner's Motion pursuant to CPL 440.10 dated September 25, 2004, at page 10.).

The next day, April 14, 1999, less than one week after the Court's denial of his motions to suppress Petitioner made an application to the trial court to adjourn the case for one day so that he and his wife could get the finances their families and friends had agreed to assist them with in order to represent him at trial the following day. (See Exhibit "C" Hamel Affid. p.11).

The following colloquy took place upon Petitioner's appearance before the Court:

THE DEFENDANT: I just informed Mr. Bray in the back that we're seeking other legal counsel, but we'll wait until tomorrow. I told him I would wait until tomorrow.

THE COURT: Whose we?

2

THE DEFENDANT: Me and my wife.

THE COURT: Were are– on the eve of jury selection
you come forth seeking to retain your
own attorney. Mr. Bray has been assigned
Is that what your telling the court on the
eve of selecting a jury ...your requesting to
discharge Mr. Bray and come forth with
an attorney of your own? Is that what you are
asking the Court?

THE DEFENDANT: I informed you that we're seeking–

THE COURT; You don't inform. Is that what you are
asking me?

THE DEFENDANT: I'm asking. I am seeking my own counsel.

THE COURT: I would assume if that would be forthcoming,
it would have happened before this, but this date–
but if it didn't happen before this date I would
have assumed you would have your attorney here
now if you were sincere in your application to
have your own attorney of your choosing. When
I use the words, choosing, that you could pay for
Mr. Bray has been assigned... The Court based
upon action and based upon what has transpired
here I would have to come to the logical
conclusion that you are just attempting to
delay the inevitable. The inevitable is a trial

THE DEFENDANT: I'm not trying to delay a trial.

THE COURT: Why are you bringing it forth at the last chance?

THE DEFENDANT: Mr. Bray brings to my attention yesterday he
says that he's being forced to go to trial.
He doesn't want to go to trial.

(T4-6)

THE COURT: He used the words forced?

3

THE DEFENDANT: That's what he used.  He informed me and my wife that you have already made your decision that your not going to –not going to let me go.

THE COURT: What do you mean, not going to let you go?

THE DEFENDANT: In reference he stated that you don't want me on the street anymore.  He says he is not being paid, you know, seeing any money.  He says that – He says that he's being f forced to go to trial.  He said I should have took the plea.  And he already told my wife I'm going to do more time.

(T9)

THE DEFENDANT: Up until this point I didn't have any complaint with Mr. Bray until he informed me and my wife of the things that he informed us of.

THE COURT: Your telling me a story , Mr. Pagan, in plain English.

THE DEFENDANT: I'm not telling you a story.

THE COURT: Your bringing this forth on the eve of trial.

THE DEFENDANT: I'm not telling you a story.

THE COURT: Did you think the case did not go to trial?

THE DEFENDANT: I want it to go to trial.

THE COURT: Its going today.  Your  application is denied. I don't believe your sincere and honest with the Court.  Had I seen an attorney here today making that application in your behalf, I may have given some credence to your desire to have another attorney here, but an attorney is not here.  And I have to assume it's dilatory on your part to delay, to procrastinate, with the trial going forward.  So, your application is denied.

(T11-13)

4

The trial of Petitioner immediately proceeded with jury selection that day and trial the next. The entire trial took two days with petitioner being convicted on April 15, 1999.

On September 2, 2004 Petitioner filed a motion pursuant to CPL 440.10(f) and (h) requesting that the Court issue an Order vacating his judgment and conviction. Amongst other reasons[1] Petitioner principally argued that in denying him a one day continuance of the trial on April 14, 1999 to have retained counsel appear to represent Pagan at trial the following day he was denied his Sixth Amendment right to counsel of his choice. (Exhibit "C" p.11).

In a decision dated December 7, 2007 the trial Court denied Petitioner's motion. In so doing the court focused entirely upon Petitioner's claim of ineffectiveness of trial counsel and completely ignored Pagan's claim that he was denied his Sixth amendment right to rationed counsel of choice as a consequence of the Court's denying him a one day continuance to have such counsel appear. The court's only comment on this claim being "the court has considered the balance of defendant's arguments raise din his motion and has determined them to be without merit. (See Exhibit "D" CPL 440.10 Decision).

## B. Argument

The Sixth amendment provides that in all criminal prosecutions the accused shall enjoy the right to have the assistance of counsel for his defense. An element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him. Wheat v. United States, 486 U.S. 153 (1988).

In United States v. Gonzalez-Lopez, 548 U.S. 140 (2006) the Supreme Court held that the

---

[1] In addition Petitioner alleged that trial counsel was ineffective, failed to provide meaningful representation and as a consequence he was prejudice and denied a fail trial with the context of Strickland v. Washington, 466 U.S. 668 (1984).

right to be represented by retained counsel of one's choice is separate and distinct from the right to effective assistance of counsel. Where the right to be assisted by counsel of one's own choice is wrongly denied it is not necessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation. Deprivation of the right is "complete" when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he receives. United States v. Gonzalez-Lopez, 548 U.S. 140, 148 (2006).

