UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CHRISTOPHER PAGAN,

        Petitioner,

                                          CV-07-453(JS)

    -against-

WILLIAM BROWN, Superintendent,

        Respondent.

-----------------------------------------------------------------X

**EXHIBITS TO SUPPLEMENTAL PAPERS IN SUPPORT OF
PRO SE PETITION BROUGHT UNDER 28 U.S.C 2254**

Alan M. Nelson
Attorney for petitioner Christopher Pagan
3000 Marcus Ave - Suite 1E5
Lake Success, N.Y. 11042
(516) 328-6200

Exhibits

A. Ballistics Reports and Records

B. April 8, 1999 Suppression Hearing Memorandum Decision

C. Affirmation M. Harmel in Support of CPL 440.10 Motion

D. December 7, 2004 CPL 440.10 Memorandum Decision

E. November 20, 1998 Indictment

EXHIBIT "A"

Lab #998-134359

C-98-177 - NYSP

(3) - SPB⁵

item #1- SPB, Evid/Prop, NYSP-JDG mkgs, mkd 1 of 3, containing:
      Pistol - .32 auto caliber DAVIS, S/A Pistol
          Ser # Po 84323
          Mod - P-32

item #2- SPB, Evid/Prop, NYSP-JDG mkgs, mkd 2 of 3, containing:
     1- Pistol mag, DAVis brand   (6 rds cap.)

item #3- SPB, Evid/Prop, NYSP JDG mkgs, mkd 3 of 3 containing:
     1- .32 auto cal R-P wp fmj. ctge

TEST - 1- .32 auto ctge (Submitted) (CH134359)
        2- .32 auto R-P wp fmj ctgs, (Supply) (CH134359-1)

Result - Gun is Operable

                              (CH)

| | T/Z'S<br>L211 | CASE NUMBER<br>BE 5811 | | T/Z'S<br>L211 | CASE NUMBER<br>98-177 | OCCURRED<br>09/17/98 | LABORATORY CASE NO. |

| COUNTY OF OCCURRENCE<br>Suffolk | INVESTIGATING MEMBER<br>Inv. Daniel J. Regini | SUBMITTED BY |

| LAB USE ONLY | NAME (L/F/MI), ADDRESS & DOB OF DEFENDANT: XXXX<br>Pagan, Christopher R. 12/30/64<br>1653 Brentwood Rd.,<br>Brentwood, NY | NAME (L/F/MI), AND ADDRESS OF COMPLAINANT/XXXXX<br>NYSP |

NUMBER OF ADDITIONAL DEFENDANTS:  0

LIST ALL ADDITIONAL DEFENDANTS IN THE EVIDENCE SECTION BELOW OR ON A GENL 2A CONTINUATION SHEET

CHARACTER OF CASE:  CPW 2/F

DESCRIPTION OF EVENTS: VTL stop yielded loaded handgun and items of disguise

### EVIDENCE

| ITEM # | DESCRIPTION | EXAMINATION REQUESTED | 10 | HOLD AT STA. | TO TROOP | TO LAB |
|---|---|---|---|---|---|---|
| 1 | Davis Industries .32 cal. pistol, model P32, Ser. # P084323 | Ballistics/Operability | | | | xx |
| 2 | Davis Industries P32 magazine loaded with Item 3 | Operability | | | | xx |
| 3 | RP .32 cal. auto round (loaded into Item 2) | Ballistics | | | | xx |
| 4 | Black windpants | None | | xx | | |
| 5 | Black ski cap | None | | xx | | |
| 6 | Cut-off black stocking mask w/eye holes | None | | xx | | |
| 7 | Pair Nike black gloves /.nd | None | | xx | | |
| 8 | False black beard | None | | xx | | |
| 9 | Black packpack | None | | xx | | |
| 10 | Bank statements & personal papers in name of LORNA BAGNOT & CATHERINE KNODT | None | | xx | | |

### TRANSFER RECORD

| DATE | ITEMS INVOLVED | FROM | TO | SIGNATURE |
|---|---|---|---|---|
| 09/17/98 | 1 to 10 | Scene | SPIT Unif. EL | Tpr. M/ Mawn |
| 09/17/98 | 1 to 10 | SPIT Unif. EL | SPIT BCI EL | |
| 09/21/98 | 1 to 3 | SPIT BCI EL | SC Crime Lab | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

INSTRUCTIONS TO EVIDENCE CUSTODIAN:  None

NAME AND ADDRESS OF LABORATORY:  SC Crime Lab, Hauppauge, NY

FINAL DISPOSITION OF EVIDENCE: ITEM NUMBERS-DATE OF DISPOSITION

AUTHORITY FOR DISPOSITION:

LIST ADDITIONAL REPORTS OR PHOTOGRAPHS SUBMITTED TO THE LAB:

ADDITIONAL INFORMATION:

Suffolk County Crime Laboratory
Firearms Section
**Weapon Worksheet**

Date _9/22/98_

| LAB# 998-134359 | CC# 98-177- NYSP | ITEM # 1 |
| | | TYPE Pistol |
| CALIBER .32 auto | MAKE DAVIS IND     MODEL P-32 | |
| SERIAL# P084323 | LOCATION(S) Back Strap | |
| OTHER#s | LOCATION(S) | |

HAMMER (LESS)     (SINGLE ACTION)     DOUBLE ACTION     (SEMI-AUTO)     SINGLE SHOT     HINGED FRAME     SWING-OUT CYLINDER     GATE LOADING

RECOIL OPERATED     BLOW BACK     GAS OPERATED     PUMP ACTION     BOLT ACTION     LEVER ACTION     FULL ACTION     OTHER:

| FINISH Chrome | BARREL LENGTH 2 3/4" | OVERALL LENGTH 5 3/8" |
| BARREL SHAPE C | RIFLING 6 L | CHOKE |
| CYL/MAG CAPACITY 6 | CYL. ROTATION | FIRING ORDER |
| TRIGGER PULL | SA 9 1/2 - 10 1/2 DA | FIRING PIN SHAPE C |
| SAFETY CHECK Manual - OK | | |
| BARREL CONDITION / RESIDUES Present | | |
| CYLINDER CONDITION / RESIDUES | | |
| CHAMBERED FOR .32 auto | WILL CHAMBER .32 auto | |
| TEST FIRED ☑ YES ☐ NO | OPERATIONAL CONDITION GooD | |

TESTS: 1 - .32 auto R-P - Submitted
2 - .32 auto R-P - Supply

NOTES:

ANALYST: _CH_

FA1020 [6/97]

EXHIBIT "B"

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
- - - - - - - - - - - - - - - - - - - - - - -x
THE PEOPLE OF THE STATE OF NEW YORK  :
  :
             VS                 : By: HON. LOUIS J. OHLIG
                              :        J.C.C.
  :
Christopher Pagan,           : Case No. 2623-98
  :
  :
               Defendant    :
- - - - - - - - - - - - - - - - - - - - - - -x

HON. JAMES M. CATTERSON, JR.        JOHN A. BRAY, ESQ.
Suffolk County District Attorney     Attorney for Defendant
By: BRIAN RAFFERTY, ESQ.          6080 Jericho Tpke.
Criminal Courts Building           Suite 312
Center Drive South              Commack, NY 11725
Riverhead, New York 11901
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

    At the request of the above named Defendant, a pre-trial <u>Huntley-Mapp</u> hearing was held before this Court, to determine the admissibility, at trial, of certain physical evidence seized as well as statements allegedly made by the Defendant to the police.

    After considering the various testimony and other evidence adduced at the hearing the Court makes the following determination as to the facts and conclusions of law.

    In the early morning hours of September 17, 1998 Trooper Michael Mawn of the New York State Police was on patrol in a marked vehicle with his partner on the Southern State Parkway in Islip.

    At approximately 2:10 a.m. he observed a grey Volkswagen operating without lights make an illegal U-turn on the grass median. Trooper Mawn pursued this vehicle and ultimately pulled it over for the purpose of issuing vehicle and traffic violations. Prior to coming to a stop Trooper Mawn observed the driver of the Volkswagen lunge to the right, in the front passenger area of the car. Upon coming to a stop, approximately 3 feet from the tree line on the right shoulder of the parkway, the Defendant was seen exiting from the right front passenger door of his vehicle. Mawn's partner, Trooper Schwartz, was there to meet him as he exited. The Defendant was asked for a license but could not produce one. He cooperated with the Troopers and moved to the rear of his vehicle. Neither Trooper apparently felt any need for their safety, at this point, since there guns were not drawn and the Defendant was not patted down for weapons.

-1-

While the Defendant and Trooper Schwartz remained at the rear of the Defendant's vehicle some 10 feet away from either door, Trooper Mawn approached the drivers side door, shined his flashlight inside and observed a black stocking type mask with eyeholes cut out. At this point Trooper Mawn opened the drivers door, entered the Defendant's vehicle, picked up the mask, then noticed a wig type object, and picked this up; he then found a black cap and when he picked this up, tucked inside it he found a handgun.

Trooper Mawn testified that he entered the Defendant's vehicle and searched and seized the items listed above, prior to locating the gun, because he felt that the mask and wig were the types of items used in crimes.

Upon seeing Trooper Mawn remove these items the Defendant spontaneously uttered "Oh fuck". The Defendant was then handcuffed and placed under arrest.

Trooper Mawn thereafter attempted to provide <u>Miranda</u> rights to the Defendant from a card in his possession but prior to completion of all rights and waivers, the Defendant spontaneously uttered, in substance, that he was holding the gun for a friend.

The Defendant was then transferred to the State Police barracks and met with State Police Investigator Daniel Regini. Prior to any questioning, Investigator Regini orally advised the Defendant of each of his constitutional <u>Miranda</u> Rights. The Defendant appeared to understand his rights and voluntarily, knowingly and intelligently decided to waive his rights and consent to be questioned by Investigator Regini without the assistance of an attorney. Thereafter the Defendant made an oral inculpatory statement wherein, in substance, he stated that he was returning the gun to its owner in Queens when he was stopped. His purpose of returning it was to exchange it for a better one to do jobs with. When asked to reduce his statements to writing the Defendant declined.

CONCLUSIONS OF LAW

A - <u>Motion to Suppress Physical Evidence Seized</u>

Although it is true that the People have no basis for their claims that Trooper Mawn's search of the Defendant's car was lawful because it was based on reasonable suspicion to believe that the Defendant was armed, or on the Trooper's fear for his safety (People v. Parris, 83 NY2d 342; People v. Chapman, 211 AD2d 5440, there is a second reason which, the Court has determined, justified the search in this case.

Trooper Mawn's observations of a black knit mask with eyeholes cut out on the front seat of Defendant's vehicle combined with the Defendant's suspicious and furtive actions of lunging to the right prior to being stopped and exiting from the right passenger door, taken together, provided probable cause to believe the car contained evidence of a crime, and thus probable cause to search the vehicle. In the opinion of the Court, the observation of a black knit mask

-2-

in the condition found is not merely an innocuous item, but clearly it was reasonable to believe that such was used as a disguise in the commission of crimes. (See, People v. Blasich 73 NY2d 673).

Accordingly, it is the determination of the Court that probable cause existed to search the Defendant's vehicle and the motion to suppress the fruits of the search is hereby DENIED.

## B - Motion to Suppress Statements

With respect to the oral statements of the Defendant allegedly uttered to Trooper Mawn, while in custody and prior to being fully apprised of his Miranda rights, it is the determination of the Court that all such statements were spontaneously uttered. These remarks were in no way the product of an interrogation environment, the result of express questioning or its functional equivalent [People v. Stoesser, 53 NY2d 648]. These statements were truly spontaneous and not the result of inducement, provocation or otherwise.

Accordingly, Defendant's motion to suppress these statements is DENIED.

With respect to the oral statements allegedly made by the Defendant to Investigator Regini, it is the determination of this Court that the uncontroverted evidence established beyond a reasonable doubt that prior to any questioning and while the Defendant was in custody under arrest, he was fully and adequately apprised of each of his constitutional Miranda rights. The Court further finds that the Defendant clearly understood each of his rights and that he knowingly, voluntarily and intelligently decided to waive those rights and make an oral statement without the assistance of an attorney.

Accordingly, it is the determination of this Court that the oral statement of the Defendant made to Investigator Regini and as received in evidence at this hearing, was voluntarily obtained and is, therefore, admissible at trial on the People's direct case.

The above memorandum constitutes the decision and order of the Court.

SO ORDERED:

Dated: APRIL 8, 1999

Hon. Louis J. Ohlig

J.C.C.

-3-

EXHIBIT "C"

**STATE OF NEW YORK**
**COUNTY COURT : COUNTY OF SUFFOLK**

-------------------------------------------------------------------x

**THE PEOPLE OF THE STATE OF NEW YORK,**    Case No. 2623-98

Plaintiff,                                 **ATTORNEY'S**
                                           **AFFIRMATION**

-against-

**CHRISTOPHER PAGAN,**

Defendant.

-------------------------------------------------------------------x

STATE OF NEW YORK)
                 )s.s.:
COUNTY OF SUFFOLK)

     **GEORGE M. HARMEL, JR.,** an attorney duly licensed to practice law in the State of New York, duly affirms the following under the penalties of perjury:

     I am the attorney of record for the defendant, **CHRISTOPHER PAGAN,** and as such I am fully familiar with the facts and circumstances surrounding this matter. I have represented Christopher Pagan post-conviction. He has requested me to file a CPL 440.10 motion to vacate his conviction due to the defendant's wishes to argue ineffective assistance of his trial attorney, Mr. John Bray. The defendant has also requested me to review his own motion as prepared by his legal assistant, Mr. Larry Davis.

     Said motion by Mr. Davis and Mr. Pagan is hereby incorporated by reference in total. I have edited same and have made corrections. I wish to comply with Mr. Pagan's directions and requests made to me and to the other agencies involved.

On April 20, 1999, a jury trial was held before the Honorable Judge, C.C.J., Louis Ohlig, wherein the defendant was convicted of Criminal Possession of a Weapon, in the second degree as a Class C Violent Felony.

On May 25, 1999, the Honorable Ohlig sentenced the defendant to a term of 22-1/2 years to life imprisonment as a Persistent Violent Felony Offender.

This court has jurisdiction over subject matter infra, pursuant to Section 440.20, subd. 1. of the New York State Criminal Procedure Law.

That a prior motion to vacate the judgment of conviction pursuant to CPL Section 440.20 was filed by **GEORGE M. HARMEL, JR.,** regarding the sentencing requirements of a violent persistent felony status which was denied by this Court. Other than that prior motion, no other application has been made by the defendant herein arguing ineffective assistance of counsel. On behalf of the defendant, Christopher Pagan and Mr. Davis, his legal assistant, the following is offered:

Mr. Pagan submits that the events which transpired in the instant case constitute a denial of Mr. Pagan's rights to effective assistance of trial counsel, fair trial, an equal protection and due process of laws as guaranteed by the New York State Constitution, Article I, Sections 6 and 11, and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution

Since Mr. Pagan's claim of ineffective assistance of counsel can turn on the cumulative effect of all counsel's actions, all his allegations of ineffective assistance should be reviewed together. **Rodgrigues v. Hoke**, 928 F.2d 534 (CA 2 1991) citing **Strickland v. Washington.** 466 U.S. 668, 695-96, 104 S.Ct. 2052, 2068-2069 (1994). See also **Lindstadt v. Keane**, 239 F.2d 191, 199 (CA 2 2001). This court is "given the

opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole. **Id.** Citing **Grady v. LeFeve**, 846 F.2d 862, 865 (CA 2 1988).

