UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
CHRISTOPHER PAGAN,

                              Petitioner,                    **REPORT AND**
                                                            **RECOMMENDATION**
                -against-                                    CV 07-0453 (JS) (WDW)

WILLIAM BROWN, Superintendent,

                              Respondent.
--------------------------------------------------------X
**WILLIAM D. WALL, United States Magistrate Judge:**

        Christopher Pagan ("Pagan" or "Petitioner") petitions the court for a writ of habeas

corpus pursuant to 28 U.S.C. §2254, challenging a 1999 conviction in New York State Supreme

Court, Suffolk County, whereby he was found guilty of one count of criminal possession of a

weapon in the second degree, in violation of New York State Penal Law §265.03.  Petitioner was

sentenced to an indefinite term of 22 ½ years to life imprisonment.  At the time this Petition was

filed, he was incarcerated at the Eastern Correctional Facility.

        For the reasons set forth below, it is respectfully recommended that the petition be

denied.

## BACKGROUND

### I.    Factual Background

        Petitioner was pulled over by New York State Troopers for a routine traffic stop in the

early morning of September 17, 1998.  As will be discussed in greater detail *infra,* a loaded

firearm was recovered in the vehicle during the arrest, and Petitioner was ultimately convicted

for criminal possession of a weapon in the second degree.   At trial, the prosecution presented the

testimony of New York State Troopers Michael Mawn ("Mawn") and Jared Schwarz

("Schwarz"), New York State Police Investigator Daniel Regini, and Charles Hopkins of the Suffolk County Crime Lab. Petitioner did not present any witnesses in defense. The following facts are summarized from the testimony in the record of Petitioner's trial.

On September 17, 1998, New York State Troopers Mawn and Schwarz were on routine patrol on the Southern State Parkway in a marked Chevy Tahoe. Trial Transcript ("Tr.") at 121, 124. The officers were traveling eastbound at about 2:15 a.m. when Mawn observed a westbound gray Volkswagen make an illegal U-turn over the grass median and begin driving eastbound. *Id.* at 122, 126. Mawn saw that the vehicle, which was driving without headlights, was weaving between lanes, and that its driver was not wearing a seatbelt. *Id.* at 123-25. Mawn then activated his lights and proceeded to pull the Volkswagen over, intending to issue traffic tickets for the illegal U-turn, driving without headlights, and possibly no seatbelt. *Id.* at 125-26. After activating the patrol vehicle's lights, Mawn observed the Volkswagen's driver lunge towards the right front passenger seat. *Id.* at 127.

After the Volkswagen came to a halt on the grassy berm off the right side of the highway, Trooper Mawn approached the vehicle's driver side, while Schwarz approached the passenger side. Tr. at 129. Mawn observed the driver jump the console and exit through the passenger side near where Schwarz was standing. *Id.* at 129. When asked what he was doing, the driver responded that he was having car trouble. *Id.* at 130. According to Schwarz, Pagan said his driver's side door was not working, and he was unable to produce a license or registration. *Id.* at 243. According to Mawn, Pagan avoided eye contact during the interview and seemed generally apprehensive when faced with questioning. *Id.* at 132.

At that point, Mawn left Schwarz to continue the interview and again approached the

vehicle's driver's side to inspect the vehicle's ignition switch and registration certification for signs the car was stolen. Tr. at 133. Shining his flashlight into the passenger compartment, he saw the ignition was not "popped." *Id.* at 134. In the process, however, he noticed a stocking with eye holes in it on the passenger seat, along with several other items, one of which appeared to be a wig. *Id.* at 134-35. Based on his experience, Mawn associated these items with robberies. *Id.* at 135. He then entered the vehicle through the driver's side door, picking up the mask and what turned out to be a black beard. *Id.* at 135-36. As he put the beard back down on the seat he felt a solid object he believed to be a gun. *Id.* at 136. Mawn, inspecting further, discoverd that immediately beneath the beard was a black knit cap that contained a shiny silver gun. *Id.* at 136-37.

Mawn rejoined Schwarz behind the rear of the Volkswagen and placed Pagan under arrest. He did not tell Pagan about the gun. Rather, he informed Pagan he was being arrested because he had no identification and the Troopers had to figure out what was going on. Tr. at 138. Pagan was handcuffed and placed in the police vehicle. *Id.* at 139-40. Mawn took all the items from the front seat and brought them back to the police vehicle. *Id.* at 140. Upon observing the gun, Pagan said, "Oh fuck." *Id.* at 141. Mawn then proceeded to read Pagan his *Miranda* rights. *Id.* at 142. When asked if there was anything he wanted to say to the police at that time, Pagan answered "no." *Id.* at 146-47.

During the ride to the police barracks, Pagan said that he was holding the gun for a friend. Tr. at 149. Upon arriving at the barracks, Mawn gave the gun to his supervisor, Sergeant Hubbard. *Id.* at 150. The sergeant unloaded the weapon, which contained one bullet. *Id.*

Mawn then met with Investigator Daniel Regini and told him about the case. Tr. at 151.

He also provided the evidence to Investigator Regini. *Id.* at 151. Investigator Regini processed the evidence in the case. *Id.* at 270-74. He also re-administered *Miranda* rights to Petitioner and questioned him. *Id.* at 275-76. At that time, Pagan waived those rights and subsequently made certain admissions, including an assertion that he was returning the gun to the owner in Queens in order to get a better gun to do jobs with. *Id.* at 279.