A state court's ruling is contrary to ...clearly established Federal Law if the court applied a rule that contradicts the governing law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent. Williams v. Taylor, 529 U.S. 362, 405-406 (2000).

Although the factual determinations made by the state court are presumed correct absent clear and convincing evidence to the contrary, 28 U.S.C. 2254(e)(1), deference does not imply abandonment of judicial review. Moreover the AEDPA does not require petitioner to prove that decision is objectively unreasonable by clear and convincing evidence.

Petitioner submits that his Sixth Amendment right to retain counsel of his own choice was violated when the trial court refused to adjourn the trial one day for retained counsel to appear and represent him at trial.

A trial court is afforded wide latitude in balancing the right to counsel of choice against the demands of its calendar. United States v. Konstantin, 2008 U.S. App. LEXIS 11485 (2nd Cir. 1008). In this case the procedural history and the underlying reasons why petitioner

sought private counsel of choice immediately prior to trial, all of which was made known to the trial court, presents compelling evidence that Judge Ohlig failed to balance the right to counsel of choice against the demands of his calendar.

Initially it must be noted that the case was not particularly old. Petitioner was arrested on September 17, 1998. The instant indictment was returned by the Grand Jury on November 20, 1998. (See Exhibit "E" Indictment). A suppression hearing was held on March 19 with the Court rendering decision on April 8, 1999. At that time the Court scheduled trial, which lasted two days, for the next week, April 14, 1999. Accordingly there was little if no delay in the proceedings to that point. The length of the trial, a total of 2 days clearly demonstrates that the requested one day adjournment of the trial would have had little if no impact upon the demands of the Court's calendar. Moreover, because all of the witnesses were law enforcement officers living and working in Suffolk County, the postponement of the trial for this short period of time would have caused no hardship upon the witnesses.

Most compelling however is the underlying reason for petitioner requesting a postponement to acquire retained counsel. As set forth in detail above prior to the denial of petitioner's motion to suppress Pagan had no complaint or quarrel with his assigned counsel. However, as is clearly reflected by the colloquy between Pagan and the Court at the commencement of proceedings on April 14, 1999 there had developed a significant strain in their relationship during the intervening week following denial of the suppression motion. Indeed the strain in the relationship caused Petitioner to contact his family and friends to assist him in acquiring the financial resources to acquire retained counsel. (T4-13).

In light of the breakdown in the relationship between Petitioner and his counsel during

this week it was not an unreasonable request for Pagan to request a one day adjournment of the trial for the purpose of acquiring retained counsel. Moreover Pagan made clear to the Court he intended to go to trial and was aware the case would go to trial. He desired the adjournment not "to delay the inevitable" as phrased by the Court, but rather to acquire private counsel of his choice as trial counsel in a case where he was well aware of the potential consequences of his conviction having already rejected a plea offer of 12 years to life incarceration.(T11-13).

In  United States v. Gonzalez-Lopez, the Supreme Court states:

> "we have little trouble concluding that the erroneous deprivation
> of the right to counsel of choice with consequences that are
> necessarily unquantifiable and indeterminate unquestionably
> qualifies as a structural error. Different attorneys will pursue
> different strategies with regard to investigation and discovery,
> development of the theory of the defense, selection of the jury,
> presentation of witnesses, and style of witness examination and
> jury argument.... In light of these myriad aspects of representation,
> the erroneous denial of counsel bears directly on the framework
> within which the trail proceeds, or indeed whether it proceeds at all".

United States v. Gonzalez-Lopez, 548 U.S. 140, 150 (2006).

As a consequence once a determination is made that there was an erroneous deprivation of the right to counsel of choice neither ineffectiveness nor prejudice need be shown.


As discussed in he above analysis of the actions of Justice Ohlig in denying petitioner's application for a one day continuance to obtain private counsel of his choice presents compelling evidence to demonstrate that he failed to properly balance the right to petitioner to acquire his retained counsel of choice when facing in a possible life sentence against the almost imperceptible demands of his calendar.

Although <u>United States v. Gonzalez-Lopez</u>, 548 U.S. 140, 150 (2006) was decided subsequent to the denial of petitioner's motion, the law concerning the issue of the right to retained counsel of choice had already been clearly established by the Supreme Court in <u>Wheat v. United States</u>, 486 U.S. 153 (1988). Rather <u>Gonzalez-Lopez</u> clearly established that violation of the right, being a structural error did not require that petitioner establish ineffectiveness or prejudice once an erroneous denial of the right is demonstrated upon collateral attack. To the extent that this aspect of the holding of <u>Gonzalez-Lopez</u> antedates the Court's denial of petitioner's motion it is submitted that it should apply retroactively for purposes of collateral review because it presents a "watershed rule" of criminal procedure as such is defined in <u>Teague v. Lane</u>, 489 U.S. 288 (1989). See discussion in <u>Mungo v. Duncan</u>, 393 3d 327 (2nd Cir. 2005).

Accordingly the trial court's denial of petitioner's application for the adjournment and in subsequently denying his motion pursuant to CPL 440.10 was contrary to ...clearly established Federal Law in that the court applied a rule that contradicts the governing law set forth in Supreme Court cases to wit <u>United States v. Gonzalez-Lopez</u>, 548 U.S. 140 (2006).