Nonetheless, there is an exception to the **Rodriguez** and **Lindstadt** rulings, as the New York Court of Appeals put it. While a single, substantial error by counsel so seriously compromises a defendant's right to a fair trial, it will qualify as ineffective assistance. **People v. Hobot**, 84 N.Y. 1021, 1022 (1995). Moreover, a number of courts have held that one egregious error by the trial attorney may constitute ineffective assistance of counsel. **People v. Alexander,** 136 Misc 3d 573, 518 N.Y.S. 2d 872, 878 (Sup. 1987) citing **Kimmelman v. Morrison**, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed. 2d 305 (1986); **People v. Jenkins**, 68 N.Y. 2d 896, 508 N.Y.S. 2d 837, 501 N.E. 2d 586 (1986).

Here, the trial court abused its discretion when he denied Mr. Pagan his fundamental Constitutional right to his choice of counsel, notwithstanding, Mr. Pagan was denied effective assistance of trial counsel and a fair trial in violation of his Sixth and Fourteenth Amendment rights to the United States Constitution. There can be little doubt that the right to counsel, as guaranteed by both the State and Federal Constitutions, (N.Y. Const., Art. I, Sec. 6; U.S. Const. 6th Amend) incorporates the right of a criminal defendant to representation by an attorney of his own choosing. **People v. Tineo**, 64 N.Y.2d 53, 490 N.Y.S.2d 159, 163, 479 N.E.2d 795 (Ct. App. 1985) citing **People v. Arroyave,** 49N.Y.2d 264, 270, 425 N.Y.S.2d 282, 401 N.E. 2d 393; **Chandler v. Fretag**, 348 U.S. 3, 9, 75 S.Ct. 1, 4, 99 L.E. 4 and that judicial restriction or governmental intrusion upon the exercise of this fundamental right will be carefully scrutinized. **Id.** Pagan's right to counsel of choice is not diminished once the criminal action has been

commenced, i.e.: during and in between trial or at sentence. As a necessary corollary to this right, a defendant must be accorded a reasonable opportunity to select and retain his counsel. **People v. Arrovave**, 49 N.Y. 2d 264, 425 N.Y.S.2d 283, 285, 401 N.E.2d 393 (1980) citing **Chandler v. Fretag**, 348 U.S. at pp. 9-10, 75 S.Ct. at pp. 4-5, **supra**; **United States v. Bragan**, 4 Cir., 499 F.2d 1376, 1379. This Constitutional guarantee, ensuring the right of a defendant to be represented at trial by counsel of his own choosing serves many critical needs. Paramount among these considerations is the need for a defendant to be willing to confide freely and fully in his attorney so that the channels of communication and advice between counsel and his client may remain free-flowing and unobstructed. Mutual cooperation between defendant and legal representation, and an atmosphere of trust and respect can best be obtained if defendant's choice of counsel is honored. **Id.** Citing **Baird v. Kerner**, 9th Cir., 279 F.2d 623, 629-30. However, the right to counsel of choice is qualified and can be outweighed by countervailing governmental interest. **Kuriansky v. Bed-Stuy Health Care Corp.**, 135 A.D.2d 160, 525 N.Y.S.2d 225, 223 (2nd Dept. 1988) citing i.e.: **United States v. Paone**, 782 F.2d 386, 392 (CA 2 1986), **cert denied** _____U.S. , 107 S.Ct. 3261, 97 L.Ed.2d 761 (1987), or "when required by the fair and proper administration of justice." **Id.** Here, there is nothing in this record that would show the government had an interest one way or another regarding Pagan's application seeking to have court appointed counsel Bray discharged, and allow him a one day adjournment to retain new counsel. Moreover, Pagan's request to adjourn the case for one day to retain new counsel of his choice would not in any way have obstructed a fair and proper administration of justice

4

as more fully explained herein below. **See Exhibit "A" pp. 1-218 of the April 14, 1999 Trial Transcript and Exhibit "B" pp. 1-376 of the April 15, 1999 Trial Transcript.**

In any event, the Sixth Amendment right to counsel, includes a right to retain counsel of choice by one who is financially able to do so. **Id.** at 233 citing i.e.: **United States v. Curcio**, 694 F.2d 14, 22-23 (CA 2 1982); **United States v. Burton**, 584 F.2d 485, 489 (D.C. Cir. 1978), **cert. denied**, 439 U.S. 1969, 99 S.Ct. 837, 59 L.Ed.2d 34. And "(a)n accused who is financially able to retain counsel must not be deprived of the opportunity to do so." **United States v. Monanto**, 838 F.2d 74, 80 (CA 2 1987) citing **United States v. Curcio**, 694 F.2d 14, 22-23 (CA 2 1982), even though it "may sometimes seem woefully foolish to the judge." **Torres v. United States**, 140 F.2d 392, 402 (CA 2 1998), **cert. denied**, 119 S.Ct 595, 525 U.S. 1042, 142 L.Ed 237 (1998). Just as (state or district courts) should not "compel a defendant to accept a lawyer (he) does not want, " **Id.** at 402 citing **Faretta v. California**, 422 U.S. at 833, 93 S.Ct. at 2540 (1975), to do so is to "imprison a man in his privileges and call it the Constitution." **Wiesher v. Adams**, 726 F. Supp. 912, 918 (E.D.N.Y. 1989) citing **Faretta**, 422 U.S. at 815, 95 S.Ct. at 253). Nonetheless, unless an accused agrees to representation by counsel, the defense presented by counsel is not deemed the defense guaranteed by the Constitution for in a very real sense it is not the accused's defense. **Id.** citing **id.** at 821, 95 S.Ct. at 2534. As expressed by Chief Judge Brieant of New York:

> (a)t trial, the criminal defendant is confronted with the possible loss of his liberty, his dignity and a host of other things, on this occasion, above all others, he is entitled to speak freely, to control his own future and exercise his free will . . .If freely chosen, the right to go to trial without counsel is protected by Constitutional and indeed natural law. **Id.** (quoting aff'd. S.Ct. 3212, 96 L.Ed. 2d 699 (1987).

The Constitutional right to counsel is fundamental to our system of justice (see U.S. Const. 6th Amend; NY Const., Art. I, Sec. 6). Implicit in the exercise of this right is the concomitant right to forego the advantages of counsel and represent oneself. **People v. Arroyo**, 1 No. 64, **Decided June 11, 2002** by the Court of Appeals, reported at p. 18 in the June 12, 2002 New York Law Journal **(NYLJ Id)** citing **People v. McIntyre**, 36 N.Y.2d 10, 15; see also **Adams v. United States ex rel McCann**, 377 U.S. 269, 279 (recognizing the right to counsel implicitly embodies 'correlative right to dispense with a lawyer's help.") **NYLJ Id.** It is nearly a universal conviction on the part of our People, as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." **NYLJ. Id.** citing **Faretta v. California**, 422 U.S. 806, 817. See also **People v. Smith**, 68 NY2d 737, 739. The right to counsel and the right to forego counsel are "inherently antagonistic" ideals. In order to best promote the orderly administration of justice and insulate convictions from claims of deprivation of fundamental fairness, the right of self-representation is necessarily a qualified right. **NYLJ, Id.** citing **McIntyre**, 36 NY2d at 14, 16-17.

Thus, before proceeding pro se, a defendant must make a knowing, voluntary and intelligent waiver of the right to counsel. **NYLJ, Id.** citing **People v. Slaughter**, 78 NY2d 485, 491; **People v. Vivienzo**, 62 NY2d 775, 776. In determining whether a waiver meets this requirement, the court should undertake a "searching inquiry" of the defendant, **NYLJ. Id.** citing **Slaughter**, 78 NY2d at 491; **Faretta**, 422 US at 835. A defendant need not have the professional skills and experience of an attorney to choose self-representation. However, a defendant should be "made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what

6

he is doing and his choice is made with eyes open." **NYLJ, Id.** citing **Faretta**, 422 US at 835 (quotation omitted). Moreover, appropriate record evidence is required which "should affirmatively disclose that a trial court has delved into a defendant's age, education, occupation, previous exposure to legal procedures and other relevant factors bearing on a competent, intelligent, voluntary waiver." **NYLJ, Id.** citing **People v. Smith**, 92 NY2d 516, 520 citing **McIntyre**, 36 NY2d at 171. Although we have eschewed application of any rigid formula and endorsed the use of a nonformalistic, flexible inquiry, the court's record exploration of the issue "must accomplish the goals of adequately warning a defendant of the rights inherent in proceeding pro se, and apprising a defendant of the singular importance of the lawyer in the adversarial system of adjudication" **NYLJ, id.** citing **People v. Kaltenbach**, 60 NY2d 797, 799.

Here, Pagan motioned the trial court to have court appointed counsel, Bray, discharged as his counsel, and he thereby waived his right to counsel necessary to allow him to represent himself or proceed to trial with new counsel of his choice. Moreover, though Pagan did not move the trial court to allow him to proceed pro se, the fact that he had moved, for good reasons to have counsel, Bray, removed from his case as his counsel strongly suggests Pagan would have proceeded pro se had he been aware or advised by Bray of his right to do so despite the fact that his application to remove Bray and allow him one day to retain his new counsel had been denied by the trial court. Furthermore, even though Pagan did not move the court to allow him to proceed pro se, the trial court was still obligated to adequately evaluate defendant's competency to waive counsel, to warn him of the "risks inherent in proceeding pro se," and to apprise him of the importance of the lawyer in the adversarial system of adjudication." **NYLJ, id.** citing

**Smith**, 92 NY2d at 520. Here, the trial record fails to establish the court made any such searching inquiries. Notwithstanding, the trial record fails to establish that Pagan had knowingly and intelligently waived his right to proceed pro se in this case, despite the fact that he had moved the court to discharge Bray and allow him one day to retain his new choice of counsel. **See Exhibit "A" pp. 1-16.**

In any event, there is nothing in Article 18-b which prohibits nor can be interpreted to counsel against the appointment of more than one attorney or of any attorney from outside the County Panel. **See N.Y. County Law, Art. 18-B, Section 722 (McKinney 1993).** As said before, a defendant's "right to counsel in New York, encompasses the right to counsel of (his) choice . . . ." **People v. Martinez,** 151 Misc.2d 641, 649-50, 574 N.Y.S.2d 467, 475 (Sup.Ct. N.Y. County 1991) citing **People v. Arrovave**, 49 N.Y.2d 264, 425 N.Y.S.2d 282, 401 N.E.2d 393 (1980). An indigent defendant has the "absolute right . . . to have the attorney who interviewed him, who investigated his case, and who prepared his case for trial, also try his case." **People v. Elliot**, 98 Misc.2d 424, 427, 413 N.Y.S.2d 1001, 1004 (Sup.Ct. N.Y. County 1979). The "confidence built up over weeks or months by the defendant in the attorney who has undertaken the representation ...should not be dissipated." **Id.** Moreover, in **People v. Gulley**, 89 A.D.2d 874, 453 N.Y.S.2d 229, 230 (2nd Dept. 1982) the court held that the trial court abused its discretion in refusing to grant defendant's application for a change in his appointed counsel. **Id.** in refusing to grant the application, the trial court noted defendant's present attorney was his third appointed counsel. The record indicates, however, that none of the prior changes in counsel was caused by the defendant. **Id.** at 230. The court should not have considered the number of attorneys involved as the

8

determinative factor in denying the defendant's application for new counsel. **Id.** Here, Pagan's first counsel became a potential material witness for Pagan when the court dismissed the first indictment in connection with the People's failure to serve proper notice upon counsel or Pagan advising them that a grand jury had been convened to investigate this case, and that Pagan was being advised of his right to appear in that grand jury if he so wished. Mr. Pagan's second counsel, Vitale, as said before, was discharged due to his efforts to get Pagan to cooperate with the District Attorney's office regarding unrelated cases that Mr. Pagan knew nothing about. Thereafter, Bray was assigned to represent Pagan. Nonetheless, the trial record reveals that the court erroneously considered the number of attorneys involved as the determinative factor in denying the defendant's application for new counsel. For example, the trial court noted:

> "My recollection here is you made a complaint before for Legal Aid representation of you and they were relieved by your complaint and Mr. Bray was assigned. Now, you are asking that Mr. Bray be discharged with the replacement of your own attorney. You seem to have a pattern here of trying to delay or criticize or find fault with attorneys who represent you." **See Exhibit "A" pp. 5-6.**

Prior to Bray, Pagan had only made one request to have Vitale discharged and new counsel appointed, and the court granted that application with no reluctance. Had this court believed anything contrary to Pagan's complaint against Vitale, the court would not have discharged Vitale and proceeded to trial. So, the court's statement that: "**You seem to have a pattern here of trying to delay or criticize or find fault with attorneys who represent you**" is nothing more than a conclusory statement which is not supported by one single piece of evidence in the trial record.

In addition, Mr. Pagan made only one application asking this court to discharge Vitale and that request was made prior to Pagan's request to discharge Bray. Moreover,

this is not a case where Pagan sought to have Bray discharged and new counsel appointed by this court. Simply put, Pagan requested a one day adjournment to retain new counsel because of a serious conflict of interest and a statement made to him and his wife by Bray in which Bray stated: **"I'm being forced to go to trial with you. You need to take a plea because I don't have a defense for you, and the defense you have stated I am not going to put on if a trial is held. Besides, I am not getting enough money from the court to try this case, and as you already know, the court has ruled against your search and seizure issue."** The court did not take steps to call Mr. Pagan's wife to the stand to testify under oath about what she and her husband had been told by Bray, the court without any foundation outright rejected Pagan's complaints about Bray and basically claimed Pagan's complaints about Bray were lies. **Exhibit "A" pp. 4-12.**

Counsel Bray did nothing to fulfill the obligation of his position as counsel. **Harding v. Davis**, 878 F.2d 1341, 1344 (CA 11 1989). Even a criminal defendant's complete non-cooperation does not free his lawyer to abdicate his professional responsibility circumstances. **Id.** Accordingly, counsel Bray failed to fulfill his obligation even after a breakdown in communication with Mr. Pagan, rendering Bray's assistance ineffective prior to and during trial when he, among other things, failed to register for the record any objection to the trial court compelling Mr. Pagan to accept counsel Bray as his trial attorney, and the trial court's refusal to grant Pagan's application to adjourn the case for one day to allow Pagan to retain new counsel of his choice for trial failed to honor Mr. Pagan's request to hire an investigator to locate several material witnesses, failed to investigate Pagan's case himself and put on the defense Pagan had requested Bray to put on, failed to put on any other defense available to Pagan, ill-

10

advised Pagan of his right to testify at trial, failed to inform Pagan that he had constitutional rights to proceed to trial pro se, or, with retained counsel of his choice, failed to make timely objections prior to and during trial, failed to file and/or make several applications and or motions with the trial court on behalf of Mr. Pagan's defense as explained herein throughout.

In the instant case, on April 13, 1999, after counsel Bray stated to Mr. And Mrs. Pagan over the phone about his being forced to go to trial, etc., Mr. And Ms. Pagan contacted an attorney. Pagan at that time advised the attorney that he would have the retainer fee to retain him on either April 14 or no later than April 15, 1999.