Firearms examiner Charles Hopkins testified that he received the gun, one bullet, and the magazine. He performed testing, including test firing of the one bullet, and determined that the gun was operable. Tr. at 221, 224-25.

## II.     Procedural Background

### A.     Indictment and Pretrial Proceedings

Following Petitioner's September 17, 1998 arrest, his case was presented to a Grand Jury. The Grand Jury subsequently indicted petitioner for one count of second-degree Criminal Possession of a Weapon under New York Penal Law § 265.03(1)(b), a class "C" felony.

On March 9, 1999, a combined *Huntley/Mapp* hearing was held before the Honorable Louis J. Ohlig in the Supreme Court of New York, Suffolk County to determine whether the physical evidence and Petitioner's statements were properly obtained by officers of the New York State Police.[1] After the hearing, the court issued a written decision on April 8, 1999, holding there was probable cause to search Petitioner's car and seize the pistol and other physical evidence found therein. The court further held that Petitioner's statements were made voluntarily

---

[1]The hearing was held pursuant to (1) *People v. Huntley,* 15 N.Y.2d 72, 204 N.E.2d 179, 255 N.Y.S.2d 838 (1965) to determine whether Petitioner's statements were voluntarily made, and (2) *Mapp v. Ohio,* 367 U.S. 643 (1961), to determine the admissibility of the physical evidence seized from Petitioner's vehicle.

and were admissible at trial.

**B.**      **Trial and Sentencing**

A jury trial was scheduled to commence on April 14, 1999. Just prior to jury selection on that date, Petitioner made an application to the trial court for a one day adjournment for the expressed purpose of retaining new legal counsel. Petitioner stated that he was dissatisfied with his current counsel, John Bray, who had been appointed to represent him pursuant to County Law Article 18b and who had represented him at the suppression hearing. The court also noted that Mr. Bray was assigned after Pagan complained about Legal Aid's representation and stated to Petitioner that he "seem[ed] to have a pattern here of trying to delay or criticize or find fault with attorneys who represent you." Tr. at 6. The court denied the application, concluding that Petitioner's request was insincere; an attempt "to delay, to procrastinate, with the trial going forward." *Id.* at 12.

After a jury trial, Petitioner was convicted of second-degree criminal possession of a weapon. On May 25, 1999, he was sentenced as a persistent felony offender to prison for a term of 22 ½ years to life.

**C.**      **Post-Trial Motions**

In September 2004, Petitioner moved to vacate his judgment of conviction pursuant to CPL §440.10(1)(h), alleging ineffective assistance of counsel on the part of both Edward Vitale and John Bray as well as a violation of his right to counsel of his choice.[2] On December 7, 2004,

---

[2]Petitioner additionally moved, pursuant to CPL §440.20, to set aside his sentence on the ground that he was not properly found to be a persistent felony offender. That motion was also denied, but Petitioner has not raised this issue in his current petition, nor has he raised ineffective assistance of counsel.

the court denied Petitioner's motion, finding that Petitioner had received effective assistance of counsel and finding the balance of his claims to be "without merit." Petitioner's January 2005 motion for leave to appeal this decision was also denied on June 3, 2005. Though Petitioner attempted to seek further review by way of leave to appeal to the Court of Appeals, his application was dismissed on the ground that the Appellate Division's decision denying leave to appeal was not itself appealable.

### D.  Direct Appeal

Petitioner filed a Notice of Appeal of his conviction in March 2005. The direct appeal raised the following issues: (1) lack of probable cause to search Petitioner's vehicle; (2) the trial court committed reversible error by permitting an improper reference to Petitioner's post-Miranda silence; (3) Petitioner's post-Miranda oral statements were improperly admitted in violation of this right to remain silent; (4) failure to prove the weapon was loaded; and (5) failure to prove unlawful intent.

The Appellate Division affirmed the judgment of conviction in a decision dated November 7, 2005, finding there was probable cause for the police search of Petitioner's vehicle and that the lower court's denial of Petitioner's pretrial motion to suppress the fruits of the search was proper. The court held that Petitioner's remaining contentions were either unpreserved for review or without merit. *People v. Pagan*, 23 A.D.3d 412, 805 N.Y.S.2d 557 (2d Dep't 2005). The Court of Appeals subsequently denied Pagan leave to appeal. *People v. Pagan,* 6 N.Y.3d 779, 811 N.Y.S.2d 346 (2006).

### E.  Habeas Petition

Proceeding pro se, Petitioner filed his habeas petition in the Eastern District of New York

on January 28, 2007.  Following Respondent's March 19, 2007 filing of a Memorandum of Law in Opposition, Petitioner requested that the court appoint counsel to assist him in replying to Respondent's memorandum.  Thereafter, in April 2007, by order of the Honorable Joanna Seybert, Alan M. Nelson, Esq. was appointed to assist Petitioner in his reply.  Mr. Nelson submitted a Supplemental memorandum in support of the petition.

## DISCUSSION

Pagan's habeas petition challenges his conviction on the following grounds: (1) denial of petitioner's pretrial motion to suppress the physical evidence recovered from the search of his vehicle; (2) denial of his right to counsel of his choice; (3)  improper reference to his post-arrest silence; (4) improper introduction of various post-Miranda statements and admission made by Petitioner;  and (5) that the evidence presented was insufficient to sustain a verdict of guilt beyond a reasonable doubt.  Respondent, in turn, argues that Petitioner's claims are without merit, and that a number of them are procedurally barred due to a lack of prior state court review.