## POINT II

**PETITIONER'S FIFTH AMENDMENT RIGHT TO REMAIN SILENT WAS VIOLATED BY THE INTRODUCTION OF EVIDENCE BEFORE THE JURY OF HIS ASSERTION OF HIS RIGHT TO REMAIN SILENT AT THE TIME OF HIS INITIAL ARREST AND INTERROGATION.**

Trooper Mawn testified that as petitioner was being placed in the rear of the police cruiser at the time of his arrest was administered *Miranda* warnings. At the pre-trial hearing Trooper Mawn testified that petitioner remained silent after being read his rights. (H98).

9

The Fifth Amendment privilege against self-incrimination contains the implicit promise that a defendant's post-arrest silence will not prove to be detrimental to the defendant. Accordingly, the government may not refer to the defendant's assertion of the right to remain silent at the time of his arrest and interrogation during trial, because jurors may infer guilt from the defendant's refusal to speak to authorities. See Doyle v. Ohio, 426 U.S. 610 (1976). This rule rests on the rationale that a defendant's choice to remain silent will not be used against him. See Wainwright v. Griffin, 474 U.S. 284, 291 (1986). This prohibition applies to all circumstances in which a defendant may invoke his right of silence, even if the defendant subsequently waives his rights and speaks to the police. See United States v. Velarde-Gomez, 224 F.3d 1062 (9th Cir. 2000).

Although not all Doyle violations require reversal and are subject to harmless error analysis a Doyle violation may only be cured by a timely objection or through a limiting instruction given by the trial Court. See Greer v. Miller, 483 U.S. 756, 759 (1987). In the instant case not only did the trial Court fail to provide a limiting instruction, incredibly, the Court aware that Pagan had invoked his right to silence from the hearing testimony of Trooper Mawn nonetheless insisted on eliciting that fact before the jury. Indeed the Court did so despite the People's clearly articulated concern that in so doing the Court was committing reversible error.

As Trooper Mawn testified concerning the fact he had administered *Miranda* warnings to Pagan before the jury the following colloquy occurred:

| THE COURT: | "Can you be more specific, what the terminology means? |
|---|---|
| MR RAFFERTY: | " Judge, perhaps we can approach? Can we approach? |

10

"The following proceedings were held at sidebar, on the record, out of the hearing of the jury"

MR RAFFERTY: " The reason why I wanted to move on is if this trooper clarifies that the defendant invokes his rights to silence , I would rather not-I can't listen to that kind of testimony. That is why at this point it would be better if I just moved, and because he invokes his rights to silence, at this point the defendant doesn't say anything in response, the jury can draw a negative inference and I'm not entitled to say anything about the defendant invocation of his rights to silence"

THE COURT: "You said you mirandized him, counsel wants to know what the word means?

MR. BRAY: "The jury doesn't know what the word means."

MR. RAFFERTY: "Judge, my concern is the trooper, without responding said I read him his Miranda rights and he stayed silent at this point."

MR. BRAY: "That's all right."

MR. RAFFERTY: " We cannot elicit the fact that he remained silent on A direct case, that's-."

MR. BRAY: " We already elicited the fact that he read a Miranda. he doesn't have to say what he did, he can just say he read his Miranda warnings which means A, B., C. But mirandized-."

MR. RAFFERTY: "For safety I would like the opportunity at least to explain to the witness."

THE COURT: "Just hold on. You have him under arrest, you have him in the car, you mirandized him, you gotta tell the jury what he said to him. If he makes any spontaneous statement after that -."

MR. RAFFERTY: "What I'm saying is this judge: To be safe, it would be better if we excuse the jury, all I'm asking you to do is to explain Miranda because he can just blurt out and he invokes his right to silence at

11

this point and we have a mistrial."

MR BRAY: *"If he invoked his right to silence at that point then that's something different than what he testified to at the hearing, and nothing he said after that can be used as evidence against him."*

(Emphasis supplied)

MR. RAFFERTY: "What I'm saying is if he says - even if he says he didn't say anything responsive, what he said at the hearing was he didn't say anything in response."

THE COURT: You gotta - if you mirandize, and so forth, if he asks him any question. If he allows questions to be asked if he makes anything spontaneous, that's something else. You gotta tell tem what he means by mirandized."

"(The following proceedings were then had in open court with the jury present.)"

THE COURT: "All right, Trooper Mawn, you testified you used the words, terminology, you took him into custody you arrested him and put him in handcuffs; you used another word mirandized him. Will you tell the jury what you did when you mirandized him. What was that?"

THE WITNESS: "I read him his rights."

THE COURT: "You want to pick that up?"

Question: (unclear by whom)
" What rights did you read."

THE WITNESS: " I read him his rights, the basic rights, "You have the right to remain silent...," Read them off the card we carry in our wallet, which is standard police procedure every time you make an arrest."

MR. BRAY: "Objection to standard police procedure, It's irrelevant."