Nonetheless, on April 14, during the early hours of that day, at the opening of the court proceedings and before the beginning of jury selection, Mr. Pagan made an application to the trial court to discharge court appointed attorney Bray, whom Pagan had shown good cause for his removal. Notwithstanding, Pagan sought permission from the trial court to adjourn the case for one day so that he and his wife could get the finances their families and friends had finally agreed to assist them with in order to retain new counsel to represent Pagan at trial the following day. However, the trial court denied that application without any legal or reasonable and/or logical conclusion for the denial. It is well settled that "the trial court's refusal to grant the accused's motion for a continuance in order that he might have the assistance in the proceeding of counsel whom he had retained, deprived the accused of due process in the Constitutional sense." **Reynolds v. Cochran**, 365 U.S. 525, 5 L.Ed. 754, 81 S.Ct 713 (1961).

When Judge Ohlig denied Pagan's application to discharge Bray from Pagan's case, Bray stood by and did absolutely nothing to protect Pagan's right to his choice of

11

counsel, not even join in on Pagan's application for a one day adjournment to retain new counsel when asked to do so by Pagan. Moreover, Pagan was deterred by Bray's actions and statement that **"there is nothing I could do about the judge denying your request to retain new counsel by tomorrow" (referring to April 15, 1999).** This statement caused Pagan to believe that there was nothing that could be done to protect his right to retain his choice of counsel, when in fact, Bray could have asked for a continuance so that Pagan could have retained new counsel or to allow Bray to motion the Appellate Division asking that the court, pursuant to Article 78 of the Civil Practice Law and Rules, to prohibit Judge Ohlig from proceeding with this case with Bray as Pagan's counsel. However, Bray failed to do either, rendering assistance ineffective to Pagan. For example, in open court on April 14, 1999, the record reveals the following:

**Mr. Bray:** Yes, judge. In light of recent case law, I think it only prudent to place on the record that I have had extensive discussion with the defendant, both in prison and by telephone, with regard to his position as to this trial. As you know, we're here because he's insisting we go to trial.

I told him that the main issue, namely, whether or not the search for the gun was valid, is already decided by the court. In any event, it's his choice whether or not to go to trial.

But I want to place on the record that I have told him it was in his best interest to plead guilty. He still reserves all issues and rights to the hearing. In the future, so that there is no confusion about whether or not I gave him all the necessary advise concerning his legal rights and about my best advise as counsel in terms of how we should proceed.

I also think at this time, that the defendant wants to address the court.

**The Court:** All right. Mr. Pagan, now, stand up.

**The Defendant:** I just informed Mr. Bray –

**The Court:** Speak up so we can hear.

**The Defendant** I just informed Mr. Bray in the back that we're seeking other legal counsel, but we'll wait until tomorrow. I told him I would wait until tomorrow.

**The Court:** Whose we?

**The Defendant:** Me and my wife.

**The Court:** We are – on the eve of jury selection you come forth and say that you are seeking to retain your own attorney. Mr. Bray has been assigned. I think what you are telling the court on the eve of selecting a jury that has been called to the courthouse here in Riverhead, the County Site, and downstairs waiting to come up for jury selection, you are requesting to discharge Mr. Bray and come forth with an attorney of your own. Is that what you are asking the court?

**The Defendant:** I informed you that we're seeking –

**The Court:** You don't inform. Is that what you are asking me?

**The Defendant:** I'm asking. I am seeking my own counsel.

**The Court:** I would assume that would be forthcoming, it would have happened before this, by this date – but if it didn't happen before this date, I would assume you would have had your attorney here now if you were sincere in your application to have your own attorney of your own choosing. When I use the words, choosing, that you could pay for Mr. Bray has been assigned.

My recollection here is you made a complaint before us for Legal Aid representation of you and they were relieved by your complaint and Mr. Bray was assigned. Now, you are asking that Mr. Bray be discharged with the replacement of your own attorney. You seem to have a pattern here of trying to delay or criticize or find fault with attorneys who represent you.

The court, based on your action and based on what has transpired here, I would have to come to a logical conclusion that you are just attempting to delay the inevitable. The inevitable is a trial.

13

**The Defendant:** I'm not trying to delay a trial.

**The Court:** Why are you bringing forth that last charge?

**The Defendant:** Mr. Bray brings to my attention yesterday and he says that he's being forced to go to trial. He doesn't want to go trial to –

**The Court:** He's being forced to go to trial?

**The Defendant:** That's what Mr. Bray told us.

**The Court:** Let's get that in the proper context. Forced to go to trial. I said so many times as judge in 23 years, cases only can get resolved three ways?

The People move to dismiss.

The second way, if the first does not happen, the second way is that there is a plea bargain arrangement agreed upon between defense counsel acting in the best interest of his client and the district attorney who is willing to go along with it and present it to the court subject to the court's approval.

If that cannot be achieved, then the third and final way that a case gets resolved is to go to trial.

Now, there has been – Mr. Bray has come back in the conferences that we have had on numerous occasions and said that you do not wish to accept the People's offer of sixteen to life. So when you say he uses the words, forces to go to trial, he's not forced to go to trial. He must go to trial because you do not wish to accept the People's offer which you are entitled not accept and you are entitled to go to trial. And this is what we have here now. It cannot be resolved on plea bargain and you have been through the system.

**The Defendant:** I'm not not looking for a plea, your Honor.

**The Court:** You have been before the court before so the only way this case can get resolved is a trial. And now you're coming forth and you told me he told you yesterday that he's forced to go to trial. That word is ---

Let me ask Mr. Bray. Did you use the words forced to go to trial?

14

**Mr. Bray:** No Judge.

**The Court:** What words did you say?

**Mr. Bray:** The only way to resolve this is with a trial and that we're here at his request. I didn't use the word, force. That wasn't used.

**The Court:** I'm not surprised. I certainly wanted you to set forth that on the record. You disagree with what Mr. Bray just said?

**The Defendant:** Yes, I disagree.

**The Court:** He used the word forced?

**The Defendant:** That's what he used.

He informed me and my wife that you have already made your decision, that you are not going to — not going to let me go.

**The Court:** What do you mean, not going to let me go.

**The Defendant:** In reference, he stated that you don't want me on the street any more. He says he's not being paid, you know, seeing any money. He says that — he says that he's being forced to go to trial. He said I should have taken the plea. And he already told my wife I'm going to do more time.

**The Court:** I just told you if a plea bargain cannot be obtained and agreed upon by the parties subject to the court, the only way, the final way the case can get resolved, is you have to go to trial.

**The Defendant:** I understand. I want to go to trial.

**The Court:** He spoke with you. You do not want to take or accept the People's offer so you must go to trial.

**The Defendant:** I understand that.

**The Court:** Well, you are telling him you don't want the offer. So, he's saying, fine. I'm going to represent you. We're going to select a jury and we must go to trial. That's it. It's simple. There's nothing to read between the lines. It's simple.

The third way a case gets resolved if it cannot be accepted and resolved with a plea bargain, it must go to trial.

So, you told him you don't want the offer. And he said, fine. I'll be here tomorrow. We're going to trial just like we had a hearing in October. And I rendered my

decision. And just before jury selection, a Sandoval Hearing which is an issue here, is whether or not the People can introduce any prior criminal activities of yours.

All right.

That's what the hearing is for now. Okay.

So, Mr. Bray is here again to represent you, you know to the fullest. He represented you to the fullest with the hearing that we had before as to the admissibility of the evidence that was obtained and the Miranda Warnings, also. And also he's made motions in your behalf. He's done everything that a defense attorney could do for a client.

**The Defendant:** Up until this point, I didn't have any complaint with Mr. Bray until he informed me and my wife of the things that he informed us of.

**The Court:** You are telling me a story, Mr. Pagan, in plain English.

**The Defendant:** I'm not telling a story.

**The Court:** You are bringing this forth at the eve of jury selection.

**The Defendant:** I'm not telling a story.

**The Court:** Did you think the case did not go to trial?

**The Defendant:** I want it to go to trial.

**The Court:** It's going today. Your application is denied. I don't believe you are sincere and honest with the court. Had I seen an attorney here today making that application on your behalf, I may have given some credence to your desire to another attorney here, but an attorney is not here. And I have to assume it's dilatory on your part to delay, to procrastinate, with the trial going forward. So, your application is denied.

We are ready gentlemen on the Sandoval issue?

**Mr. Rafferty:** Yes.

**Mr. Bray:** Yes.

**Mr. Rafferty:** For the record, judge –

**The Court:** Let me – while we're on the record here. Have you – what is your understanding what the People's offer is, Mr. Pagan, on the plea bargain?

**The Defendant** Ten years.

**The Court:** I beg your pardon.

**The Defendant:** Ten years.

**Mr. Rafferty:** That's not the People's offer. The People's offer, Judge, is sixteen to life. That's the minimum time to receive on a C Violent Felony. If the defendant should go to trial, it's the People's intention to seek the maximum sentence of this defendant which is twenty-five years to life.

**The Court:** So nobody leaves my courtroom confused.

All right.

I'm going to spend a little more time here. No defendant ever said, I didn't know. Why didn't you tell me? Had I been informed? I wasn't aware. Now, it's crystal clear. It's on the record. You face a maximum time here of twenty-five years to life because of two prior criminal incidents that you had. Okay. Felony convictions. They're violent. Therefore, you are in the category here that allows, with the guidelines of twenty-five years to life as maximum . That you are a persistent violent felony offender. Two priors. The People have offered you the minimum of sixteen years.

If you get convicted I, myself, as a Judge, have the right to use my discretion and I could impose a maximum of twenty-five years. I'll listen. If you are convicted, I would listen to the testimony that comes out for the various witnesses and determine what should be the proper sentence. I could go twenty-five. I don't know if I will, but I could go – but the People are offering you the minimum now of sixteen years. I don't know where you are coming up with the ten from. It's sixteen years. By statute they cannot offer anything less based on the indictment. Okay, so, their hands are tied so to say. Also, based on what the law is, on these sentence guidelines and enacted by the Legislature.

So, is there anything that I just stated here that you do not understand or comprehend?

**The Defendant:** No, there is not. Ten years came from Mr. Vitale when he was my attorney.

**The Court:** That was a long time ago.

**The Defendant:** I understand that.

**The Court:** We're at this juncture now.

All right.

**The Defendant:** Yes.

**The Court:** -- by the People now, it's sixteen to life. After a jury trial if they do find you guilty, then it lies within my province here to determine what sentence I would impose. The Court in accordance with the guidelines. But you face a maximum you could receive twenty-five years to life.

You understand?

**The Defendant:** Yes, sir.

**The Court:** Okay. Shall we proceed ahead with the Sandoval Hearing?

**The Defendant:** Yes.

**See Exhibit "A" pp. 1-16 of the April 14, 1999 Trial Transcript.** Wherein, the only basis given by the trial court for its denial of Pagan's request for a **ONE DAY** adjournment to retain new counsel and have him appear the following day, is the trial court's statement to Pagan as reflected in the record, in which the trial court states: **"based on your action and based on what has transpired here I would have to come to a logical conclusion that you are just attempting to delay the inevitable. The inevitable is a trial."** However, the court's aforesaid statement is contradicted and/or disputed by Pagan's repeated statements thereafter that he did not want to plead guilty and that **"I'm not trying to delay a trial."** However, the court's aforesaid statement is contradicted and/or disputed by Pagan's repeated statements thereafter that he did not

18

want to plead guilty, and that **I'm not trying to delay a trial. I understand. I want to go to trial. I want it to go to trial."** See Exhibit "A" pp. 6, 10 and 12. Notwithstanding, defense counsel's remarks at the very opening of the April 14, 1999 proceeding and prior to the trial court's aforementioned statement in which counsel Bray makes it clear that Mr. Pagan was insisting that he wanted to go to trial. Bray states: **"Yes, Judge. In light of recent case law, I think it only prudent to place on the record that I have had extensive discussion with the defendant, both in prison and by telephone, with regards to his position as to the trial. As you know, we're here because he's insisting we go to trial."** See Exhibit "A" p. 3. If there were anyone trying to delay a trial, it certainly was not Mr. Pagan. Moreover, the trial record clearly reflects that it was counsel Bray and the trial court making every foil move possible to avoid a trial. For example, counsel Bray rendered assistance ineffective when he advised Pagan to plead guilty to the charge without first exploring the plea offer and/or how much time Pagan would receive had he taken the plea. At the opening of the April 14, 1999 proceeding, counsel Bray informed the Court **"that I have told him it was in his best interest to plead guilty."** See Exhibit "A" p.3. However, as evident, counsel Bray never fully explored the plea offer from the People before advising Pagan to plead guilty and among other things is the trial court's questions to Pagan and Pagan's responses thereto. Bray rendered assistance ineffective when he, among other things, advised Pagan that it was in his best interest to plead guilty without first investigating and/or inquiring of the People about any plea offer and prison time recommended by the People had Pagan pled guilty. However, Bray informed Pagan that he had been told by his counsel, Vitale, that the court had stated to him **"get him to plead guilty and I'll think**

19

**about doing the right thing for him."** In spite of this statement, and not knowing precisely what the trial court or Vitale meant by **"I'll think about doing the right thing for him."** Bray did not raise the statement with the court or the People when asked to do so by Pagan. Simply put, he did absolutely nothing to properly address it in any manner. As said before, Bray felt comfortable telling Pagan it was in his best interest to plead guilty, but yet, he never advised him of how much time he could and/or would receive had he pled guilty.

More disturbing is the trial court's statement: **"...I don't know where you are coming up with the ten from. It's sixteen years..." Exhibit "A" p. 15** makes clear that the trial court and ADA Rafferty had not discussed with either Vitale or Bray that Pagan would receive a ten year sentence had he pled guilty. Moreover, Vitale also rendered assistance ineffective to Pagan when he lied to him by telling him he would only receive a sentence of ten years if he pled guilty, when, in fact, he would not have received such an illusory sentence. A motion seeking vacatur of conviction, on the ground that defense counsel told Pagan a lie and that, in absence of the lie, Pagan may have pled guilty based on an **ALFORD** plea or to a lesser charge and may not have insisted on trial, renders Bray's assistance ineffective when he lies to the defendant. **See United States v. Giardino, 797 F.2d 30 (CA 1 1986)** Likewise, Bray rendered assistance ineffective when he lent credit to the Court's aforesaid statement by not responding to it at all. See **(Exhibit "A" pp. 3-218 and Exhibit "B" pp. 1-376),**and when he relied upon Vitale's sole aforesaid statement as his basis in attempting to get Pagan to plead guilty. Furthermore, at no time prior to April 14, 1998, was Pagan ever

told by Bray or Vitale that if he pled guilty to the C Violent Felony that he would be sentenced to sixteen years to life in prison. **(Exhibit "A" pp. 13-16).**

Even assuming Pagan pled guilty based upon Vitale's false promise that he would receive ten years in prison, indeed, had he done so, the trial court would not have sentenced him to ten years. In fact, according to the trial judge, he would not have been in a position to give Pagan ten years because the Sentencing Guidelines prohibited the court from doing so, as the trial court puts it: **"...I don't know where you are coming up with the ten from. It is sixteen years. By statute, they cannot offer anything less based on the indictment. Okay. So, their hands are tied so to say. Also, based on what the law is on these sentencing guidelines and enacted by the Legislature..." (Exhibit "A" p. 15).**

Though the trial court (over Pagan's objection) compelled Bray as Pagan's counsel on this case, Pagan still was entitled to competent assistance by Bray prior to and during his trial. Moreover, whether Pagan decided to plead guilty or not is of no concern because he was entitled to competent assistance of counsel who adequately investigated both the law and facts regarding any plea negotiations and sentence, and to convey fully accurate information regarding those plea negotiations and sentence to the defendant. Neither counselors Bray or Vitale conveyed accurate information regarding any plea offer or sentence, thereby rendering assistance ineffective when it came to exploring any plea offer and sentence on Pagan's behalf and fully conveying accurate information regarding the plea offer and sentence to the defendant.