## I.    Applicable Legal Standards

### A.    Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, Publ. L. No. 104-132, 110 Stat. 1214 (1996), a habeas court considering a claim that was decided on the merits in a state court proceeding may grant relief only if the state court's decision was "(1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) based on an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d).  A state court decision is considered "contrary to" federal law if it either "applies a rule that contradicts the governing law set forth in

[the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of federal law occurs where the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id*. at 407-08. In other words, the state court's application must not merely be erroneous, but objectively unreasonable. *Id*. at 409.

## B. Exhaustion

It is well-established that "[a] district court must dismiss any petition for habeas corpus, brought pursuant to 28 U.S.C. § 2254, that contains issues not exhausted in the state courts." *McKethan v. Mantello,* 292 F.3d 119, 122 (2d Cir. 2002). A claim is considered exhausted when the state court was presented with "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General of New York,* 696 F.2d 186, 191 (2d Cir. 1982). Ordinarily "a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material . . . that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

Where a petition presents both exhausted and unexhausted claims, it is treated as a "mixed petition." A district court confronted with a mixed petition may 1) dismiss the petition, 2) stay consideration of the exhausted claims and hold the petition in abeyance while the petitioner returns to state court to exhaust the unexhausted claims, or 3) deny the entire petition on the merits if it finds that his unexhausted claims are plainly without merit. *See Rhines v.*

*Weber,* 544 U.S. 269, 277 (2005); *Mingo v. Ercole,* 2010 WL 4941483, at \*5 (E.D.N.Y. Nov. 30, 2010); *see also Zarvela v. Artuz*, 254 F.3d 374 (2d Cir. 2001). The federal habeas statute clearly provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. §2254(b)(2). The "stay and abeyance" option "is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Rhines,* 544 U.S. at 277.

Here, Respondent argues that two of Petitioner's claims, the introduction of various post-*Miranda* statements made by Petitioner and that the evidence presented was insufficient to sustain a verdict of guilt beyond a reasonable doubt, were neither raised nor adjudicated by the state court. Thus, Respondent argues, Petitioner presents a mixed petition of both exhausted and unexhausted claims. Petitioner disagrees with this assessment of his claims.

## II.  Petitioner's Claims

### A.  Fourth Amendment Right Against Unreasonable Searches and Seizures

 Petitioner challenges the trial court's denial of his motion to suppress the evidence recovered in the search of his vehicle. The federal court's review of Fourth Amendment claims is severely limited by the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465 (1976). The Second Circuit has noted that *Stone* "bars us from considering Fourth Amendment challenges raised in a petitioner's petition for habeas relief." *Palacios v. Burge,* 589 F.3d 556, 561 (2d Cir. 2009). This bar is "permanent and incurable" absent a state's failure to provide "a full and fair opportunity to litigate the claim." *Graham v. Costello,* 299 F.3d 129, 134 (2d Cir. 2002).

"To demonstrate the requisite lack of opportunity, petitioner must show that the state either (a) 'has provided no corrective procedures at all to redress the alleged Fourth Amendment violations,' or (b) 'has provided a corrective mechanism, but [he] was precluded from using that mechanism because of an unconscionable breakdown in the underlying process.'" *Crosby v. New York State,* 2010 WL 744522, at *6 (E.D.N.Y. Mar. 1, 2010) (quoting *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir. 1992)). It is clear that "the federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate." *Capellan,* 975 F.2d at 70 n.1 (internal quotation marks and citations omitted).

Not only does New York provide adequate procedures, the Petitioner took full advantage of those procedures including his participation in a pre-trial *Huntley/Mapp* evidentiary hearing that included witness testimony and cross-examination. He raised the suppression issue on direct appeal to the Appellate Division, Second Department, which held that the record supported "the County Court's determination to credit the police officer's testimony, which indicated that there was probable cause for search of the defendant's vehicle." *People v. Pagan,* 23 A.D.3d at 412, 805 N.Y.S.2d at 557-58 (citations omitted). As the Petitioner employed New York's corrective procedures, he must, to present this claim for habeas review, show that there was an unconscionable breakdown in the corrective process.

An unconscionable breakdown is one that "calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society." *Cappiello v. Hoke*, 698 F. Supp. 1042, 1050 (E.D.N.Y.), *aff'd*, 852 F.2d 59 (2d Cir. 1988). The Second Circuit has, by reference to citation, suggested situations that might possibly constitute an unconscionable breakdown, such as a trial dominated by an angry

mob, the use of torture to obtain a plea, or the knowing use of perjured testimony. *See Gates v.*

*Henderson,* 568 F.2d 830, 840 (2d Cir. 1977) (citing *Frank v. Mangum,* 237 U.S. 309 (1915),

and Bator, Paul M., *Finality in Criminal Law & Federal Habeas Corpus for State Prisoners,* 76

Harv. L. Rev. 441 (1963)).

Petitioner summarily argues that the trial judge "took great pains to deny suppression" by

making a *sua sponte* determination that evidence presented provided probable cause for Trooper

Mawn to believe the car contained evidence of a crime. P's Mem. at 28-29, DE [38-1]. He does

not expand on this contention, and absent more, his "mere dissatisfaction or disagreement with

the outcome of [his] suppression motion is not sufficient to establish that an 'unconscionable

breakdown' occurred in the existing process" in violation of his rights under the Fourth

Amendment. *Goodwin v. Duncan,* 668 F. Supp. 2d 509, 517 (W.D.N.Y. 2009) (citing *Capellan,*

975 F.2d at 71; *Gates,* 568 F.2d at 840). The alleged occurrences here simply do not constitute

the type of "unconscionable breakdown" that would warrant habeas review in the Federal Courts.