12

| | |
|---|---|
| *THE COURT:* | *"Tell me what you did concerning this arrest, with this defendant."* |
| THE WITNESS: | "I read him his rights. I told him he has right to remain silent. I told him that anything he said could be used against him in a Court of Law. I told him if he had to got to trial over this matter, if he couldn't afford an attorney that an attorney would be provided for him by the court. And I asked him him if he understood these rights, he indicated he did *and I asked him if there was anything he wanted to say to us at this time and he said "no."* |

(Emphasis supplied).

(T. 143-147).

Defense counsel immediately objected and requested a mistrial (T.147). At sidebar counsel in citing grounds for a mistrial stated:

| | |
|---|---|
| MR. BRAY: | "Judge on the grounds that during the hearing this Trooper testified that he gave him his Miranda warnings and elicited certain responses from the defendant. Now he's saying when he first gave him his Miranda warnings he invoked his right to silence, he chose not to say anything... |
| | he actually said he didn't want to say anything after he received his Miranda warnings, and now we have the whole hearing and the court's decision based on the fact that this Trooper asked him questions after Miranda, he got responses; not that he said "I don't want anything, because that's the end of it . That should stop right there." |
| THE COURT: | "I don't know if he made any spontaneous-" |
| MR. BRAY: | "Well spontaneous has to be after Miranda. There is no spontaneous." |
| THE COURT: | "Yes there is. He can make spontaneous outcries or make a response or make a statement without being |

13

> questioned. He does so at his own peril. So, we are up
> to the part where I don't know what's coming next.
> There hasn't been any further questions by the
> police officer. I'm gonna deny your application
> at this juncture for a mistrial."

(T147-148).

At this juncture despite intentionally highlighting Petitioner's invocation of his right to silence the Court not only denies counsel's application for a mistrial but also fails to provide a limiting instruction the jury. Moreover, the nature of the testimony elicited by the Court with full prior knowledge that petitioner had invoked his right to silence by remaining silent in response to the inquiry if he wishes to make a statement was considerably more prejudicial than the hearing testimony. As observed, in direct contradiction to his hearing testimony Trooper Mawn testified at trial that Pagan had stated "No" an affirmative invocation of his Fifth and Sixth Amendment rights to silence and counsel.

A state court's ruling is contrary to ...clearly established Federal Law if the court applied a rule that contradicts the governing law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent. Williams v. Taylor, 529 U.S. 362,

405-406 (2000). Clearly the trial Court in intentionally eliciting the fact that petitioner had asserted his right to silence despite the cautionary warning from the People and with full knowledge that Pagan had in fact asserted his right of silence was contrary to the clearly established Federal Law on the issue as held in Doyle v. Ohio, supra.

The violation cannot survive harmless error analysis for two reasons. First, having

14

elicited and in fact highlighted the testimony without then providing a curative instruction the Court failed to comply with the requirements of Greer v. Miller, supra. Second, as discussed more fully below Trooper Mawn's trial testimony now made explicit what had been clearly implicit during the pre-trial hearing. Having invoked his right to remain silent and refuse to answer questions, he could not later waive that right without counsel being present. Accordingly, the subsequent statements made to Investigator Regini were required to be suppressed. Moreover, the People having discussed in their opening statement the substance of Pagan's statement to Regini, the sole cure at this juncture was to grant defense counsel's request for a mistrial. Accordingly Respondent's contention that the issue is unpreserved due to petitioner's trial counsel not having moved to reopen the suppression hearing at this juncture is inapposite.

Accordingly the trial court's denial of petitioner's application for a mistrial following the eliciting of testimony concerning his assertion of his Fifth Amendment right to silence was contrary to ...clearly established Federal Law in that the court applied a rule that contradicts the governing law set forth in Supreme Court cases to wit Doyle v. Ohio, 426 U.S. 610 (1976).

## POINT III.

## THE INTRODUCTION INTO EVIDENCE OF PETITIONER'S STATEMENT TO INVESTIGATOR REGINI SUBSEQUENT TO HIS INITIAL REFUSAL TO ANSWER QUESTIONS VIOLATED HIS FIFTH AMENDMENT RIGHT TO REMAIN SILENT

The trial court in denying the suppression of petitioner's statement to Investigator Regini completely ignored the uncontroverted evidence that Pagan had invoked his Fifth Amendment right to remain silent prior to questioning by Regini. Trooper Mawn had testified he advised Pagan of his rights at the time of his arrest. He further testified that when asked the last question,

15

"Having these rights in mind do you wish to talk to us now?", petitioner remained silent.(H98).

To the extent respondent has argued that petitioner remained silent rather than providing a verbal response thereby creating an ambiguity as to whether Pagan's had asserted his right to remain silent that ambiguity was fully resolved by Trooper Mawn's trial testimony.

At trial but subsequent to the Prosecution having opened on the substance of Pagan's later statement to Regini, Mawn testified that in response to the last Miranda inquiry petitioner, rather than remaining silent had specifically stated "No" (T146-147). As discussed above, trial counsel immediately requested a mistrial raising the issue of the inconsistency and how it related to the admissibility of petitioner's subsequent statement to Investigator Regini.