Furthermore, Bray rendered himself ineffective to Pagan's defense when he (over Pagan's objections) refused to properly and/or at all, use several police reports to

21

impeach Trooper Michael A. Mawn or Investigator Daniel J. Regini on several critical key points, i.e.: among other things, whether Mawn or Regini did or did not interview Lorna Bagnot and/or Catherine Knodt regarding their bank statements and other personal papers that were found in a backpack with a gun and other items allegedly found inside Pagan's wife's car that Mr. Pagan was driving at the time he was pulled over and arrested for possession of a weapon, or, to determine whether Ms. Knodt and Ms. Bagnot were or not the victims of a robbery or robberies by Pagan or whether either one of them would own up to the gun and other items allegedly found in the backpack with their personal papers. Simply put, had counsel impeached Mawn and/or Regini with the police evidence reports, there is a reasonable possibility that, but for counsel's refusal to impeach them, the outcome would·have been different. Moreover, counsel rendered assistance ineffective when he refused (over Pagan's objections) to locate the two aforesaid witnesses himself and interview them or to hire an investigator to locate and interview them to determine: (a) whether Ms. Knodt and Ms. Bagnot were not or were the victims of a robbery or robberies by Pagan, or (b) whether either of them would own up to the gun and other items found with their personal papers.

In any event, there are many ways to properly assist a client. **Pavel v. Hollins**, 2001 WL 845379, *6 (2ND Cir. NY). But making important decisions with no regard to a client's interests is not one of them. That much is perfectly clear without the benefit of hindsight. **Id.** Inasmuch as "an attorney's failure to present available exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration justified it." **Pavel**, 2001 WL 845379, *8. In such cases, it should be perfectly obvious that it will almost always be useful for defense counsel to speak before trial with readily

22

available fact witnesses whose non-cumulative testimony would directly corroborate the defense's theory of important disputes. **Id.** "Counsel's anticipation of what a potential witness would say does not excuse the failure to find out, " in the context of an attorney who failed to contact a particular witness would say. **Id.** "Though there may be instances when the decision not to contact a potential defense witness is justified, an attorney who fails even to interview a readily available witness whose noncumulative testimony may potentially aid the defense should not be allowed automatically to defend his omission simply by raising the shield of 'trial strategy and tactic.'" **Id. See also i.e.: Hart v. Gomez**, 174 F.3d 1067, 1071 (CA 9 1999) holding that counsel provided constitutionally ineffective assistance where, inter alia, "having chosen to pursue (a particular) line of defense," counsel did not introduce readily available evidence that would have corroborated that line of defense, and there was no plausible strategic reason for his not introducing the evidence). **Id.** at 2001 WL 845379, *9. Where, as here, on September 17, 1998, Pagan was pulled over in his wife's car by Trooper Mawn, upon a search of the car, Mawn, claimed he found a gun, a number of other items and assorted papers. Among the papers found with the gun were bank statements addressed to Catherine Knodt, a letter addressed to Mrs. Knodt, a request for taxpayer I.D. number for Mrs. Knodt, mail addressed to Mrs. Knodt, personal banking statement from Lorna Bagnot, photocopies of checks of Mrs. Knodt and other items. The Assistant District Attorney listed for the record the aforesaid items among others. **See Exhibit "B" Tr. Pp 94-99).** These aforesaid items, among others were allegedly taken from the car and were recorded on several police reports prepared by Trooper Mawn and/or Investigator Regini. These police reports are labeled as: (a) the Suffolk County Sheriff's Department Property

Inventory form, dated September 17, 1998; (b) the New York State Police Vehicle Impoundment and Inventory Record form, dated September 17, 1998, and (c) two (2) pages of the BCI Evidence Record form, dated September 17 and 21, 1998. In the BCI Evidence Record form it contains the signatures of Trooper Mawn and Investigator Regini, who listed the description of the items allegedly removed from the car. Trial counsel received a copy of the aforesaid form and never used the form to impeach Mawn and Regini during their cross-examination on the stand and even after Pagan repeatedly requested, trial counsel still refused to use the form to ask the officers that they attempted to locate and interview the aforesaid two witnesses to find out why their personal papers were in a backpack with a gun in a car driven by Pagan. Moreover, if Mawn and Regini did locate and interview the two witnesses, did they own up to the gun and other items allegedly found in the car? **See Exhibit "B" Tr. Pp. 174-207 and 279-289.**

Even assuming Knodt or Bagnot did not own up to the gun, their personal papers and other items found in the car did not belong to them. It cannot be assumed any other way in light of the fact that trial counsel, Trooper Mawn and/or Investigator Regini never attempted to locate and interview the aforementioned two witnesses to find out what, if anything, they would have said regarding their personal papers being in a backpack with a gun in a car Pagan had been driving. Had the jury in this case became aware that personal papers of Knodt and Bagnot were found in a backpack with a gun or even next to the gun and other items, the jury could have drawn an inference that perhaps the gun and other items were left in the car by either Knodt or Bagnot, and may very well have found Pagan not guilty of gun possession.

Plainly, even at the time counsel should have raised these impeachment statements, the law was well settled in favor of the defendant. The law pertaining to prior inconsistent statements is well developed, having originated as early common law. **People v. Wise,** 46 N.Y. 321, 413 N.Y.S.2d 334, 337, 385, N.E.2d 1262 (Ct. App., 1978), and having been refined over the intervening decades. **Id.** Thus, the elements of the rules are easily stated: "If a proper foundation is laid, a party may show that one of his adversary's witnesses has, on another occasion, made statements which are inconsistent with some material part of his (or her) present testimony. **Id.** To set the stage for the prior inconsistency, the questioner must first set the stage for the prior inconsistency, the questioner must first inform the witness of the circumstances surrounding the making of the statement, and inquire of him whether he, in fact, made it. **Id.** Once properly admitted, the previous statement traditionally might be used only to affect credibility. **Id.**

From earliest common law days, a prior statement was admissible for impeachment purposes even though it did not directly contradict the witness' testimony. **Id.** "Nor need there be a direct and positive contradiction. It is enough that the testimony and the statements are inconsistent and tend to prove differing facts." More recent cases, to reiterate and apply the rule in this fashion, **Id.** citing **People v. Bornholdt,** 33 N.Y.2d 75, 88, 350 N.Y.S. 2d 369, 379, 305 N.E. 2d 461. 468, **supra;** see **Peoeple v. Miles,** 23 N.Y.2d 527, 543-544, 297 N.Y.S.2d 913, 925-926, 245 N.E.2d 688, 696-697, **cert. denied** 395 U.S. 948, 89 S.Ct. 2028, 23 L.Ed. 2d 467; **People v. Johnson,** 27 N.Y.2d 119, 122-123, 313 N.Y.S.2d 728, 730-732, 261 N.E.2d 644, 6450647, **cert. denied** 401 U.S. 966, 81 S.Ct. 981, 28 L.Ed. 2d 248). Indeed, a more

rigorous rule requiring direct contradiction would be at odds with the purpose underlying use of prior inconsistencies, since such statements are admitted principally to assist the jury in its fact finding role. **Id.** at 337. In case of doubt, therefore, the balance should be struck in favor of admissibility, leaving to the jury the function of determining what weight should be assigned the impeachment evidence applied in this fashion, the law of previous contradictory statement will advance rather than impede the truth seeking process. **Id.** at 337. Moreover, the use of a witness' grand jury testimony for impeachment purposes is commonplace and perfectly proper. **People v. DiNapoli**, 27 N.Y.2d 229, 316 N.Y.S.2d 622, 265 N.E.2d 449(Ct. App. 1970). "It is now universally conceded that a witness may be impeached in any subsequent trial, civil or criminal, by self-contradictory testimony \*\*\* given by him before the grand jury." **Id.** at 628. In the instant case, trial counsel's failure to impeach Trooper Mawn or Investigator Regini with the BCI evidence record form denied the appellant-defendant his Constitutional rights to effective assistance of trial due process and an equal protection of the laws as guaranteed under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 6 and 11 of the New York State Constitution. As such, a hearing should be held where trial counsel may appear and testify why he failed to use available exculpatory evidence (BCI Evidence record form) to impeach Trooper Mawn or Investigator Regini. See C.P.L., Section 440.30(5).

In the People's summation to the jury, the People attacked the mask, gloves and gun in an improper and prejudicial way. Counsel Bray stood by and did absolutely nothing to protest against the improper and prejudicial remarks and description made by the People regarding, among other things, what the mask, gloves and gun were to be used

for and/or were used for. The People first suggested, without a shred of evidentiary support in the record, that the defendant was wearing the mask, gloves and physically had the gun on his person to commit crimes, again without any evidence in the record to support such an assertion:

"You see, any person who doesn't have a license who is carrying a loaded gun has no lawful purpose because any purpose that he could use that gun is unlawful. So again, you have the law, ladies and gentlemen, at your disposal, and the law by itself without any other evidence would allow you to conclude that this defendant had the intent to use that gun unlawfully against another. But again, that's not the only evidence that you have. You have the defendant's admission, you have him stating, "I need the gun for jobs," and we talked about our jobs. You all said what you did for a living. We have lawyers, we have IRS agents, we have people with all sorts of different occupations in this jury, and when you think about your jobs you often may think about what you wear to work because you can often tell a lot about a person based on what they wear.

For example, look at the judge, the judge wears a robe, so you know the judge is a judge. He wears a robe. That's what the judge wears. A lawyer wears a suit. You can tell a lot about a person's intent based on what they wear. So let me ask you, ladies and gentlemen, what can you tell about what his jobs are? What did he plan to do? Did anyone think he was going to work as a lawyer or an IRS agent? Was that the jobs? I don't think so, ladies and gentlemen. The kind of jobs that you need a loaded .32 caliber handgun, a mask, black gloves, black pants, fake beard, these are not jobs where you get up at six o'clock in the morning and put on a suit. The jobs he spoke about, ladies and gentlemen, are the kind of jobs you read about in the newspapers every morning, the kind of things you hear about on the eleven o'clock news, the kind of jobs you want nothing to do with.

You see, ladies and gentlemen, the clothes themselves, they speak volumes, and one of the things about this case that you need to consider is to look at all of the evidence collectively. You can't look at any single piece of evidence and decide what the person's intent was or decide the defendant's guilt or innocence. You have to look at all of the evidence and listen to the law from the judge.

A great example of that, ladies and gentlemen, is just looking at these gloves, can you decide what his intent was just from these gloves?

**See Exhibit "B" Tr. Pp. 333-335.**

These remarks by the prosecutor were improper, highly prejudicial and critical to the defendant. Assuming the defendant gave an alleged admission to the police as the prosecutor claimed he stated "I needed the gun for jobs." This alleged admission certainly did not mean he was using the gun to commit crimes. It could have meant that the gun was used for odd jobs. Such as, security protection work at clubs or for bodyguard work or private person(s). However, the prosecutor persuades this jury to believe that the gun, mask, gloves, pants and fake beard were used to commit crimes when there was absolutely no evidence in this whole record to support a claim that the aforesaid items had anything to do with jobs committing crimes. The prosecutor further persuaded the jury to believe that they were obligated to consider the clothes and beard as intent to commit crimes or that he committed crimes. Therefore, the jury was obligated on this basis to convict the defendant for gun possession. In other words, the prosecutor's comments that "about this case that you need to consider is to look at all of the evidence collectively. You can't look at any single piece of evidence and decide what the person's intent was or decide the defendant's guilt or innocence. You have to look at all the evidence and listen to the law from the judge." These comments persuade this jury to convict this defendant by placing an obligation on them with no alternative. Moreover, this jury was compelled to convict this defendant on the basis of intent to commit a crime and/or for uncharged crimes that have never been committed by this defendant. ** This case was supposed to be about a simple weapon's possession charge. However, it turned out to be about what the prosecutor believed the defendant's intentions were because of some clothes and a beard allegedly found in the defendant's wife's car. The prosecutor or defense counsel never mentioned and/or brought out the

28

fact in their summations or during testimonies that personal papers belonging to Ms. Knodt and Ms. Bagnot were found among the other aforesaid items and could have belonged to Knodt and/or Bagnot.

Further comments by the prosecutor prejudice the defendant as he demonstrated to the jury that the mask, gloves, pants and fake beard were used to commit crimes without any evidentiary support in this record for making such a claim, another critical factor in this case.

"(Demonstrating) The gloves themselves aren't enough. You need more than that, right? So let's go further—the pants –I'm not gonna put these on – but the pants, the pants and the gloves, a little bit more, right? You see a little bit more about what's going on here when you look at it here. But it goes further. The fake beard, why would he have the pants, right? And the bag, carrying the backpack, maybe you can carry something like have a fake beard, ladies and gentlemen? What purpose would he have there? It's not Halloween, right? And then you got this mask. What's my intention now? What's my intention now? What's my intention now? What do I intend to do now, ladies and gentlemen? What's my intention? It speaks volumes, ladies and gentlemen. This isn't a joke. This isn't a game. You carry this outfit, you carry this gun and it's loaded, you have only on intent and that's to commit a crime. Don't be fooled by talk of distances, by talk of times, by talk of anything else."

This case is about a loaded .32 caliber handgun, it's about this outfit, about what it represents and about what this defendant is all about. You can read a lot about a person based on what they wear and what they carry, and what this defendant had to wear and what he was carrying says a lot about this defendant. So that is the case, ladies and gentlemen. There are your four elements. It's really that simple. There is not much more to it. So, you have an opportunity now, ladies and gentlemen, to go back into that jury room and talk amongst yourselves and think about what this case is really about, think about the essential facts, and you have an opportunity to send a message in the case because you heard a lot of talk during voir dire about guns and loaded handguns and about why anyone would have a loaded handgun, and it's your opportunity now to speak amongst yourselves and then to speak for your verdict about loaded guns and about an outfit like this, about this defendant.

See Exhibit "B" Tr. Pp. 336-337.

These comments, like the others aforesaid, along with the demonstration by the prosecutor was improper and highly prejudicial to the defendant. For example, when the prosecutor stated: A great example of that, ladies and gentlemen, is just looking at these gloves, can you decide what his intent was just from these gloves (at this time the prosecutor has the gloves on his hands, holding his hands up to the level of his shoulders.

The gloves themselves aren't enough. You need more than that, right? So let's go further, the pants (at this time the prosecutor is holding the pants up to his waist with the gloves still on his hands) – I'm not gonna put these on (at this time the prosecutor still has the gloves on and puts the pants down) – but the pants, the pants and the gloves, a little bit more, right? You see a little bit more about what's going on here when you look at the pants, right? And the bag, carrying the backpack, maybe you can carry something in here (at this time the prosecutor points at the backpack.) But it goes further. The fake beard, what would he have a fake beard, (at this time the prosecutor points at the beard).           ఽ
Ladies and gentlemen, what purpose would he have there? It's not Halloween, right? And then you got this mask. (The prosecutor picks up the mask and puts it on over his face, and picks up the gun with his right hand.), stating: What is my intention now? (The prosecutor lunged at members of the jury, causing them to push back deep into their seats in fear) yelling: What's my intention now? What do I intend to do now, (at this time the prosecutor is rushing right to left of the jury box causing jurors to jump up from their seats in fear). Ladies and gentlemen, what's my intention? (The prosecutor, at this time stopped in the center of the jury box wearing the gloves and mask, pointing and waving the gun in the air over the jurors' heads). It speaks volumes, ladies and gentlemen. This isn't a joke. This isn't a game. (The prosecutor is now holding the gun above his head).