Since Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim in

the state courts, the issue is not amenable to habeas review. Accordingly, it is recommended that

this claim be denied.

**B.**     **Sixth Amendment Right to Counsel of Choice**

Petitioner asserts that the trial court committed a Sixth Amendment violation by denying

his application to adjourn the trial so he could retain new defense counsel. Respondent, in turn,

argues that the court's decision was consistent with federal law.

Petitioner relies in large part upon the Supreme Court decision in *United States v.*

*Gonzalez-Lopez*, 548 U.S. 140 (2006). In that case, the Court found that a violation of the Sixth

Amendment right to counsel "is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." *Id.* at 148. *Gonzalez-Lopez* does not suggest, however, that a constitutional violation occurs any time a defendant is denied counsel of his choosing, but instead stands for the proposition that the Sixth Amendment is violated whenever a defendant's choice of counsel is *wrongfully* denied. Indeed, Justice Scalia, writing for the majority, expressly reaffirmed that a defendant's right to counsel of his choice is constricted by, among other things, "the demands of [the trial court's] calendar," and its power "to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." *Id*. at 152 (internal citations omitted). Thus, the question to be addressed is whether the trial court's denial of Petitioner's application in this case was erroneous.

The Sixth Amendment right to counsel of choice is not an absolute right and "[a]bsent a conflict of interest, a defendant in a criminal case does not have the unfettered right to retain new counsel." *United States v. Brumer,* 528 F.3d 157, 160 (2d Cir. 2008) (quoting *United States v. Paone*, 782 F.2d 386, 392 (2d Cir. 1986)(citations omitted)). "In determining whether to allow a defendant to retain new counsel, the court must consider . . . the risks and problems associated with the delay, and whether substitutions would disrupt the proceedings and the administration of justice." *Paone,* 782 F.2d at 292 (citing *United States v. Llanes*, 374 F.2d 712, 717 (2d Cir. 1967) ("Judges must be vigilant that requests for appointment of a new attorney ... should not become a vehicle for achieving delay.")); *see also Washington v. Brown,* 2009 WL 1605553, at *8 (E.D.N.Y. June 8, 2009) (request denied where defendant advised court of his desire to change counsel immediately prior to hearing). Generally, delay is "a valid reason to deny a

motion to substitute counsel." *Brumer*, 528 F.3d at 161.

Where an application is made on the eve of trial, a defendant can only substitute new counsel when "unusual circumstances . . . such as a complete breakdown of communication or an irreconcilable conflict" are found to exist. *United States v. Miranda*, 152 F.3d 921 (2d Cir. 1998), (quoting *United States v. Schmidt,* 105 F.3d 82, 89 (2d Cir. 1997)); *see also Barratt v. Garvin*, 2000 WL 1364352, at * 5 (S.D.N.Y. Sept. 21, 2000) ("[E]leventh hour submission of an application for substitute counsel weighs against the finding of a Sixth Amendment violation." (internal quotation and citation omitted)). Indeed, a "belated substitution of counsel is warranted only by 'good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict.'" *Greene v. Brown,* 2007 WL 1589449, at *16 (S.D.N.Y. June 4, 2007) (quoting *McKee v. Harris,* 649 F.2d 927, 931 (2d Cir. 1981)), adopted by 2010 WL 1541429 (S.D.N.Y. Apr. 15, 2010). When determining whether a denial of an adjournment violated a petitioner's constitutional right, the court must look to the circumstances surrounding the denial to determine that the failure to grant a continuance was "so arbitrary as to violate due process." *Grotto v. Herbert,* 316 F.3d 198, 206 (2d Cir. 2003).

In the present case, Petitioner made his application on the very day his trial was scheduled to begin. Petitioner characterizes his request as for a "one-day" adjournment, apparently based on his statement that he had told Bray that he was "seeking other legal counsel, but we'll wait until tomorrow. I told him I would wait until tomorrow." Tr. at 4. At the time, however, there was no suggestion that Petitioner had even consulted with, let alone retained, private counsel. *See, e.g., Dotson v. Artus,* 2009 WL 6896840, at *3 (S.D.N.Y. July 30, 2009), adopted by 2010

WL 3825731 (S.D.N.Y. Sept. 29, 2010) (finding no constitutional violation in denying adjournment request where petitioner had given no indication "that his family actually had retained an attorney, let alone one who was ready to step into the jury selection or the rest of the trial"). The trial judge in the current case specifically noted that "[h]ad I seen an attorney here today making that application in your behalf, I may have given some credence to your desire to have another attorney here, but an attorney is not here." Tr. at 12. In addition, Petitioner gave the trial judge no reason to believe he had the financial capacity to forego assigned counsel and retain his own attorney.

Moreover, the reasons given by Petitioner in support of his request for the change in counsel did not constitute good cause for an eleventh-hour substitution. Petitioner stated that his reason for requesting an adjournment to retain new counsel was Mr. Bray's statement that "he's being forced to go to trial. He doesn't want to go trial," Tr. at 6, and further noted that "[u]p until this point I didn't have any complaint with Mr. Bray until he informed me and my wife of the things that he informed us of." *Id.* at 11-12. Mr. Bray stated that he did not use the word "forced," but rather told him that absent a plea, "[t]he only way is to resolve this is with a trial." *Id.* at 8. The trial judge further explained to Petitioner that the necessity of a trial was the natural consequence of Petitioner's decision to decline the plea offered by the prosecution. *Id.* at 7-8.