At sidebar counsel in citing grounds for a mistrial petitioner's trial counsel stated:

MR. BRAY:
"Judge on the grounds that during the hearing this Trooper testified that he gave him his Miranda warnings and elicited certain responses from the defendant. Now he's saying when he first gave him his Miranda warnings he invoked his right to silence, he chose not to say anything... he actually said he didn't want to say anything after he received his Miranda warnings, and now we have the whole hearing and the court's decision based on the fact that this Trooper asked him questions after Miranda, he got responses; not that he said "I don't want anything, because that's the end of it . That should stop right there."

Respondent argues that at this juncture trial counsel should have moved to reopen the Suppression hearing (Respondent Memorandum at page 13). Such application would have futile at this point. The Prosecution in its opening statement had extensively discussed the sum and substance of Pagan's subsequent statement to Investigator Regini. (T115). Accordingly, the only possible remedy at this stage of the proceedings was to declare a mistrial, which application

was denied by the Court.

It is black letter and clearly established Federal Law that upon a suspect invokes his right to remain silent the police must cease all questioning. Once a suspect invokes his Miranda rights police may not reinstate interrogation unless counsel is present. <u>Minnick v. Mississippi</u>, 498 U.S. 146, 153 (1990). Any questioning following a suspects having responded "no" to police inquiry of whether he wishes to answer questions violates *Miranda*. <u>United States v. Rambo</u>, 365 F.3d 905, 910-11 (10th Cir. 2004).

Once an individual has asserted his right to counsel, officials must not question him until either a lawyer is present or the individual reinitiates conversation. <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981). To determine whether an individual has invoked his right to counsel the court must conduct an objective inquiry into whether a reasonable officer under the circumstances would understand the defendant's statement to be a request for an attorney. <u>Davis v. United States</u>. 512 U.S. 452 (1994).

Here the uncontroverted testimony established both at the hearing an trial was that upon Pagan observing Trooper Mawn removing the hat which contained the pistol from his vehicle and carrying it into the police cruiser he spontaneously uttered "Oh fuck". Immediately thereafter Trooper Mawn administered *Miranda* warnings to Pagan at which time petitioner in response to the last question, "Having these rights in mind do you wish to talk to us now?", stated "No". (T146-147).

It is respectfully submitted the combined actions of petitioner in first objectively demonstrating his awareness that the weapon had been discovered by the police (through his spontaneous statement) and his affirmative assertion immediately thereafter of his right to remain

17

silent demonstrates that a reasonable officer under the circumstances would understand the defendant's statement to be a request for an attorney. Significantly, Investigator Regini was at no time informed by Trooper Mawn that upon being advised of his rights that Pagan had remained silent. To the contrary he was told by Mawn that is was "okay" to speak to him. (T. 287).

This testimony was ignored by the trial court both in its decision upon the motion to suppress and in denying counsel's request for a mistrial. Indeed the trial Court misstates Mawn's hearing testimony in its decision writing:

> "Mawn thereafter attempted to provide Miranda rights to
> the defendant from a card in his possession but prior to
> completion of all rights and waivers the defendant spontaneously
> uttered that he was holding a gun for a friend."

(Exhibit"B", p. 2)

This statement of facts is contrary to the hearing testimony. More significantly it ignores both petitioner's explicit assertion of his Fifth Amendment right to remain silent and his implicit assertion of his Sixth Amendment Right to counsel. Moreover, the Court having ignored this testimony it failed to even consider the consequences of petitioner's assertion of his rights to silence and counsel upon the subsequent statements made to Investigator Regini.

In ignoring this uncontroverted testimony and denying the suppression of petitioner's subsequent statements to Investigator Regini the hearing court's decision was both "contrary to" and involved an "unreasonable application of" clearly established Federal Law.

Ccontrary to respondent's contention, the error was not harmless. The statements made by Pagan to Regini that he was "going to return the firearm to its owner for thepurpose of acquiring a better one to do jobs with" was directly relevant to one of the elements of Penal Law

18

Section 265.03(2); the intent to use the weapon unlawfully against another. Indeed the prosecution commented upon the statement during summation in detail to establish this element. (T334-335). By establishing this fourth element of Penal Law Section 265.03(2) petitioner faced the enhanced sentence as a Class C rather than Class D Mandatory Persistent Felony Offender. (See New York State Criminal Procedure Law section 70.10).

**POINT IV**

**THERE WAS INSUFFICIENT AND LEGALLY INCOMPETENT EVIDENCE INTRODUCED AT TRIAL TO PROVE THE FIREARM WAS LOADED.**

To prove a violation of New York State Penal Law Section 265.03(2), Criminal Use of a Firearm in the Second Degree, the People must prove that the defendant possessed a "loaded firearm with the intent to use the same unlawfully against another."

New York State Penal Law Section 265.00(15) defines "loaded firearm as follows:

> "Loaded firearm" means any firearm loaded with ammunition or any firearm possessed by one who, at the same time, possesses a quantity of ammunition which may be used to discharge such firearm."