You carry this outfit, carry this gun and it's loaded. (The prosecutor, waving the gun at members of the jury causing them to jump out of their seats). You have only one intent, and that's to commit a crime. Don't be fooled by talk of distances, by talk of times, by talk of anything else. (The prosecutor then puts the gun and mask down, and takes off the gloves and lies them down).

These demonstrations were highly prejudicial to the defendant. The prosecutor persuades this jury to believe that Pagan was out to commit a crime with the mask, gloves, pants and gun. Nothing in this record supports a claim that Pagan was and/or had been wearing the gloves, mask or pants to commit a crime. No DNA testing was conducted on the mask, gloves or pants to determine whether Pagan's DNA was found, or, not on the items aforesaid. Notwithstanding, Pagan's fingerprints were never found on the gun. Simply put, there was no testimony by Trooper Mawn or any other officers that the gloves, pants, mask or gun had been used to commit a crime or was about to be used to commit a crime.

Nor was Pagan physically carrying the gun allegedly found in the car as the prosecutor argued during summation: **what this defendant had to wear and what he was carrying says a lot about this defendant." (See Exhibit B, Tr. P. 337).** There was no evidentiary support in this record for this claim. Nor was there any support in the record to support a claim of intent, i.e.: Trooper Mawn testified that one statement the defendant made in particular we took note of, stated he was "holding the gun for a friend." Mawn further stated: "That was the only thing he said that I took note of." **See Exhibit "B" Tr. P. 149).** In light of these statements and the fact that personal papers belonging to Ms. Knodt and Ms. Bagnot were found in the car, Trooper Mawn, the

prosecutor and certainly defense counsel should have attempted to locate and interview the aforesaid witnesses to determine if either one of them were the friend Pagan allegedly informed Trooper Mawn he had been holding the gun for. Indeed, when Pagan asked trial counsel to raise Trooper Mawn's statements during his summation that the gun was not Pagan's, and that in light of Trooper Mawn's statements, it is evident that there was no intent to use the gun or that a crime was committed with the gun if all Pagan was doing was allegedly holding the gun for a friend. Assuming, **Arguendo**, that there was no gun found in the car, and that the only items found in the car was a mask, gloves, and pants, does this mean that the jury should be allowed to consider intent and find the defendant guilty of an uncharged crime, where there is no evidentiary support in the record or elsewhere that a crime took place? In other words, based on the prosecutor's comments and demonstrations before the jury, this jury may have found this defendant guilty of weapon possession (not because the prosecutor proved he possessed the gun), but as a result of the prosecutor's comments and demonstrations that they believed the pants, gloves, mask and gun were used to commit a crime or were about to be used to commit crime(s).

**See Murray v. Carrier**, 477 U.S. 478, 496 (1986) (dictum) "The right to effective assistance of counsel . . .may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial."). Here, trial counsel simply failed to object or preserve for Appellate review these aforesaid portions of the Assistant District Attorney Rafferty's comments during summation, and especially the demonstrations of what the gloves, pants, mask and gun had been used or were about to be used for when there was not a single piece of evidence in this record to show that

the aforesaid items had been used or were about to be used in the manner demonstrated by the prosecutor.

Furthermore, after the court charged the jury, the court asked the prosecutor and trial counsel if they have any exceptions or additions for charge or requests. Trial counsel failed to note any exception to the aforesaid portions of the prosecutor's summation:

> **The Court:** Gentlemen, out of the presence of the jury, any exceptions or additions to charge or any requests?
> **Mr Rafferty:** None, Judge.
> **The Court:** Defendant?
> **Mr. Bray:** Yes, Judge. I just want to repeat my request having to do with the evidence in the case, having to do with a loaded weapon. It is oral testimony by the Trooper, and with that in mind, the jury can find there is a fact or question of credibility whether the Officer was telling the truth. So, I think a charge having to do with a downward lesser included charge of unloaded weapon's possession in the case.

**See Exhibit "B" Tr. Pp. 360-61.**

This is the only exception counsel took to the trial court's charge and the prosecutor's summation. **See also Exhibit "B" Tr. Pp. 335-375.**

Not only were these aforesaid comments by the prosecutor improper and prejudicial in the People's summation, but ADA Rafferty acted as a fact witness and, with no evidence in the record for support, demonstrated and asserted that the gloves, pants, mask and gun had been used to commit a crime or was about to be used to commit crime(s). The prosecutor asked this jury to draw unfair conclusions from evidence that was not submitted for these aforesaid purposes.

It is a "fundamental rule, known to every lawyer, that argument is limited to the facts in evidence." **United States v. Foster**, 982 F.2d 551, 555 (D.C. Cir. 1993) **quoting United States v. Reagan,** 694 F.2d 1075, 1980 (7th Cir.). (citations omitted), **cert. denied**, 459 U.S. 1071 (1982). "The Assistant District Attorney had no right to refer to matters not in evidence or to ask the jury to draw such a conclusion which was not fairly inferred from the evidence." **People v. Wright**, 41 N.Y.2d 172, 175, 391 N.Y.S.2d 101, 104, 359 N.E.2d 696, 698-99 (1976). See also **People v. Zlochevsky,** A.D.2d , 603 N.Y.S.2d 433, 434 (1st Dept. 1993); **People v. Simmons**, 110 A.D.2d 666, 667, 487 N.Y.S.2d 396, 398 (2nd Dept. 1985); **People v. Contreras,** 108 A.D.2d 627, 629, 485 N.Y.S. 2d 261, 263 (1st Dept. 1985).

"With no basis in the record for the prosecutor's remarks" or demonstrations before the jury about how the mask, pants, gloves and gun had been used by this defendant to commit a crime or was about to be used to commit crime(s), "and no door opened for those remarks by the defense statements . . ., we can detect no purpose for the comments other than an impermissible one . . ." **Foster**, 694 F.2d at 555. "Because this was a close case, the errors cannot be considered harmless . . ." **People v. Simmons,** 110 A.D.2d 666, 667, 487 N.Y.S.2d 396, 398 (2nd Dept. 1985).

Moreover, the trial court's charge did very little, if anything at all to cure the improper and prejudicial comments and demonstrations made by the prosecutor. In fact, the trial court added insult to injury when the trial court told the jury they could consider the comments from the summation:

> **"The arguments and remarks and summation of counsel are not evidence.**
> **You may consider the summation of counsel if you find that the comments made by them on summation are based on the evidence received by you during the trial. During the course of the trial, questions were asked at times as to which**

objections were sustained, and whether these matters seemed at any time to be trivial or important is of no concern. They are not in the case and you must not be influenced by them. There were times where I asked you to strike that from your memory and the answer that was given, and you should do so, nor shall any inference be drawn by you with any respect to any other."

See Exhibit "B" Tr. Pp. 340-41.

Based on information and belief, Bray further rendered himself ineffective to Pagan's defense when he (over Pagan's repeated objections) refused to demand that the prosecutor produce a true bill (indictment, signed by the foreperson of the Grand Jury. The only indictment Pagan recalls the prosecutor turned over to Bray and that Pagan saw was an unsigned indictment that Bray refused to provide Pagan with a copy. If, in fact, there is no true bill, signed by the foreperson of the Grand Jury, then this defendant has not been indicted and, therefore, this court allowed the prosecution of an innocent defendant whom this court did not have jurisdiction of the action or of the person of the defendant in the first place. See **CPL.Section 440.10(1)(a) which provides:**

> **(1) At any time after the entry of a judgment, the court in which it was rendered may, upon motion of the defendant, vacate such judgment upon the ground that:**
>
> **(a) That court did not have jurisdiction of the action or of the person of the defendant.**

Accordingly, the conviction should be reversed and the indictment dismissed as defective. **See People v. Cooper**, 241 A.D.2d 553, 661 N.Y.S.2d 243, 244 (2nd Dept. 1997); **People v. Miller**, 75 Misc.2d 1, 346 N.Y.S.2d 144 (County Court, Dutchess County 1973). On the other hand, this defendant requests that the prosecutor produce the

original indictment so that Pagan can test its authenticity, to see if, in fact, it is a true bill signed by the original foreperson of the second Grand Jury.

Moreover, Bray rendered himself ineffective to Pagan when he (over Pagan's repeated objections) refused to move the trial court for an order dismissing the second Grand Jury proceedings for several reasons: (a) creating the appearance of impropriety and prejudice to Pagan when he was produced before the Grand Jury in handcuffs, sandwiched between two deputy sheriffs, with his so-called Legal Aid Attorney, Edward J. Vitale, trailing behind; (2) compelled upon Pagan's attorney, Vitale, to serve as his counsel and/or advisor during Pagan's Grand Jury testimony even after the court was made aware that Pagan had repeatedly rejected Vitale as his counsel or advisor during his Grand Jury testimony; and (3) refused to raise a double jeopardy claim regarding the prosecutor's failure to properly serve notice upon the defendant or his first counsel that a Grand Jury had been convened to hearing the charge brought against the defendant and that he may appear to testify (as of right) before the first Grand Jury if he so wishes, this prosecutorial misconduct resulted in the first indictment being dismissed, thereby barring any subsequent indictment under the double jeopardy clause.

First off, with respect to the appearance of impropriety, a prejudice to Pagan when he was produced before the body of Grand Jurors in handcuffs, sandwiched between two deputy sheriffs, with his so called attorney or advisor, Vitale, trailing behind as they all entered the grand jury.

There must be some showing that the presence of the unauthorized person created a possibility of prejudice, and impaired the integrity of the proceeding. **People v. Hyde,** 85 A.D.2d 745, 445 N.Y.S.2d 800 (2nd Dept. 1981) citing **People v. Calbud, Inc.,** 49

N.Y.2d 389, 426 N.Y.S.2d 238, 402 N.E.2d 1140; **People v. DiFalco**, 44 N.Y.2d 482, 406 N.Y.2d 279, 377 N.E. 2d 732; **People v. Wilson**,77 A.D.2d 713, 430 N.Y.S.2d 715; **People v. Percy**, 45 A.D.2d 284, 385 N.Y.S.2d 434; CPL 210.35, subd. 5; **Cf. People v. Minet**, 296 N.Y. 315, 73 N.E.2d 529.

CPL 210.20(l) authorizes a court to dismiss an indictment on the grounds that "the grand jury proceeding was defective, within the meaning of (CPL 210.35." CPL, 210.35, in turn, sets forth four specific types of defects, including an "illegally constituted" Grand Jury and certain quorum deficiencies (CPL, 210.35 (1)-(3); see also, CPL 210.35 (4) concerning failures to accord the target a right to testify. A separate catchall provision is included for those proceedings which "otherwise fail to conform to the requirement of CPL, Art. 190 to such degree that the integrity thereof is impaired and prejudice to the defendant may result." (CPL, 210.35(5) emphasis supplied). This catchall provision is the statutory equivalent of the common law principle that an indictment issued by a legally constituted Grand Jury need not be dismissed because of a simple technical error if the accused was not prejudiced or the fundamental integrity of the process impaired. The clear intention of the statute drafter was to establish a rule of automatic dismissal for a limited number of improprieties that were deemed most serious while leaving the common-law "de facto" Grand Jury principle intact for other, less serious infractions of the Article 190 rules. Thus, in cases involving any of the specific defects delineated in CPL, 210.35(1)-(3), dismissal of the indictment is the necessary consequence, and judicial actual harm is wholly out of place. **People v. Williams.** 538 N.Y.S.2d 222, 225-26 (Ct. App. 1989). In this instance, the defect in the Grand Jury proceeding was sufficiently serious to bring it within the statutory provisions for dismissal without regard

to prejudice. **Id.** at 226. Where, as here, although the grand jury record is not very clear as to how Pagan entered the grand jury proceedings on November 19, 1998, the grand jury record does, however, reflect that Pagan entered the grand jury with two deputy sheriffs and his so called counsel/advisor, Vitale, while the grand jurors were present. The court reporter present in the grand jury noted Pagan entering the grand jury room as follows:

**"(Christopher Pagan enters the Grand Jury room accompanied by his attorney and two deputy sheriffs.)"**

**MR. VITALE: EDWARD J. VITALE, Legal Aid Society."**
**See Exhibit "C" Tr. P. 28.**

This aforesaid statement evident that at the very least, the record establishes the presence of two unauthorized deputy sheriffs entered the grand jury with Pagan. This was Pagan's first time ever appearing before a grand jury, he had no idea that the law was well settled in favor of prohibiting the government from producing him before the grand jury, handcuffed and sandwiched between two unauthorized armed deputy sheriffs. Indeed, had he known, he certainly would have objected. Nonetheless, whether a personal exception was registered by Pagan is of no concern here because Pagan was represented by assigned counsel Vitale, who did absolutely nothing to protest Pagan's right not to be brought before the grand jury handcuffed and sandwiched between the two unauthorized deputy sheriffs that were armed. Moreover, one can only imagine what was going through the minds of the grand jurors as Pagan entered the grand jury room handcuffed and sandwiched between two unauthorized deputy sheriffs. It can easily be assumed, among other things, that the grand jury believed:

(I)     that he was incarcerated because Pagan somehow posed a threat to society; (II) that Pagan was so dangerous that he posed a threat to the

grand jurors' safety, thereby, requiring him to be escorted by two armed deputy sheriffs before the grand jury.

To add insult to injury, Pagan complained during his grand jury testimony that he was displeased with counsel, Vitale's ineffective representation. He demanded of Vitale to withdraw as his counsel and declared before the grand jury that Vitale was not his counsel. ADA Lydecker was unpleased with Pagan's remarks regarding counsel Vitale being present in the grand jury, and demanded that Pagan talk about the alleged events that took place on September 17, 1998, or risk being excused and physically removed by two deputy sheriffs from the grand jury. The following took place.

**MR. LYDECKER:** Mr. Vitale, Legal Aid is assigned as representing this subject:

**MR. VITALE:** It has been.

**MR. LYDECKER:** Are you stating that you are the attorney?

**MR. VITALE:** Do you want me to leave?

**MR. PAGAN:** No. What I am saying, according to the Constitution, I am entitled to legal representation.

**MR.LYDECKER:** Mr. Vitale sitting right here ----?

**MR. PAGAN:** Even though he is here in body, he's not representing me.

**MR. LYDECKER:** He's your attorney, is that correct?

**MR. PAGAN:** No, he is not.

**MR. LYDECKER:** Do you have any other attorney besides Mr. Vitale?

**MR. PAGAN:** He's not my attorney. I don't have an attorney.

**MR. LYDECKER:** I'm not playing games here. Is he representing you in this action?

**MR. PAGAN:** No, he is not.?

**MR. LYDECKER:** No, you are not stating anything at this point. Just step outside.

**(Witness excused.)**

**MR. LYDECKER:** At this point, I just ask that the grand jury sit for a minute or two. I will be right back.

**See Exhibit "D" Tr. Pp. 30-31.**

Though the record is not very clear, Pagan can never forget what took place during the grand jury proceedings. For example, Pagan's recollection is that ADA Lydecker directed the two armed deputy sheriffs to physically remove him out of the grand jury. But even more disturbing, is during Pagan's brief testimony, he was compelled to remain handcuffed on the stand before the grand jury.