At most, Petitioner's complaints could be described in a failure in confidence with Mr. Bray, who had recommended that Petitioner accept the plea bargain. While a lack of confidence may be a factor in assessing good cause, the defendant must present legitimate reasons for his perceptions. Petitioner's feeling that Mr. Bray was "forced" into representing him at trial is not by itself sufficient cause for a last minute substitution. *See, e.g., Greene,* 2007 WL 1589449, at

*17 (defendant's feeling that counsel was paying insufficient attention to his case was not enough to warrant new counsel). Petitioner's personal preference for another attorney is also "an insufficient justification for delaying the start of a trial." *Persad v. Conway,* 2008 WL 268812, at *9 (E.D.N.Y. Jan. 30, 2008) (no good cause for last minute adjournment where request was based on defendant's "personal preference")

Petitioner has not established that his last minute request was made in an unusual situation, or that a complete breakdown in communications existed, or otherwise shown good cause for the desired change in counsel. Accordingly, the trial court's denial of his request was not erroneous. *See, e.g., United States v. Konstantin,* 280 Fed.Appx. 54 (2d Cir. 2008) (no erroneous deprivation of right to counsel of choice where defendant requested adjournment a week prior to trial because he was "displeased" with current counsel); *Nelson v. Smith,* 2008 WL 2357098, at *1 (N.D.N.Y. June 4, 2008) (no Sixth Amendment violation for disallowing substitution of new counsel on eve of trial where there was no breakdown of communication or an irreconcilable conflict between defendant and his counsel).

The trial judge's denial of a continuance and the state court decision upholding that ruling were not contrary to clearly established federal law, nor did they involve an unreasonable application of such law.[3] Accordingly, Petitioner's Sixth Amendment choice-of-counsel claim should be dismissed.

### C.      Improper Reference to Petitioner's Post-*Miranda* Silence

Petitioner next argues that his Fifth Amendment right to remain silent was violated when

---

[3]In addition, it is noted that Petitioner had already substituted counsel at least once before and federal habeas courts have been particularly unsympathetic to petitioners who demonstrated a pattern of substituting attorneys. *See Brumer*, 528 F.3d 157; *Persad*, 2008 WL 268812.

a witness for the prosecution made an express reference to Petitioner's refusal to answer questions immediately after being read his *Miranda*[4] warnings. According to Respondent, the court's allowance of the single reference to Petitioner's silence was not a constitutional error, and even if it was, the error was harmless.

Petitioner's claim rests on the principle first enunciated in *Doyle v. Ohio*, wherein the Supreme Court held that because a *Miranda* warning provides an "implicit" assurance that "silence will carry no penalty . . . it would be fundamentally unfair and a deprivation of due process to allow an arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). Cases applying *Doyle* often involve prosecutorial attempts to impeach a defendant's testimony regarding an exculpatory version of events by pointing to that defendant's failure to provide the story post-arrest. *See, e.g., Farakesh v. Artuz*, 2000 WL 1480896, at *10 (E.D.N.Y. Oct. 3, 2000) (violation where prosecutor in summation used the defendant's silence "to prove guilty knowledge" and to impeach his version of events). A *Doyle* violation is also said to have occurred where the fact of the defendant's post-arrest silence is submitted to the jury as evidence from which it is allowed to draw "any impermissible inference." *Greer v. Miller*, 483 U.S. 756, 764-65 (1987) (no violation where prosecutor was not permitted to undertake impeachment on, or call attention to, defendant's silence); *Grigg v. Phillips*, 2009 WL 2983030, at *9 (E.D.N.Y. Sept. 11, 2009), *aff'd*, 2010 WL 4673880 (2d Cir. Nov. 18, 2010) (violation where prosecutor's reference to defendant's silence in summation "was clearly aimed at convincing the jury that Petitioner's uncooperative behavior was a sign of his guilt").

---

[4]*Miranda v. Arizona,* 384 U.S. 436, 467-73 (1966).

Here, Petitioner points to the following exchange between the trial judge and Trooper Mawn, during which the court was attempting to clarify for the jury what Mawn meant, in lay terms, when he testified earlier that he had administered *Miranda* warnings to Petitioner:

> THE COURT: Tell me what you did concerning this arrest, with this defendant.
>
> THE WITNESS: I read him his rights. I told him he has the right to remain silent. I told him that anything he said could be used against him in a Court of Law. I told him if he had to got to trial over this matter, if he couldn't afford an attorney that an attorney would be provided for him by the court. And I asked him him if he understood these rights, he indicated he did *and I asked him if there was anything he wanted to say to us at this time and he said "no."*

Tr. at 147 (emphasis added). Petitioner's counsel immediately objected and moved unsuccessfully for a mistrial, the grounds for which were discussed at sidebar. Petitioner does not point to, nor can the court find, any other reference to his post-arrest silence anywhere in the trial transcript.