Petitioner argued on direct appeal and renews his contention here that there was insufficient competent evidence presented at trial to demonstrate beyond a reasonable doubt that the firearm recovered form the vehicle on September 17, 1998 was a "loaded" firearm within the definition of New York Penal Law section 265.00(15) and as such that element of Penal Law section 265.03 was not proven beyond a reasonable doubt.

More specifically Petitioner submits that the evidence presented concerning this issue was inadmissible hearsay. Moreover, the hearsay evidence, because both material and testimonial

was introduced in violation of Petitioner's Sixth Amendment right to confrontation as defined by Crawford v. Washington, 541 U.S. 36 (2004).

### a. Procedural Background

Once a prima facie constitutional violation is demonstrated the court is required to conduct an evaluation as required pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") to determine whether the State trial and appellate courts determination of the issue were "contrary to" or involved an "unreasonable application of" clearly established Federal Law. 28 U.S.C. 2254(d)(1). See also Miller-El v. Cockrell, U.S , No.01-7662, 2/25/03.

A state court's ruling is contrary to clearly established Federal Law if the court applied a rule that contradicts the governing law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent. Williams v. Taylor, 529 U.S. 362, 405-406 (2000).

Although the factual determinations made by the state court are presumed correct absent clear and convincing evidence to the contrary, 28 U.S.C. 2254(e)(1), deference does not imply abandonment of judicial review. Moreover the AEDPA does not require petitioner to prove that decision is objectively unreasonable by clear and convincing evidence.

Respondent argues and the Appellate Division in its decision states that counsel failed to preserve this issue for appeal by failing to make timely objection. The determination of the Appellate Division is plainly contradicted by the record. Counsel did in fact make timely and complete objection to the failure to prove the firearm was loaded (T232-233) and requested that

Court submit the jury the lesser included charge of Possession of an Unloaded Firearm, which request was denied by the Court. (T296).

It is submitted that trial record establishes by clear and convincing evidence that the Appellate Division was erroneous in determining that Petitioner had not preserved his claim of insufficiency. Moreover, contrary to Respondent's contention that the claim "is essentially a sufficiency of evidence claim and not the province of a federal habeas court to reexamine" (Respondent's Memorandum page 15), the violation is constitutional in nature in that it constitutes a deprivation of Petitioner's Sixth amendment right to confrontation.

Having established this error the instant court should review this claim on its merits. As discussed above it is respectfully submitted that such analysis clearly establishes that Petitioner was denied his Sixth Amendment right to confrontation as a consequence of the introduction of the hearsay evidence.

**b. The admission into evidence of the hearsay information utilized by the People violated Petitioner's Sixth Amendment right of confrontation in violation of Crawford v. Washington, 541 U.S. 36 (2004).**

### i. The Evidence

The testimony presented at trial concerning the issue of whether the firearm was loaded was solely hearsay. At the time of the weapon's recovery by Trooper Mawn he did not inspect or unload it. Mawn testified that upon arrival at the Barracks he gave the gun to his supervisor Sergeant Hubbard who proceeded to safeguard and unload the firearm. The evidence presented at trial appears to be that than Trooper Mawn did not actually observe this occur. (T150).

Indeed, upon inquiry by the Court Trooper Mawn testified:

" I learned later at the station when it's unloaded
by my Sergeant that one bullet was in the clip."

(T.173).

At a later time Investigator Regini, who was not present when the firearm was

given to the Sergeant secured the firearm, magazine and one bullet as evidence. (T151). Over

defense objection and subject to connection upon the proffered subsequent testimony of

Investigator Regini the gun was introduced into evidence as Exhibit 7. (T. 162). Significantly,

although a ballistics expert Charles Hopkins from the Suffolk County Crime Laboratory later

testified to the operability of the firearm and a single bullet provided to him, neither the bullet

nor the magazine were ever introduced as evidence. (T153, 225-226).

Thereafter at sidebar the issue of whether sufficient evidence concerning whether the

weapon was loaded was discussed.

| | |
|---|---|
| MR. BRAY: | "He said someone else told him." |
| MR RAFFERTY: | "He testified he and the sergeant, he then unloaded the gun, it was at that point he learned the gun was loaded." |
| THE COURT: | "Your objection is on the record." |

(T232-233)

Following the denial of petitioner's motion to dismiss for lack of a prima facie case a

request was made for the court to submit the leaser included offense of possession of an unloaded

firearm, Criminal Possession of a Weapon in the Fourth Degree. That request was denied by the

Court (T296).

This summary of the trial testimony is significant because it was alleged that there was

only one bullet in the gun's magazine an that bullet, having been test fired was never introduced as evidence. The gravamen of petitioner's claim is that no proof in the record exists to show that at the time and place of the possession attributed to Pagan does there exist any competent evidence that the weapon was loaded. No one ever checked the weapon until much later at the Barracks. And it is solely hearsay evidence which was admitted that Sergeant Hubbard checked the clip and then removed the bullet from it.

Criminal Procedure Law 70.20 provides:

> No conviction of an offense by verdict is valid unless
> based upon trial evidence *which is legally sufficient* and
> which establishes beyond a reasonable doubt every element
> of the offense and the defendant's commission thereof.