Nonetheless, during the short recess, Pagan was escorted out of the grand jury, where ADA Lydecker and Attorney Vitale appeared before Judge Louis J. Lefkowitz, of the Suffolk County Court, Part VIII, to resolve the question of whether or not Judge Lefkowitz would assign new counsel to appear before the grand jury with Pagan and allow Attorney Vitale to withdraw as counsel. Instead, Judge Lefkowitz compelled attorney Vitale upon Pagan even after the court had become aware by attorney Vitale's own remarks which established he denied Pagan effective assistance when he indicated his only interest was to get Pagan to plead guilty before he was even indicted in the second grand jury. In part, the following took place before Judge Lefkowitz:

**THE COURT:** Can I have your appearance gentlemen, please.

**MR. LYDECKER:** Richard Lydecker from the District Attorney's office.

**MR. VITALE:** Edward Vitale, Legal Aid Society.

Your Honor, the defendant indicated he wanted to testify before the grand jury.

We are before the grand jury today. I had an opportunity to explain to him the waiver of grand jury presentment—excuse me—the waiver of immunity. I went over it with him. He also read it himself.

When he got into the grand jury, at that time the District Attorney asked him whether or not he was represented by counsel. He said he was not.

Mr. Pagan is unhappy with my representation for whatever reasons Judge, and does not want me to represent him before the grand jury.

He indicated to me that he is going to say certain things to the jury as to my representation.

I indicated to him that I didn't actually believe the grand jury was interested in whether or not he was happy with me or not, but in any event, that's up to him whether or not he wants – I'm not going to dissuade him or persuade him to do that.

I additionally indicated to him that if his intention is to bad mouth me so to speak before the grand jury, I am not going to rebut anything he has to say: as a matter of fact, I'd rather not be there.

The defendant indicates that he would rather proceed without me., but does not understand the waiver of immunity.

**THE COURT:** Do you know at this stage as his attorney all the facts and circumstances related to you by the defendant surrounding these possible indictments?

**MR. VITALE:** I don't know all the facts as to it, your Honor.

**THE COURT :** From what you know and your conversations with Mr. Pagan, do you agree with his desire to testify before the grand jury?

**MR. VITALE:** Do I agree with his desire to testify before the grand jury?

**THE COURT:** As a legal advisor.

**MR. VITALE:** My advise to Mr. Pagan was to engage in a plea bargain in this matter, Judge.

Mr. Pagan is someone who can be considered a mandatory persistent. He was charged – in the original indictment which I had dismissed on motion. He was charged with a C Violent Felony which carries a minimum of sixteen years to life sentence.

If the District Attorney agreed to reduce it, it could go only down to twelve to life. I was able, during the period of time between the dismissal and today, Negotiate a different plea bargain with the District Attorney wherein he would plead to an E Violent Felony, a weapon's charge and could receive a sentence of ten to life.

**See Exhibit "D" Tr. Pp. 2-5.**

The fact that Attorney Vitale had attempted to get Pagan to plead guilty before a true bill was returned, in and of itself, suggests that Vitale rendered assistance ineffective to Pagan. Notwithstanding, the fact that Vitale indicated that Pagan had made a statement to Vitale that he is going to say certain negative things to the grand jury as to Vitale's representation of him was enough to establish that there was indeed a conflict of him and was enough to establish that there was indeed a conflict of interest between the two. Therefore, requiring Vitale to withdrawn as counsel for Pagan and assigning new counsel to prepare Pagan to appear before the grand jury to testify.

During Pagan's appearance before Judge Lefkowitz, Pagan made clear that he did not want Vitale as his counsel and further indicated that he did not know the law. In part, the following took place:

**THE COURT:** You feel that you know enough about the law that you can appear representing yourself before this grand jury?

**MR. PAGAN:** No.

**THE COURT:** Then how can you proceed without Mr. Vitale sitting next to you?

I'll let you sign this. It's clear to me that you understand the waiver.

**MR. PAGAN:** I understand the waiver.

**THE COURT:** And it's clear to me that you want to testify.

I'm telling you, you're not going to know when Mr. Lydecker, the District attorney is overstepping his bounds in the grand jury proceeding where a defendant testifies.

You have no idea what I just said or what I meant. Mr. Vitale knows.

Mr. Vitale can stop the prosecutor if, in fact, it's improper cross-examination. If he goes where he shouldn't go, if he gets into questioning that he should not, Mr. Vitale can speak to you and can make a record of that. You're not going to be able to do that alone.

So my considered opinion is as follows - - and you can do whatever you want, Mr. Pagan. I am satisfied you understand this waiver. And contrary to what anybody has said, you want to sign it and testify. Mr. Lydecker is ready to accept that. I suggest you have Mr. Vitale sit in right next to you in the grand jury and not represent yourself.

What do you wish to do, sir?

**MR. PAGAN:** He can sit there but I still don't consider him my attorney.

**THE COURT:** I'm going to appoint you his legal advisor to sit next to him.

I have known Mr. Vitale for the six years I've been here and his reputation prior for ten years.

If I were in your shoes, I would be very comfortable with Mr. Vitale sitting next to me as my legal advisor.

He'll protect your interests before that grand jury.

If you will uncuff him, I'll have him sign -- See Exhibit **"D" Tr. Pp. 12-14.**

Just as Pagan has the right to counsel of his choice for trial he also has the right to counsel of choice during the grand jury proceedings.

As said before, there is noting in Article 18-b that prohibits or can be interpreted to counsel against the appointment of more than one attorney or of an attorney from outside county panel. See **N.Y. County Law, Art 18-b, §722 (McKinney 1993)**. A defendant's "right to counsel in New York encompasses the right to counsel of (his) choice . . . ." **Martinez,** 151 Misc.2d 641, 649-50, 574 N.Y.S.2d 467, 475 (Sup. Ct. N.Y. County 1991) citing **People v. Arrovave,** 49 N.Y.2d 264, 425 N.Y.S.2d 282, 401 N.E.2d 393 (1980). An indigent defendant has the "absolute right . . . .to have the attorney who interviewed him, who investigated his case and who prepared his case for trial, also try his case." **People v. Elliot**, 98 Misc2d 424, 427, 413 N.Y.S.2d 1001, 1004 (Sup. Ct. N.Y. County 1979). Here, there is no doubt that Pagan did not know the law and needed counsel to effectively represent him in the grand jury proceedings. He was denied that right when he was compelled to accept counsel Vitale as his "legal advisor" rather than his counsel who would fully and effectively represent him in the grand jury proceedings. Moreover, Vitale did nothing to provide Pagan with effective representation or to protect his rights while before Judge Lefkowitz or when he appeared before the grand jury.

Indeed, there is a difference between a "legal advisor" and counsel who actually "represents a client." For example, a defendant proceeding pro se would be entitled to stand by counsel who would act as a legal advisor. See **People v. Medina**, 44 N.Y.2d 199, 404 N.Y.S.2d 588, (Ct. App. 1978). Here, the grand jury transcript or the transcript of the proceedings before Judge Lefkowitz does not establish that Pagan declared he wanted to proceed pro se before the grand jury. See **(Exhibits "C" Tr. Pp 1-56 and "D" Tr. Pp. 1-16).** In fact, he made it clear when he first appeared before the grand jury and stated "that's not my attorney" (referring to Vitale), and that "according to the

44

constitution, I am entitled to legal representation." See **(Exhibit "C," Tr. P. 30)**. Moreover, once Pagan returned to the grand jury he made clear again that Vitale was not his counsel and that he could not be compelled to testify without counsel as Pagan puts it: "You're going to give up my right to testify. He's not my attorney. You can't make me testify without an attorney." See **(Exhibit "C" Tr. P.48)** this statement shows that Pagan wanted counsel who would fully and effectively represent him before the grand jury, not some so called legal advisor who would stand by and only respond to questions that are put to him by Pagan after the harm would have been done by the prosecutor before the grand jury assuming Pagan was intelligent enough to catch the prosecutor overstepping his bounds.

Furthermore, there is nothing in the law that permits a judge to assign a legal advisor to stand by and wait for the client who does not know the law to ask legal questions. Legal questions Pagan doesn't understand or know to ask every time the District Attorney oversteps his bounds in the grand jury. The court was well aware that Pagan did not know the law and knew that he would not be able to protect his rights during the grand jury proceedings as Judge Lefkowitz puts it in his own words, "And it's clear to me that you want to testify. I'm telling you, you're not going to know when Mr. Lydecker, the District Attorney is overstepping his bounds in the grand jury proceeding where a defendant testifies. You have no idea what I just said or what I meant. Mr. Vitale knows." See **Exhibit "D" Tr. P. 13.** Yet, the Judge sent Vitale in the grand jury as Pagan's legal advisor rather than appoint new counsel to appear and protect Pagan's constitutional rights before the grand jury.

In any event, while all parties were before Judge Lefkowitz, the court informed Pagan that he had a right to testify before the grand jury, and that if Pagan were permitted to testify without waiving immunity, he would receive immunity pursuant to 190.40 of the Criminal Procedure Law. The following took place in part before Judge Lefkowitz:

**THE COURT:** And understanding that, you still wish to testify before the grand jury?

**MR. PAGAN:** Yes.

**THE COURT:** In order to do so, you have to sign a waiver of immunity. Have you read it?

**MR. PAGAN:** Yes.

**THE COURT:** Has it been discussed with Mr. Vitale, your attorney?

**MR. PAGAN:** It's been discussed with Mr. Vitale.

**MR. VITALE:** He no longer considers me his attorney, Judge. That's why he didn't answer that question.

**THE COURT:** Did you understand what you were signing when you signed a waiver of immunity?

**MR. PAGAN:** Yes.

**THE COURT:** Do you voluntarily consent to appear before the grand jury, you agree to be examined under oath and testify? You know that they're investigating a charge of Criminal Possession of a weapon, in the Second Degree.

Do you understand that?

**MR. PAGAN:** Yes.

**THE COURT:** And that you're appearing before this grand jury not merely as a witness but as a subject and you may be prosecuted or subjected to a penalty or forfeiture on account of any transactions on matters concerning which you testify or produce evidence.

Do you understand that?

**MR. PAGAN:** Yes.

**THE COURT:** You have a right to refuse to give any testimony or produce any evidence unless you're granted immunity pursuant to §190.40 of the Criminal Procedure Law.

Do you waive that?

**MR. PAGAN:** Yes.

**THE COURT:** And, therefore, the District Attorney will not permit you to appear, be sworn in and give testimony unless you waive immunity by executing this Waiver of Immunity.

Do you understand that?

**MR. PAGAN:** Yes.

**THE COURT:** Mr. Pagan, a witness who testifies in a grand jury proceeding who does not waive immunity receives immunity. If you were permitted to testify without waiving immunity, you would receive immunity pursuant to 190.40 of the Criminal Procedure Law.

Do you understand that?

**MR. PAGAN:** Yes.

**THE COURT:** Let me read that to you.

Immunity is defined in §50.10 of the Criminal Procedure Law as follows: "A person who has not been a witness" – I'm sorry " A person who has been a witness in a legal proceeding and who cannot, except as otherwise provided in this subdivision, be convicted of any offense or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he gave evidence therein, possesses immunity from any such conviction, evidence therein, possesses immunity from any such conviction, penalty or forfeiture. A person who possesses such immunity nevertheless may be convicted of perjury as a result of having given false testimony in such legal proceedings and may be convicted of or adjudicated or adjudged in content as a result of having contemptuously given evidence therein."

Do you understand that?

**MR. PAGAN:** Yes.

**THE COURT:** You're signing this, you're waiving all immunity and privilege you could have obtained under the Constitution of the United States and the State of New York of any statute enacted and prosecution, conviction, penalty of forfeiture for or on account of any transaction, matter or thing concerning which you'll testify, you'll give evidence in the above entitled proceeding which is entitled in the matter of the Waiver of Immunity of Christopher R. Pagan.

Do you understand that?

**MR PAGAN:** Yes.

**THE COURT:** Did anybody force you or threaten you to sign this Waiver? Anybody force you, --

**MR. PAGAN:** No.

**THE COURT:** --THREATENED you to sign the waiver?

**MR. PAGAN:** No.

**THE COURT:** Mr. Pagan, you're doing so of your own free will?

**MR. PAGAN:** Yes.

**THE COURT:** Anything promised you to sign this Waiver?

**MR. PAGAN:** No.

**THE COURT:** You understand what your attorney, Mr. Vitale, to this point has stated, that it is his considered opinion rather than you testify and continue with the grand jury proceeding you take a plea to spare yourself a considerable period of imprisonment for an indefinite term having a maximum of life if you're convicted as a predicate felon.

Do you understand that?

**MR. PAGAN:** I understand that. But the advice that he said he gave, that wasn't correct.

**THE COURT:** You feel that you know enough about the law that you can appear representing yourself before this grand jury?

**MR. PAGAN:** No.

**THE COURT:** then how can you proceed without Mr. Vitale sitting next to you? I'll let you sign this. It's clear to me that you understand the waiver.

**THE COURT:** And it's clear to me that you want to testify. I'm telling you, you're not going to know when Mr. Lydecker, the District Attorney is overstepping his bounds in the grand jury proceeding where a defendant testifies.

You have no idea what I just said or what I meant. Mr. Vitale knows.

Mr. Vitale can stop the prosecutor if, in fact, it is improper cross-examination. If he goes where he shouldn't go, if he gets into questioning that he should not, Mr. Vitale, can speak to you and can make a record of that. You're not going to be able to do that alone.

So my considered opinion is as follows – and you can do whatever you want Mr. Pagan. I am satisfied you understand this waiver. And contrary to what anybody has said, you want to sign it and testify. Mr. Lydecker is ready to accept that. I suggest you have Mr. Vitale sit in right next to you in the grand jury and not represent yourself.

What do you wish to do, sir?

**MR. PAGAN:** He can sit there but I still don't consider him my attorney.

**THE COURT:** I'm going to appoint you his legal advisor to sit next to him.

I have known Mr. Vitale for the six years I've been here, and the reputation prior for ten years.

If I were in your shoes, I would be very comfortable with Mr. Vitale sitting next to me as my legal advisor.

He'll protect your interests before that grand jury.

If you will uncuff him, I'll have him sign –

**MR. LYDECKER:** Judge, I think I should have that done –

**THE COURT:** Before the grand jury. Very well.

**MR. LYDECKER:** Thank you, your Honor.

**MR. VITALE:** Therefore, your Honor, where his attorney will sign, it is as advisor?

**THE COURT:** Yes, sir, legal advisor.

**MR. LYDECKER:** Thank you.

**THE COURT:** Any question you have about law, any time you want Mr. Vitale's advice, lean over and ask him or ask Mr. Lydecker that you want to speak to him.