In determining whether this statement constitutes a *Doyle* violation, the court should look to the overall circumstances in which the statement was made and how it was used. In *Greer v. Miller*, the prosecutor posed only a single question regarding the defendant's post-arrest silence, and the defendant moved for a mistrial which was denied by the trial judge. *Greer*, 483 U.S. at 759. In finding no *Doyle* violation, the Court emphasized that the rule established in *Doyle* applied to the "*use*" of the post arrest silence and the permission by the court of that use. *Id.* at 763 (quoting *Doyle*, 426 U.S. at 619) (emphasis in original). The Court added that "[i]t is significant that in each of the cases in which this Court has applied *Doyle*, the trial court has

permitted specific inquiry or argument respecting the defendant's post-*Miranda* silence." *Id.* at 764 (citing *Wainwright v. Greenfield*, 474 U.S. 284, 285 (1986) (use in closing argument); *Fletcher v. Weir*, 455 U.S. 603, 603-04 (1982) (questioning); *Jenkins v. Anderson*, 447 U.S. 231, 233-34 (1980) (extended questioning and reference in closing argument); *Anderson v. Charles*, 447 U.S. 404, 405-06 (1980) (questioning)).

The isolated reference to Petitioner's post-arrest silence in the instant case does not amount to a violation of the Fifth Amendment as enunciated in *Doyle*. Here, there were no follow-up questions regarding Petitioner's refusal to submit to questioning at that time, nor did the prosecutor seek to portray Petitioner's post-*Miranda* silence as a tacit admission of guilt or suggest to the jury the defendant's guilt may be inferred from his invocation of the right to remain silent. *See, e.g., Lee v. Pallito*, 2010 WL 2265044, at *4 (D. Vt. Apr. 12, 2010), *adopted,* 2010 WL 2265046 (D. Vt. June 4, 2010) (no violation where "the prosecution did not actively promote an inference of guilt")*; Montano v. McCann*, 2009 WL 1033598, at *3 (N.D. Ill. Apr. 17, 2009) ("a jury's knowledge of a suspect's silence is not problematic 'when the knowledge is not used to subvert the defense' or put another way, when the prosecutor does not argue that the jury should infer guilt from the silence") (quoting *Splunge v. Parke*, 160 F.3d 369, 372 (7th Cir. 1998)). To the contrary, the prosecuting attorney in this case protested the questioning for fear of overstepping the bounds set by *Doyle*. The prosecutor neither pressed Officer Mawn on the issue during his examination, nor did he highlight Mawn's testimony regarding Pagan's silence during his summation. *Cf. Blackman v. Ercole*, 2009 WL 4891767, at *10 (E.D.N.Y. Dec. 17, 2009) ("The Court finds that the prosecutor's question to Petitioner . . . coupled with her comment during summation, amounts to a *Doyle* violation.")*; Grigg*, 2009 WL 2983030, at * 9

(finding *Doyle* violation where "[detective's] testimony, coupled with the prosecution's summation, improperly used Petitioner's silence against him"); *Farakesh*, 2000 WL 1480896, at *9-10 (violation where prosecutor questioned defendant and used his silence in closing argument). Therefore, it is recommended that the court find that the single contested statement in this case falls short of a *Doyle* violation.

Even, assuming *arguendo* that this single statement was a *Doyle* violation and thus a constitutional error, "a petitioner must still show that it was harmful." *Grigg*, 2009 WL 2983030, at *8 (citing *Leecan v. Lopes*, 893 F.2d 1434, 1442 (2d Cir. 1990)). For reversal, there must have been a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). "In determining whether this standard has been satisfied, court may consider a variety of factors, including '(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct.'" *Farakesh*, 2000 WL 1480896, at * 12 (quoting *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994)).

As discussed *supra,* the question at issue in this case came from the trial judge, and thus there was no conduct whatsoever by the prosecutor, much less "severe" action. Indeed, the prosecutor was concerned about the line of questioning possibly creating a *Doyle* problem.[5] Accordingly, analysis of this factor supports a conclusion that any error was harmless.

As to remedial steps taken by the trial court, the trial court did not issue a limiting instruction, nor did Petitioner's counsel request one. Petitioner argues that the absence of such

---

[5]Although the trial judge proceeded to ask the witness questions despite the prosecutor's concerns, the court does not find any basis in Petitioner's allegation that the trial judge "intentionally elicit[ed]" this testimony. *See* P's Supp. Mem. at 14.

an instruction is dispositive, citing the *Greer* case for the proposition that the alleged error could only be cured by a limiting instruction given by the trial court to the jury. Petitioner's interpretation of *Greer* is incorrect. In *Greer*, the Supreme Court found no *Doyle* violation where the trial court sustained a defense objection and issued a curative instruction following the only question that touched upon the defendant's post-arrest silence. *Greer,* 483 U.S. at 764. *Greer* is therefore properly understood as holding that the immediate issuance of a curative instruction can, under at least some circumstances, wholly preclude a finding of a *Doyle* violation. Put differently, the absence of an instruction merely leaves open the possibility that an alleged *Doyle* violation based on a single reference *might* not be harmless; it does not, however, mandate that result. In the circumstances of this case, the minimal risk of prejudice was not increased by the trial court's failure to provide a limiting instruction to the jury.

Finally, Petitioner's conviction for criminal possession of a weapon in the second degree was certain absent the purportedly prejudicial conduct. Under New York law, a person is guilty of this crime when he possesses a loaded firearm with intent to use it unlawfully against another. N.Y. Penal Law §265.03. In addition, New York law provides that the presence in an automobile of any firearm is presumptive evidence of its possession by all persons occupying such automobile at the time such weapon is found, and that possession of a loaded firearm is presumptive evidence of intent to use the same unlawfully against another person. *See* N.Y. Penal Law §§265.15 (3),(4); *People v. Gibbs,* 254 A.D.2d 209, 681 N.Y.S.2d 10 (1st Dep't 1998). There was sufficient evidence for the jury to conclude that he possessed the loaded firearm and to support the presumption that he intended to use it unlawfully.