If after reviewing the entire record it is determined that the *quantity and quality* of the evidence presented was not sufficient to support a verdict reversal in mandated. See C.P.L. 470.15; People v. Santos, 38 N.Y.2nd 173 (1975).

## ii. Argument

It is submitted that the reliability of the basis of information for determining that the firearm was loaded was constitutionally defective.

In Crawford v. Washington, 541 U.S.36 (2004) the Supreme Court held that out of court statements of a person who does not appear at a trial that are of a "testimonial nature" may not be received against the accused to establish the truth of what was stated unless (i) the declarant is unavailable at trial, and (ii) the accused was afforded a prior opportunity to cross-examine the declarant on the statement. Crawford, 124 S. Ct. at 1365-66.

Certainly the testimony regarding whether the firearm was loaded gun relied upon by

People was testimonial in nature. Therefore the basis of information upon which the ballistics examiner claimed the firearm was loaded was hearsay that pursuant to Crawford, supra is not admissible as evidence without running afoul of the Sixth Amendment's confrontation clause.

Without such testimony the People cannot prove the gun was loaded  Therefore pursuant to Criminal Procedure Law 70.20 the testimony relied upon by the trial judge was not based upon evidence *which was legally sufficient* and which established beyond a reasonable doubt that gun possessed by Petitioner was loaded.

Crawford v. Washington, 541 U.S.36 (2004) was decided subsequent to pertinent decisions herein.  The Second Circuit Court of Appeals in Mungo v. Duncan, 393 F.3d 327 (2nd Cir. 2005) held that Crawford should not apply retroactively for purposes of collateral review because it did not present a "watershed rule" of criminal procedure as such is defined in Teague v. Lane, 489 U.S. 288 (1989).  It is submitted however that due to the egregious nature of the error committed herein the use of hearsay information of non-testifying witnesses as the basis to prove an ultimate fact, whether the firearm was loaded the admission of the evidence fails to satisfy the Sixth Amendment's requirements of Crawford's predecessors Ohio v. Roberts, 448 U.S. 56 (1980). and White v. Illinois, 502 U.S. 346 (1992). Alternatively, its is submitted that the application of the Teague analysis applied by the Second Circuit in Mungo v. Jordan, 393 F.3d 327, 333-334 to the type of error committed herein does require the retroactive application of Crawford to address such a fundamental and blatant violation of petitioner's Sixth Amendment right to confrontation.

### iii.  Analysis Under Roberts and White

28 U.S.C. 2254(d)(1) provides that where the state court adjudication resulted in a

decision that was contrary to or involved an unreasonable application of clearly established

Federal law, as determined by the Supreme Court, then the granting of writ of habeas corpus

is warranted. The Supreme Court has described this standard as mandating that federal courts

decide habeas petitions not with reference to the Supreme Court's current jurisprudence, but

rather with reference to the Supreme Court's jurisprudence as of the date that the state court

conviction became final. Williams v. Taylor, 529 U.S. 362, 412 (2000).

In Mungo v. Duncan, 393 F.3d 327 (2nd Cir. 2004), the Second Circuit held that Crawford

should not apply retroactively for purposes of collateral review because it did not present a

"watershed rule" of criminal procedure as such is defined in Teague v. Lane, 489 U.S. 288

(1989). Therefore analysis of petitioner's contention that his Sixth Amendment right to

confrontation was violated requires that this court employ the jurisprudence of Crawford's

predecessors Ohio v. Roberts, 448 U.S. 56 (1980 ) and White v. Illinois, 502 U.S. 346 (1992).

The Sixth Amendment to the United States constitution provides "In all criminal

prosecutions the accused shall enjoy the right to be confronted with the witnesses against him..."

In Ohio v. Roberts, 448 U.S. 56 (1980) the Supreme Court held that the Confrontation

Clause was intended to exclude some hearsay but that it nonetheless countenances "hearsay

marked with such trustworthiness that there is no material departure from the reason of the

general rule. Id at 56. Reliability the court continued could either be established through a

showing of particularized guarantees of trustworthiness or be inferred from the fact that the

evidence fell within a firmly rooted hearsay exception. In White v. Illinois, 502 U.S. 346 (1992)

the court ruled that "spontaneous declarations" which applies the same underlying definition as

the New York hearsay exception of "excited utterances" fell within the definition of firmly

rooted hearsay exceptions. Admissions were likewise held to comply with this requirement.

The testimony presented at trial here falls in neither of these two categories, accordingly the

traditional reliability exceptions recognized in Ohio v. Roberts, 448 U.S. 56 (1980 ) and White v.

Illinois, 502 U.S. 346 (1992) are not present here.

Trial counsel strenuously objected to the conclusion that gun loaded and requested a

charge to that effect (T232).

The trial court's denial of that request to charge amounted to an objectively unreasonable

application of the then current Confrontation Clause jurisprudence as articulated in Roberts and

White.  The Appellate Division's determination in affirming the conviction that there

was legally sufficient evidence to support the conviction likewise amounts to an objectively

unreasonable application of the Confrontation Clause jurisprudence articulated in Roberts and

White.