**MR. VITALE:** Okay.

**THE COURT:** Good luck to you, Mr. Pagan.

See **Exhibit "D" Tr. Pp. 7-15.**

Here, the record clearly reflects that after Pagan left the grand jury and went before Judge Lefkowitz, he remained in handcuffs throughout that proceeding. As evidence of this fact that he remained in handcuffs in Judge Lefkowitz's courtroom is Judge Lefkowitz' statement when he had asked the two armed deputy sheriffs to "uncuff him" (Pagan) to sign the waiver form. However, Pagan was never uncuffed. See **Exhibit "D" Tr. Pp. 14-15.**

Nonetheless, when Pagan returned to the grand jury he was again escorted into the grand jury handcuffed, sandwiched between the two armed deputy sheriffs, with his court appointed legal advisor who had been compelled upon him trailing behind. This took place about two to three times, and Vitale completely failed to object or protest these highly prejudicial acts in which Pagan remained in handcuffs throughout his grand jury testimony. The record will clearly reflect that Vitale who had been compelled upon Pagan to be his "legal advisor" reused and/or failed to make a single remark in Pagan's behalf nor did he provide a single piece of legal advice at any time during Pagan's grand jury testimony. See **Exhibit "C" Tr. 31-48.** During Pagan's grand jury testimony the following took place as Pagan remained handcuffed throughout his testimony:

**THE FOREPERSON:** Do you further swear that you have consulted your legal advisor about it?

**THE WITNESS (PAGAN):** Was called as a witness on behalf of the defendant, and having been first duly sworn, testified as follows:

(witness stated his address as 100 Center Drive, County Jail, Riverhead).

See **Exhibit "C" Tr. P. 37.**

This aforesaid statement by Pagan that his address was County Jail was highly prejudicial because the grand jury was made aware that Pagan was incarcerated and may have been imprisoned because he may have posed a threat to public safety and was therefore remanded to the County Jail, and may also explain why Pagan appeared before the grand jury handcuffed and sandwiched between two armed deputy sheriffs. In fact, the two deputy sheriffs were sworn in before the grand jury in the following manner:

**THE FOREPERSON:** Do you swear you will keep secret all matters and things which you see and hear in the grand jury upon this complaint, so help you God?

**DEPUTY SHERIFF:** I do. Vernon Scates, Shield 81.

**DEPUTY SHERIFF:** I do. Petrone, Shield 292, first name, Salvatore.

See **Exhibit "C" Tr. Pp. 37-38.**

ADA Lydecker's following statement before the grand jury was highly prejudicial because he placed a restriction upon Vitale that should not have been placed on him because it denied the defendant his right to effective assistance or legal advise under the Sixth Amendment to the United States Constitution. The record provides:

**MR. LYDECKER:** I would instruct the defendant and his legal advisor, Mr. Vitale, that, Mr. Vitale you function as you know as an attorney is solely here as a passive participant. You cannot interrupt the proceedings in any way. At any time, should you wish to speak with your client, feel free to let me know and you may confer with him. You must confer with him outside the grand jury.

Any questions at this time? (There was no response).

See **Exhibit "C" Tr. P 38.**

51

This statement aforesaid by ADA Lydecker was highly prejudicial and precluded Vitale from providing effective legal assistance or legal advice, or object to or protest the prosecutor's conduct throughout the grand jury proceedings. However, this does not excuse Vitale's failure to seek a continuance to confer with Judge Lefkowitz on this matter.

Pagan repeatedly protested his right to choice of counsel and stressed the reasons why Mr. Vitale should be removed as counsel and/or legal advisor, and clearly explained that Vitale was not his counsel and wanted new assigned counsel. In various areas of the grand jury record Pagan made clear that Vitale was not his counsel and needed counsel to proceed in the grand jury:

**MR. LYDECKER:** Sir you have to make a statement. You can make a statement if you choose to relate to what had happened on the date of September 17, of 1998 when your car was stopped by troopers on the Southern State Parkway. If you have a statement to make related to that event, we are ready to hear it.

**MR. PAGAN:** You know, I don't mean to be of any kind of disturbance to anybody or anything, you know, but I have been informed by this man right here that anything that I say to you here today is irrelevant because you're going to indict me. You're going to indict me on my criminal history and the possession of a gun charge. That's what the man told me.

**MR. LYDECKER:** Sir---,

**MR. PAGAN:** That's what the man told me. I got witnesses. He said it.

**MR. LYDECKER:** Sir, September ---,

**MR. PAGAN:** That it don't make a difference what I say in here today, that I'm going to be indicted based on my criminal history and the fact that I have a weapons charge.

**MR. LYDECKER:** Sir, September 17, of 1998, I'm giving you an opportunity to make a statement concerning that. If you would like to make a statement, now is the time that you should make it. If you do not take this opportunity to make that statement,

then you are going to be excused as a witness. Is there something related to September 17 that you would like to make a statement about?

MR. PAGAN: I'm not going to give any testimony in reference to that until I have an attorney. He's not my attorney. You can't make me accept this man as my attorney.

MR. LYDECKER: Do you have a statement to make regarding the date of September 17.

MR. PAGAN: This man has stated on November 12 of this year ---.

MR. LYDECKER: Do you have a statement to make?

MR. PAGAN: That if I---

MR. LYDECKER: Regarding the date of September, 17th?

MR. PAGAN: If I don't take a guilty plea, that I will be going in front of Judge Ohlig who gave a man 17-1/2 to life.

MR. LYDECKER: Do you have a statement to make?

MR. LYDECKER: Take him out, please.

Do you have a statement to make regarding the date of September 17, of 1998. If you do not answer my question, I'm going to accept that as a no.

MR. PAGAN: I have plenty of things to say.

MR. LYDECKER: Go ahead.

MR. PAGAN: I need an attorney. I need an attorney. He's not my attorney. He's not.

MR. LYDECKER: Sir, you have had an opportunity for an attorney. You have had the rights read to you by not only this attorney here but by a judge sitting in court going over those rights with you. You executed a waiver. Do you want to make a statement regarding September 17th.? If you do not answer that question, I will assume it to be no.

MR. PAGAN: I have something to say in reference to September 17th.

MR. LYDECKER: September 17th, let's hear it.

MR. PAGAN: I will do so with an attorney.

MR. LYDECKER: You will confine your comments to the date of September 17th.

**MR. PAGAN:** The man advised me that there is no justice here.

**MR. LYDECKER:** Out. Out.

**THE WITNESS:** You can't force me to have this man as my attorney.

**MR. LYDECKER:** Out.

**THE WITNESS:** And I would never help you in no homicides trying to convict somebody of murder or guns.

**(Witness excused).**

**MR. LYDECKER:** We're going to have to take another break. I will be going down to the impaneling judge.

Anybody have any questions?

(There was no response).

**MR. LYDECKER:** Let me go speak with the impaneling judge. Could I have a count of the people present?

**THE FOREMAN:** Twenty.

**MR. LYDECKER:** That's the same twenty that heard the case?

**THE FOREPERSON:** Yes.

**MR. LYDECKER:** I'm going to recall Christopher Pagan.

(Christopher Pagan is recalled as a witness).

**EXAMINATION CONTINUES BY MR. LYDECKER:**

**MR. LYDECKER:** Mr. Pagan, as a legal advisor of this grand jury, you may make a statement regarding September 17th and the events that occurred at 2:15. Now, a brief recess has been taken, approximately 15 - 20 minutes. During that time period, you had an opportunity to speak with your legal advisor again, is that correct? Did you have the opportunity to speak with your legal advisor again?

**MR. PAGAN:** And again, he's not my attorney.

**MR. LYDECKER:** I SAID YOUR LEGAL ADVISOR.

**MR. PAGAN:** The judge assigned him to me.

**MR. LYDECKER:** You had an opportunity to speak with him, didn't you?

**MR. PAGAN:** I spoke with him but what he has to say doesn't make a difference to me.

**MR. LYDECKER:** Okay. Now, you have an opportunity again, at this point. I am providing you another opportunity to talk about September 17, 1998 when the state troopers stopped your car. If you would like to make a statement to this grand jury, you may do so related to September 17.

**MR. PAGAN:** And again ---,

**MR. LYDECKER:** And again, I will tell you that you will not be talking about extraneous matters. If you do not speak about what happened on September 17th, I am going to assume that it's because you have no statement to make. You will be excused.

**MR. PAGAN:** I have a statement to give. As I stated before, I will make that statement with my attorney and he's not my attorney.

**MR. LYDECKER:** Do you wish to make a statement to this grand jury right now?

**MR. PAGAN:** Again, this lawyer has told me that irregardless of what I say to you all here today that it don't make a difference because based on the fact that it's a weapon and I have a criminal history, that you're going to indict me, irregardless of what I have to say. If I'm going to testify, I would rather testify with an attorney that's protecting my rights. According to the Constitution, I have that right to have an attorney and he's not my attorney. This man has threatened me on many occasions in reference to if I don't help you with a murder charge and gun cases, that the maximum sentence will be imposed against me, and that I will be indicted and all that. What kind of attorney is that?

**MR. LYDECKER:** That's everything you have to say?

**MR. PAGAN:** No.

**MR. LYDECKER:** Go on.

**MR. PAGAN:** I want to know, for what reason would he have to tell me---?

**MR. LYDECKER:** Excuse me, excuse me, I'm not going to go through this again with you. Now, we broke for the first time; you had an opportunity to speak about---and I want the record to be clear on this, this record, I want this to be very clear, you had an opportunity several times to give a statement to this grand jury. You chose not to. You chose to speak about extraneous events. Then we took a break and you were given another opportunity to speak with your legal advisor, to speak with the judge about

55

advice. You had another opportunity to come back in here and I have rewarned you and told you again, if you would like to make a statement to this grand jury regarding September 17th, which you indicated you would, now is the time to do it. If not, you are going to be excused.

**MR. PAGAN:** No. You think you're going to threaten people's lives.

**MR. LYDECKER:** Do you have a statement to make?

**MR. PAGAN:** My attorney has threatened me with severe penalties and all that, saying that this grand jury, there's no justice here for me.

**MR. PAGAN:** I have testimony but I will do so with an attorney and he's not my attorney.

**MR. LYDECKER:** This grand jury has been convened for quite some time now.

**MR. PAGAN:** He's not my attorney. I have no problem

**MR. LYDEKER:** Didn't you speak to the judge just a few minutes ago?

**MR. PAGAN:** Yes, I spoke

**MR. LYDECKER:** Didn't you tell the judge that he was going to be your legal advisor?

**MR. PAGAN:** No.

**MR. LYDECKER:** Do you have anything further to say?

**MR. PAGAN:** Yes.

**MR. LYDECKER:** Concerning September 17th, now, if you don't go there, I'm going to excuse you, and you have had your right to testify in front of the grand jury.

**MR. PAGAN:** I didn't give ---,

**MR. LYDECKER:** Do you understand what I just said?

**MR. PAGAN:** I'm not giving up my right.

**ADA MR. LYDECKER:** I'm going to tell you that if you don't say something now regarding September 17th, you're going to be excused.

**MR. PAGAN:** You're going to give up my right to testify. He's not my attorney. You can' make me testify without an attorney.

**MR. LYDECKER:** I'll take that as a no. You're going to be excused unless you say something regarding September 17th.

**MR. PAGAN:** I didn't say I didn't want to testify.

56

MR. LYDECKER: Please remove him (witness excused).

See Exhibit "C" Tr. Pp. 40-48.

In treating the question that arose regarding the matter of counsel, the trial court was governed by now well-settled principles. Under our State and Federal Constitutions, an indigent defendant in a criminal case is guaranteed the right to counsel (N.Y.Const., Art I, §6, **People v. Medina**, 44 N.Y.2d 199, 404 N.Y.S. 2d 588, (Ct. App. 1978) citing **Argersinger v. Hamlin**, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530; **Gideon v. Wainwright**, 372 U.S. 335, 83 S.Ct. 792, 9L.Ed 2d 799). The fulfillment of that obligation calls for more than merely pro forma appointment of or service by a member of the bar. The legal assistance provided must be "effective." **Id.** At 592. To ensure that it is, trial judges have a continuing duty, not to be lightly eschewed, to see to it that the proceedings are conducted with solicitude for the essential rights of the accused. **Id.** At 592. They should carefully evaluate serious complaints about counsel. **Id.** At 592. citing **United States v. Morrissey**, 2 Cir., 461 F.2d 66, 670; **cf. United States ex rel. Thomas v. Zelker**, D.C., 332 F.Supp. 595 (Frankel, J): "That where "good cause" does exist a court is well advised to effect a change of counsel. **Id** at 593 citing **e.g. United States v. Burkeen**, 6 Cir., 355 F.2d 241, 245, cert den. Submon., **Matlock v. United States**, 384 U.S. 957, 86 S.Ct. 1582, 16 L.Ed.2d 553; **United States v. Curtiss**, 2 Cir., 330 F.2d 278, 280 (Marshall, J); ABA Project on Minimum Standards for Criminal Justice, Standard Relating to Providing Defense Services, §5.3, p. 490. In deciding whether "good cause" exists, a court must take into account such circumstances as whether present counsel is reasonably likely to afford a defendant effective assistance and whether the defendant has unduly delayed in seeking new assignment. The commentary to §5.3 of the ABA Standards (op.cit., p.51) balance these considerations quite nicely:

"Since a relationship of mutual confidence between lawyer and client is important to the lawyer's fulfillment of his professional functions, where good cause is shown by the defendant why that confidence does not exist, the court should substitute counsel. **Id.** At 593. Here, the record is clear that Pagan stressed repeatedly that he wanted and needed counsel to proceed with him in the grand jury proceedings, and there is nothing in this court record that establishes that Pagan had indicated to the court that he wished to proceed pro se with counsel Vitale as his legal advisor. In fact, ADA Lydecker committed prosecutorial misconduct by deliberately misleading the grand jury when he stated: "Didn't you tell the judge that he was going to be your legal advisor?" ADA Lydecker knowing well that this statement was false and that when Pagan had appeared before Judge Lefkowitz he stressed that Vitale be removed as his counsel, moreover, he did not accept nor did he agree to accept Vitale as his legal advisor or attorney for this matter. In fact, during Pagan's grand jury testimony he stated, "I need an attorney. I need an attorney. He's not my attorney. He's not. I have something to say in reference to September 17th. The man Vitale advised me that there is no justice here." All ADA Lydecker replied here was, Out. Out." Pagan stressed further "You can't force me to have this man Vitale as my attorney." ADA Lydecker once again replied "Out" And Pagan was removed again by the two armed deputies. When he returned Pagan again stated "And again, he's not my attorney." "The judge assigned him to me." "I have a statement to give. As I stated before, I will make that statement with my attorney." Again, this lawyer Vitale told me that irregardless of what I say to you all here today, that it don't make a difference because based on the fact that it's a weapon and I have a criminal history, that you're going to indict me, irregardless of what I have to say. If I'm

58

going to testify, I would rather testify with an attorney that's protecting my rights. According to the Constitution, I have that right to have an attorney and he's not my attorney. This man has threatened me on many occasions in reference to if I don't help you with a murder charge and gun cases that the maximum sentence will be imposed against me, and that I will be indicted and all that. What kind of attorney is that?" I have testimony but I will do so with an attorney and he's not my attorney." He's not my attorney. I have no problem." "You're going to give up my right to testify. He's not my attorney. You can't make me testify without an attorney." "I didn't say I didn't want to testify." And ADA Lydecker replied "Please remove him" And again Pagan was removed by the two armed deputies. See **Exhibit "C" Tr. Pp. 40-48.** These statements certainly evident that Pagan did not desire to proceed in the grand jury with Vitale, and did not acknowledge Vitale as his counsel or legal advisor, and wanted and needed new counsel assigned to proceed with him in the grand jury.