Even if the single statement could be deemed to be a constitutional violation under

*Doyle,* Petitioner has not established that any error had a substantial or injurious effect on the jury. As any error was harmless, it is recommended that Petitioner's claim on this ground be dismissed.

**D.** **Admission of Petitioner's Post-*Miranda* Statements**

Petitioner claims that the trial court's denial of his motion to suppress and the prosecution's subsequent introduction of Petitioner's post-*Miranda* statements to Investigator Regini violated the Fifth Amendment. Respondent argues that the denial was proper based on Petitioner's having voluntarily waived his *Miranda* rights. Petitioner also raises this issue as a Sixth Amendment right to counsel violation, arguing that one he invoked his right to counsel, any further questioning was impermissible. Respondent disagrees, and further notes that the use of Petitioner's statments was never raised at state court as a right to counsel argument and thus is an unexhausted claim.

Petitioner was pulled over at approximately 2:15 a.m. on September 17, 1998. Tr. at 121-22. As discussed *supra,* Trooper Mawn read Petitioner his *Miranda* rights in the field and Petitioner answered "No" when asked whether he wished to say anything. He was then taken to the police barracks for processing. At the barracks, Investigator Regini took over and again advised Petitioner of his *Miranda* rights. *Id.* at 276. Petitioner indicated that he understood the rights, and when Regini asked Petitioner if he wished to speak to him, he "acknowledged yes." *Id.* at 276-77. Investigator Regini testified that later in the morning, Petitioner told him that he was returning the gun to its owner in Queens "for the specific purpose of getting another gun, a better gun to do jobs with." *Id.* at 279. Petitioner's counsel did not object to any of this testimony at the trial.

Citing *Minnick v. Mississippi*, 498 U.S. 146 (1990), Petitioner asserts that once a suspect invokes his *Miranda* rights, police may not reinstate interrogation unless counsel is present. Petitioner is mistaken; the presence of counsel is only required where the suspect has requested counsel in addition to invoking his right to remain silent.  *Id.* at 150-51; *see also Edwards v. Arizona*, 451 U.S. 477, 484 (1981) (holding that an accused "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him").  Moreover, the Supreme Court has found that a "suspect must unambiguously request counsel" in order to trigger *Edwards*.  *Davis v. United States*, 512 U.S. 452, 459 (1994).  In *Davis,* the accused's statement that "Maybe I should talk to a lawyer" was deemed insufficient to constitute a clear, unequivocal request for counsel.  *Id.* at 462.  Moreover, the "mere refusal" to answer questions after receiving *Miranda* warnings "cannot be viewed as a clear assertion of the right to counsel."  *Santos v. Artuz,* 2002 WL 718265, at *5 (E.D.N.Y. Mar. 8, 2002). .

Petitioner suggests that his spontaneous utterance of  "Oh fuck" made when he saw Trooper Mawn carrying the hat containing the gun, coupled with his response of "No" to the *post-Miranda* question of "Having these rights in mind do you wish to talk to us now?" constituted a request for an attorney.  P's Supp. Mem. at 17-18.  Petitioner acknowledges that this was, at best, an "implicit assertion" of his right to counsel, *id.* at 18, and as such, cannot seriously claim that his "request" was unambiguous.  As a matter of law, Petitioner's actions and/or statements in this case do not constitute an invocation of his right to counsel.  Even if Petitioner's right to counsel claim was not properly exhausted, as Respondent suggests, his claim should nonetheless be denied as it is plainly without merit.

Without a specific request for counsel, Petitioner's response of "No" can only be viewed as an invocation of the right to remain silent. *See Anderson v. Smith,* 751 F.2d 96, 101 (2d Cir. 1984); *Santos,* 2002 WL 718165, at *5. Thus, the court must examine whether use of Petitioner's statements violated his right to remain silent. Petitioner clearly invoked this right at the scene of his arrest when he answered "No" to the Trooper's question regarding whether he wished to make a statement. The fact of this invocation, however, does not end the inquiry. "As the Supreme Court ruled in *Michigan v. Mosley*, 423 U.S. 96, 102-03 & n.9 (1975), *Miranda* cannot 'sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.'" *Santos*, 2002 WL 718265, at *4 (quoting *Mosley,* 423 U.S. at 102-03). The ultimate question is whether, based on the totality of the circumstances, the accused's right to cut off questioning was "scrupulously honored." *Mosley*, 423 U.S. at 104.

Here, the officers in the field immediately ceased questioning Petitioner after he invoked his right to remain silent. Some time later at the station house, Petitioner was re-*Mirandized* by a new officer at the police barracks and "was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options." *Mosley,* 423 U.S. at 105. Where a defendant has invoked his right to remain silent, the police may resume questioning after new *Miranda* warnings have been given. *See Campaneria v. Reid,* 891 F.2d 1014, 1021 (2d Cir. 1989). There is no evidence that Detective Regini in any way threatened, intimidated, or coerced Petitioner into waiving his rights. Having again received the warnings, Petitioner voluntarily made statements that were admitted at his trial. On the facts

presented, I recommend a finding that Petitioner's right to remain silent was not violated.[6]  For

the foregoing reasons, it is recommended that Petitioner's claim regarding use of his post-

*Miranda* statements should also be denied.