A court's determination will be deemed "contrary to" established federal law where: (1)

the state court applied a rule different from the governing law set forth by the Supreme Court or

decided a case differently than the Supreme Court on a set of materially indistinguishable facts.

Williams v. Taylor, 529 U.S. 362, 404-405 (2000).  The decision was contrary to clearly

established Federal law because the trial court failed to recognize that the evidence that the

firearm was loaded was solely hearsay in nature

The trial court like wise "unreasonably applied" clearly established Federal law by failing

to consider these issues and by failing to charge the jury on the lesser included offense of

possession of an unloaded firearm as requested by the defense.

It is clear that the Appellate Division failed to consider any of these factors set forth

above and hence likewise rendered a decision that was both "contrary to" and an "unreasonable application of" clearly established Federal law entitling petitioner to habeas relief.

Accordingly the court rendered a decision that was both "contrary to" and an "unreasonable application of" clearly established Federal law entitling petitioner to habeas relief.

Moreover, the Appellate Division and Court of Appeals in merely deferring to the factual determinations of the trial court likewise rendered decisions that were both "contrary to" and an "unreasonable application of" clearly established Federal law.

## POINT V.

## THE COURT ERRED IN DENYING HIS MOTION TO SUPPRESS THE FRUITS OF THE SEARCH OF THE VEHICLE RESULTING IN THE RECOVERY OF THE FIREARM, MASK, WIG AND WOOL HAT IN VIOLATION OF HIS FOURTH AMENDMENT RIGHTS.

The search of petitioner's vehicle was improper, impermissible and clearly constituted an illegal search and seizure in violation of his expectation of privacy. Although the initial stop of the vehicle by the State Troopers was lawful, the Trooper's subsequent search of the vehicle was not. The trooper had no lawful basis to shine the artificial light created by his flashlight for the purpose of viewing the entire front seat area of the vehicle. It was only as a consequence of Trooper Mawn's shining the flashlight in an area of the vehicle (front passenger bucket seat) that could not have been viewed by an individual merely peering though the front driver's window that he observed the non-criminal articles of clothing that are alleged to have heightened his suspicion. cf. Texas v. Brown, 460 U.S. 730, 740 fn. 5 (1983).

Regardless of the trooper's opinion of petitioner being nervous and his exiting the side passenger door in stead of the driver's side door, these factors did not give the trooper the right to

enter the vehicle and search through the pile of clothing after using artificial light to enable the initial viewing of what appeared to be a stocking. The trooper's entrance of the car, removal of the stocking and continued search of the vehicle eventually led to a discovery of a handgun. The initial viewing with a flashlight was improper. cf. United States v. Fuller, 2007 U.S. Dist. LEXIS 75403 (E.D.N.Y. 2007, Garaufis, J.) (firearm observed between driver's seat and console).

The viewing of the stocking did not call for the entry into the vehicle. The troopers were not in fear fo their safety and there was absolutely no reason to believe that a crime had been committed. Accordingly no probable cause existed fro the warrantless search.

While respondent is correct that petitioner is barred from seeking collateral review of a denial of a Fourth Amendment claim in the state courts, it is submitted that here a complete review of the record reveals that a breakdown in the state procedures resulted in a decision contrary to established Federal Law or that there was an unconscionable breakdown in the state court procedures . Stone v. Powell, 428 U.S. 465 (1976), Grey v. Hoke, 933 F.2d 117, 121 (2nd Cir. 1991) and People v. Kelly, 667 F. Supp. 963 (E.D.N.Y. 1987), *app dism*, 856 F.2d 181 (2nd Cir. 1988) .

A close analysis of the court's decision upon petitioner's motion to suppress reveals the Court took great pains to deny suppression. Initially, the Court rejected the People's argument that Trooper Mawn's search of the vehicle was lawful because it was based on reasonable suspicion to believe that Pagan was armed or the Trooper's fear for his safety.

Rather the Court *sua sponte* determined that Trooper Mawn's observations of a black knit mask with eye holes cut out on the front seat of the vehicle combined with Pagan's furtive actions of lunging to the right prior to being stopped and exiting from the right passenger door taken

together provided probable cause to believe the car contained evidence of a crime. (See Exhibit "B" Decision April 8, 1999). The trial Court completely ignored the plain view and use of artificial light issues raised by the defense. Appellate review was no more than deference to the trial Court's factual findings.

It is submitted that the trial court's *sua sponte* legal conclusions to fit erroneous factual findings when combined with the Court's ignoring clearly established search and seizure issues such as the plain view doctrine demonstrates an unconscionable breakdown in the state court procedures warranting *de novo* review by this Court.

Upon such review, for the reasons set forth herein it is submitted that the denial of petitioner's motion to suppress the fruits of the search of the vehicle was contrary to clearly established Federal Law. cf. Texas v. Brown, 460 U.S. 730, 740 fn. 5 (1983).

## VI. CONCLUSION

### THE WRIT SHOULD BE GRANTED

Dated: Lake Success, New York
       June 10, 2008

Respectfully submitted,

ALAN M. NELSON (AMN 3891)
Attorney for Petitioner
3000 Marcus Avenue, Suite 1E5
Lake Success, New York 11042
(516)328-6200