Moreover, the record clearly establishes that Vitale did nothing to preserve issues on this record or preclude Pagan from making highly prejudicial remarks, and unrelated and uncharged prejudicial remarks regarding alleged crimes during his testimony before the grand jury, i.e.: when Pagan made the grand jury aware that he was imprisoned at "100 Center Drive, County Jail, Riverhead." "I have been informed by this man Vitale right here that anything that I say to you here today is irrelevant because you're going to indict me. You're going to indict me on my criminal history and the possession of a gun charge. That's what the man Vitale told me." "That it don't make a difference what I say in here today, that I'm going to be indicted based on my history and the fact that I have a

weapon's charge." "If I don't take a guilty plea, that I will be going in front of Judge Ohlig who gave a man 17-1/2 to life. See **Exhibit "C" Tr. Pp. 40-42.**

Notwithstanding, Pagan's repeated remarks that he would not cooperate with the District Attorney to put people in prison for murders and weapons possession. "And I would never help you in homicides trying to convict somebody of murder or guns. (Witness excused). " "...This man has threatened me on many occasions in reference to, if I don't help you with a murder charge and gun cases that the maximum sentence will be imposed against me, and that I will be indicted and all that. What kind of attorney is that?" See **Exhibit "C" Tr. Pp. 43, 45-46.** These aforesaid statements were critical and highly prejudicial to Pagan because the so-called legal advisor, Vitale, stood by and said nothing to keep Pagan from committing suicide before the grand jury. Vitale's presence in the grand jury provoked Pagan to explain why he did not want Vitale as his attorney or legal advisor, and by doing so, Pagan brought out the highly prejudicial remarks to the grand jurors regarding the unrelated and uncharged alleged crimes. **Notwithstanding, brought out the fact that Vitale had demanded of him to plead guilty. Moreover, the grand jury could have easily assumed from the aforesaid remarks that Pagan was aware of the alleged crimes and was withholding information from the prosecutor that may have involved Pagan (in one way or another) in those alleged unrelated and uncharged crimes and, therefore, if the prosecutor could not get him, the grand jurors may have felt the need to get Pagan for the prosecutor by indicting him on the weapon's possession charge to keep him in jail since they were well aware that he was already in jail. The remarks by Pagan about the unrelated and uncharged alleged crimes clearly made Pagan look like he was a ruthless criminal-minded person trying to get around the alleged unrelated and

60

uncharged crimes by saying nothing, therefore, deserving of any kind of indictment returned against him to keep him in prison and to punish him for the unrelated and uncharged alleged crimes. Moreover, because Pagan brought out the fact that Vitale had told him to plead guilty may have persuaded the grand jury to believe that he was in fact guilty of weapon's possession, therefore, the grand jurors may have assumed they were duty bound to indict Pagan since Vitale believed he was guilty based upon Vitale attempting to get Pagan to plead guilty.

These statements would not have come out had Vitale been any kind of a real attorney or legal advisor with his client's interests at heart or if Vitale was removed and new counsel assigned. In light of the facts above, Pagan felt compelled to bring the aforesaid statements to the grand jury's attention. Had Pagan been assigned new counsel rather then compelled to appear before the grand jury with a legal advisor, we can assume that new counsel would have protected the record by objecting to issues in the grand jury and speaking with Pagan about refraining from saying anything about the unrelated and uncharged alleged crimes Vitale had been attempting to get Pagan to cooperate with the prosecutor about, alleged crimes Pagan knew nothing about.

Let us assume Pagan failed to establish prejudice in the contents as explained above. Hence, despite defendant's failure to establish any actual prejudice or violation of their constitutional rights, dismissal of the indictment is the appropriate remedy. **People v. Williams**, 538 N.Y.S.2d 222, 226 (1989) citing **People v. Leahy,** 72 N.Y.2d 510, 534 N.Y.S.2d 658, 531 N.E.2d 290.

Once the submission of evidentiary facts creates an issue as to the validity of the judgment, the defendant is entitled to a hearing to determine the truth of his allegations. See **People v. Ausserau**, 77 A.D. 2d 152 and **People v. Session**, 34 N.Y. 2d 254.

The Court of Appeals in **People v. Crimmins**, 38 N.Y.2d 407, 416 makes it clear that "a hearing should be held to promote justice if the issues raised by motion are sufficiently unusual. Compare **People v. Perry**, 36 N.Y.2d 114; **People v. Ferreras**, 70 N.Y.2d 630. Also see **People v. Bennett**, 174 A.D.2d 1059. At the very least, this defendant should be resentenced for noncompliance with §390.40, subd. 2 C.P.L. (Presentence statements).

The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall enjoy the right ...to have the assistance of counsel for his defense...(U.S. Const. Amend. VI). The requirement of the assistance of counsel was first recognized by the Supreme Court in **Powell v. Alabama**, 287 U.S. 45. In interpreting the Sixth Amendment, the court held that the trial judge's failure to make an effective appointment of counsel has results in the denial of effective and substantial aid. **Id**. at 53. The Supreme Court has long recognized that the "right to counsel is the right to effective assistance of counsel" under the Sixth Amendment. **United States v. Cronic**, 466 U.S. 648 (1984); **Cuyler v. Sullivan**, 466 U.S. 335, 344 (1980); **McMann v. Richardson**, 397 U.S. 759 (1970); **Tollett v. Henderson**, 441 U.S. 258 (1973); **United States v. Morrison**, 449 U.S. 361, 366 (1981).

In giving meaning to the concept of effective assistance of counsel, both the State and Federal Courts have struggled with the very difficult problem of analyzing the facts of each case to determine whether counsel's efforts were competent and effective. In

determining whether the defendant received effective assistance of counsel, this court applies the well-established standards set forth by the Supreme Court in **Strickland v. Washington**, 466 U.S. 668 (1984). The Court, citing **McMann**, held that when a convicted petitioner complains of the ineffectiveness of counsel's assistance, the petitioner must show that counsel's assistance fell below an objective standard of reasonableness. **Strickland**, **supra**, 466 U.S. at 687-88, see also **Mills v. Scully**, 826 F. 2d 11982, 1197 (2nd Cir. 1987), citing **Maddox v. Lord**, 818 F.2d 1058, 1061 (2nd Cir. 1987).

In other words, the reviewing court's task is to determine whether, in light of all the circumstances, the lawyer's performance was outside the range of professionally competent assistance. **Strickland, supra**, at 690. The range of reasonable professional judgments are wide, and courts must take care to avoid legitimate second guessing of counsel's strategic decision from the superior vantage point of hindsight. **Id.** at 689. The two-part standard requires a showing that counsel's performance was deficient and that the deficiency in counsel's performance prejudiced the defendant. See **Lockhart v. Fretwell**, _____ U.S. ____, 113 S.Ct. 838 (1993).

As set forth in the application brought pursuant to N.Y. Criminal Procedure Law §440.10 and advanced herein in furtherance of the defendant's request, it is most respectfully submitted that counsel's performance fell below an objective standard of reasonableness, **Strickland, supra**, since performance was clearly inadequate.

For the foregoing reasons, the court should vacate the judgment of conviction and

grant such other and further relief as to this court may seem just and proper in the

circumstances.

Duly affirmed this 7 day of
Sept, 2004.



GEORGE M. HARMEL, JR.
Attorney for Defendant
33 Wheeler Road
Central Islip, New York 11722
(631) 234-5222

---

*See i.e.: **People v. Rivera**, 144 A.D.2d 258, 260, 533 N.Y.S.2d 858, 859 (1st Dept. 1988) "evidence of uncharged crimes may not be received unless its probative value exceeds the potential for prejudice resulting to the defendant."

**See i.e.: **People v. Rivera**, 144 A.D.2d 258, 260, 533 N.Y.S.2d 858, 859 (1st Dept. 1988)-"evidence of uncharged crimes may not be received unless it's probative value exceeds the potential for prejudice resulting to the defendant." Here, Pagan was never charged with any crimes in which the mask, gloves, pants, and fake beard were allegedly used.

EXHIBIT "D"

submissions on the motion [People v. Satterfield, 66 NY2d 796; CPL 440.30].

It is the defendant's contentions that he was denied the effective assistance of trial counsel largely due to trial counsel's failure to cross-examine the arresting officers with respect to certain documents purportedly found in the vehicle along with the gun and for failure to investigate and possibly call as witnesses the named individuals on those documents in an effort to establish that these individuals, though not present in the car at the time of the arrest, were the true owners of the gun.

It is without dispute that both the Federal and State Constitutions guarantee the right to the effective assistance of counsel (US Const 6th Amend; NY Const Art I, 6]. However, what constitutes effective assistance cannot be defined with exact precision but will vary according to the particular circumstances of a given case (See, People v. Rivera, 71 NY2d 705; People v. Droz, 39 NY2d 457). A convicted defendant, with the benefit of hindsight, can often point out where he thinks his trial attorney went wrong.

But, as the Court of Appeals in People v. Baldi, 54 NY2d 137, has stated "trial tactics which terminate unsuccessfully do not automatically indicate ineffectiveness, so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the of the representation, reveal that the attorney provided meaningful representation, the constitutional requirements will have been met." It has been said that the right to effective assistance of counsel guaranteed by both Federal and State Constitutions includes "the right to assistance by an attorney who has taken the time to review both the law and the facts relevant to the defense, and who is familiar with and is able to employ at trial basic principles of law and procedure" (People v. Droz, supra). A contention of ineffective

-2-

assistance of trial counsel requires proof of less than meaningful representation rather than mere disagreement with strategies, tactics and results (People v. Rivera, supra, citing People v. Benn, 68 NY2d 941).

The defendant in this case has failed to establish the requisite proof of less than meaningful representation. Defense counsel's actions in failing to cross examine the arresting officers relative to the documents as well as his decision not to call as witnesses the individuals named in the documents can reasonably be viewed as decisions relative to trial tactics and strategy and did not constitute ineffective assistance of counsel. Further, defendant's contention that the jury could have reasonably inferred that the gun could have belonged to the individual named in the documents and not the defendant is pure speculation, is entirely without merit and is irrelevant to the charge facing the defendant, that being Criminal Possession of Weapon in the Second Degree.

Therefore, contrary to the contentions of the defendant, it is the determination of this Court that defendant's trial counsel competently and professionally represented the defendant both with respect to pre-trial motions during hearings and at trial and afforded him "meaningful representation" as required by both State and Federal Constitutions.

Further, the Court has considered the balance of defendant's arguments raised in his motion and has determined them to be without merit.

Accordingly, based on the foregoing, defendant's motion to vacate his judgment of conviction on the grounds that he was denied the effective assistance of counsel, or for a hearing to determine same, is in all respects DENIED.

The above memorandum constitutes the decision and order of the Court.

SO ORDERED:

Dated: December 7, 2004

Hon. Louis J. Ohlig
J.C.C.

EXHIBIT "E"

COUNTY COURT: COUNTY OF SUFFOLK

-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

versus

CASE NUMBER
I-2623-98

CHRISTOPHER R. PAGAN,
          Defendant(s).

-------------------------------------------------------------X

AVF   COUNT ONE:     CRIMINAL POSSESSION OF A WEAPON IN THE
                                SECOND DEGREE

THOMAS J. DANKOWSKI
FOREPERSON

JOHN A. LAMONICA
ASSISTANT FOREPERSON
NOVEMBER-DECEMBER, 1998  TERM XII
GRAND JURY NUMBER 1B

JAMES M. CATTERSON, JR.
DISTRICT ATTORNEY
SUFFOLK COUNTY

## COUNT ONE

THE GRAND JURY OF SUFFOLK COUNTY, by this Indictment, accuse the defendant, Christopher R. Pagan, of the crime of CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE, AN ARMED FELONY, committed as follows:

The defendant, on or about September 17, 1998, in Suffolk County, possessed a loaded firearm with intent to use the same unlawfully against another.

ADDITIONAL statement(s) made by the defendant:

Date:    9/17/98   Time:    2:30 a.m. Place:    T r o o p e r
                                                Headquarters

Sum and Substance:  Got gun earlier in evening with the intention of going to Queens, New York to exchange the gun for a better one with an un-named individual so he could have a better gun for "jobs" he wanted to do.

Date:    9/17/98   Time:    2:20 a.m. Place:    In police car en-
                                                route to police
                                                station.

Sum and Substance:  I'm holding the gun for a friend.

COUNTY COURT : COUNTY OF SUFFOLK

-------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

- against -

CHRISTOPHER R. PAGAN,

                    Defendant.

-------------------------------------------X

NOTICE AND DEMAND

NOTICE PURSUANT TO CPL SECTION 710.30
DEMAND PURSUANT TO CPL SECTION 250.20

Case No. 2623-98

SIR / MADAM :

**PLEASE TAKE NOTICE** that the People intend to offer at a trial of the above entitled action, statement(s) by and/or identification(s) of the defendant contained in or attached to the accusatory instrument or otherwise specified below (times approximate):

[X]    Evidence of oral statement(s) made by the defendant to a public servant(s); the sum and substance of statement(s) is hereby set forth as follows and/or is contained within the accusatory instrument:

      Date: 9/17/98        Time: 2:15 a.m.        Place: E/B on Southern State Pky.
      Sum and Substance: **I have no license. The car is not running right, driver's door don't work, fuck.**

    [X]    **ADDITIONAL** statement(s) made by the defendant is/are outlined on page two of this form.

[ ]    Evidence of a video recording of the defendant's statement(s) to public servant(s) subsequent to his arrest. A copy of said recording has been provided.

      Date:        Time:        Place:

[ ]    Evidence of a written statement(s) made by the defendant to public servant(s); a copy of said written statement(s) is attached hereto and/or is attached to the accusatory instrument:

      Date:        Time:        Place:

[ ]    Testimony regarding an observation of the defendant at the time or place of the commission of the offense and/or upon some other occasion relevant to the case, such testimony to be given by a witness who has previously identified the defendant at an identification procedure. [The "No. of Witnesses" refers to number of witnesses making a positive identification]: The procedure utilized was:

| | | | | |
|---|---|---|---|---|
| [ ] | Showup: | Date _____ Time_____ Place _____ | No. of Witnesses _____ |
| [ ] | Photo Identification: | Date _____ Time_____ Place _____ | No. of Witnesses _____ |
| [ ] | Lineup: | Date _____ Time_____ Place _____ | No. of Witnesses _____ |
| [ ] | Other: | Date _____ Time_____ Place _____ | No. of Witnesses _____ |

**PLEASE TAKE FURTHER NOTICE** that if the defendant intends to offer, for any purpose, whatever testimony that he, at the time of the commission of the crime charged, was at some place or places other than the scene of the crime and he intends to call witnesses in support of such defense, he must, within eight days of service of such demand, serve upon the People, and file a copy thereof with the Court, a "Notice of Alibi" reciting (a) the place or places where the defendant claims to have been at the time in question, and (b) the names, the residential addresses, the places of employment, and the addresses thereof of every such alibi witness upon whom he intends to rely.

DATED:      November 20, 1998
                 Riverhead, New York

Yours etc.,

JAMES M. CATTERSON, JR.
District Attorney
County of Suffolk

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CHRISTOPHER PAGAN,

                Petitioner,

                                            CV-07-453(JS)

    -against-

WILLIAM BROWN, Superintendent,

                Respondent.

-----------------------------------------------------------------X

# EXHIBITS TO SUPPLEMENTAL PAPERS IN SUPPORT OF PRO SE PETITION BROUGHT UNDER 28 U.S.C. 2254

## ALAN M. NELSON, ESQ.

**Attorney for Defendant**

Office and Post Office Address, Telephone

3000 Marcus Avenue
Lake Success, New York 11042
(516) 328-6200