### E.  <u>Insufficiency of the Evidence</u>

Petitioner asserts that "there was insufficient competent evidence presented at trial to

demonstrate [his guilt] beyond a reasonable doubt," citing the alleged introduction of hearsay

statements which ran afoul of the Sixth Amendment's Confrontation Clause.  Respondent claims

that this claim was not exhausted by petitioner in the state courts.  I find that, for the reasons

stated *infra,* Petitioner's claim is without merit and thus is properly denied whether or not it was

exhausted in state court.

To prove a violation of New York State Penal Law § 265.03(2), the People must prove

the defendant possessed a "loaded firearm with the intent to use the same unlawfully against

another."  A "loaded firearm" is one "loaded with ammunition or any firearm which is possessed

by one who, at the same time, possesses a quantity of ammunition which may be used to

discharge such firearm."  N.Y. Penal Law §265.00 (15).  As no other ammunition was in

Petitioner's possession, the conviction here turned on the determination of whether the gun was

loaded.  Petitioner argues that the only evidence submitted at trial on this issue was inadmissible

hearsay, and was thus introduced in violation of his Sixth Amendment right to confrontation.

At the trial, Trooper Mawn testified that upon arrival at the barracks, "I gave the gun to

_____

[6]Given the crime of which Petitioner was convicted, even if there was any error, it was
harmless.  His statement regarding getting a "better gun" goes to his unlawful intent, and, as was
discussed *supra,* the jury was permitted to presume unlawful intent from Petitioner's possession
of a loaded firearm.  Thus, there was ample evidence to convict Petitioner without his statements.

my supervisor, Sergeant Hubbard who was there at the time and told him what we had." Tr. at

150. Then the following exchange took place:

> Q: Was the gun loaded?
>
> A: He unloaded it. Yes, it was loaded.
>
> Q: How many rounds were in the gun?
>
> A: There was one, one bullet.

*Id.* There were no questions regarding whether Trooper Mawn was present when Sergeant

Hubbard unloaded the gun or whether Mawn's testimony was based upon his own personal

knowledge or what was reported to him by Hubbard.

Later in direct examination, Mawn was again asked about whether the gun was loaded:

> Q: Trooper, when you discovered the gun, was it, in fact, loaded?
>
> A: At that time it was loaded, yes, sir.
>
> Q: How many rounds were in the gun?
>
> A: There was one bullet.

Tr. at 172. The Court followed up regarding whether there was one bullet in the gun, to which

Mawn responded "I learned later at the station when it's unloaded by my sergeant that one bullet

was in the clip." *Id.* at 173.

Petitioner contends that evidence at trial "appears to be that than [sic] Trooper Mawn did

not actually observe this occur." P's Mem. at 21. Petitioner does not state why he believes that

Mawn had no personal knowledge of whether the gun was loaded; to the extent he has support

for that belief, it was <u>not</u> presented to the jury. A plain reading of Mawn's testimony is that he

had personal knowledge that there was a bullet in the gun. While there is no express testimony

25

that Mawn actually observed the unloading, there is also no testimony that he did <u>not</u> witness it himself or that he was given this information by Sergeant Hubbard. Petitioner's counsel did not propound any questions regarding whether the gun was loaded or how Mawn came to learn it was loaded. Indeed, Petitioner's counsel himself referred to the gun as loaded in the presence of the jury when he asked Mawn "You didn't drive to the barracks with a loaded thirty-two automatic in your lap, did you?" Tr. 191.

Petitioner's counsel did not object to Mawn's testimony that the gun was loaded,[7] nor did he cross-examine Mawn on this issue. During a sidebar conference well after Mawn's testimony, Petitioner's counsel indicated his belief that "I don't think the trooper examined the gun. He didn't know if it was loaded or not . . . He said someone else told him." Tr. at 233. The trial transcript does not, however, support counsel's claim.

Simply put, Trooper Mawn's testimony supports a finding that he observed Sergeant Hubbard remove the single bullet from the gun and thus had personal knowledge that the gun was loaded. In fact, there is no trial testimony that suggests that Mawn did *not* observe the procedure himself. I conclude that Mawn's testimony before the jury supports a finding that the gun was loaded.

To the extent Petitioner's claim can be read as one challenging the sufficiency of the evidence, it must also fail. A habeas petitioner challenging the sufficiency of evidence bears "a very heavy burden." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). A habeas

---

[7]Petitioner claims that the objection was raised at sidebar. *See* Tr. at 232-33. There was, however, no contemporaneous objection to Trooper Mawn's testimony which Petitioner now claims is inadmissible hearsay. *See* CPL § 470.05 (2); *People v. Antongiorgi*, 242 A.D.2d 578, 662 N.Y.S.2d 526 (2d Dep't 1997); *see also People v. N'Guyen*, 184 A.D.2d 274, 585 N.Y.S.2d 29 (1st Dep't 1992).

challenge to the sufficiency of evidence "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original) (quoting *Woodby v. Immigration & Naturalization Serv.*, 385 U.S. 276, 282 (1966)). Rather, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *Id.* (emphasis in original).

For all the reasons discussed above, there was ample evidence that Petitioner possessed a loaded firearm with the intent to use the same unlawfully against another. It is recommended that this claim be denied as well.

## OBJECTIONS

A copy of this Report and Recommendation is being sent to counsel for all parties by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. §636 (b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a) and 6(d). Failure to file objections within this period waives the right to appeal the District Court's Order. *See Ferrer v. Woliver,* 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
   January 19, 2011

            /s/ William D. Wall
            WILLIAM D. WALL
            United States Magistrate Judge